## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN HOSPITAL ASSOCIATION<br>Liberty Place, Suite 700<br>325 Seventh Street, NW<br>Washington, D.C. 20004-2802<br><br>BAXTER REGIONAL HOSPITAL, INC. D/B/A/<br>BAXTER REGIONAL MEDICAL CENTER<br>624 Hospital Drive<br>Mountain Home, Arkansas 72653<br><br>COVENANT HEALTH<br>100 Fort Sanders West Boulevard<br>Knoxville, Tennessee 37922<br><br>RUTLAND HOSPITAL, INC. D/B/A RUTLAND<br>REGIONAL MEDICAL CENTER<br>160 Allen Street<br>Rutland, Vermont 05701<br><br>                    Plaintiffs,<br>          v.<br><br>KATHLEEN SEBELIUS, in her official capacity as<br>SECRETARY OF HEALTH AND HUMAN<br>SERVICES<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>                    Defendant. | Civil Action No. 14-cv-851 |

## <u>COMPLAINT</u>

Plaintiffs the American Hospital Association ("AHA"), Baxter Regional Medical Center,

Covenant Health, and Rutland Regional Medical Center (collectively, "Plaintiffs") bring this

mandamus complaint to compel the Secretary of Health and Human Services ("HHS") to meet

the statutory deadlines for administrative review of denials of claims for Medicare

reimbursement.  Lengthy, systemic delays in the Medicare appeals process, which far exceed

statutory timeframes, are causing severe harm to providers of Medicare services, like the Plaintiff hospitals.  HHS's unlawful delays are contrary to a clear statutory mandate requiring timely adjudication and must be eliminated.

## INTRODUCTION

1.      After hospitals and other healthcare providers furnish services to Medicare beneficiaries, they submit claims for payment to HHS, which processes them through the Centers for Medicare & Medicaid Services ("CMS") and its contractors.  Of claims that are denied, some are denied before payment, while others are first paid and then subsequently denied during post-payment review.

2.      Post-payment reviews often question the providers' medical judgment.  In a growing number of cases, original payment decisions are overturned based on reviewers' findings that certain services were not medically necessary and the providers, such as Plaintiff hospitals, must pay back the funds previously reimbursed.  That is so even when the review findings are incorrect.

3.      Providers have a right to contest denials (whether pre- or post-payment) through a four-level appeals process within HHS.  Each step of the process is governed by specific timeframes in which a decision must be rendered following receipt of the appeal.

4.      Engaging in the appeals process is frequently worthwhile:  When hospitals appeal the payment denials, including those made by post-payment reviewers who have a financial incentive to make findings adverse to hospitals, the decisions are very frequently reversed. Many reversals occur at the third level of the appeals process, where hospitals have a right to review of their claims by an Administrative Law Judge ("ALJ") within the HHS Office of

Medicare Hearings and Appeals ("OMHA").  This is the first opportunity for hospitals to obtain a hearing and review by an independent adjudicator.

5.      Over the past several months, however, extraordinary delays in the appeals process, particularly at the ALJ level, have effectively stymied hospitals from challenging payment denials.

6.      Although an ALJ's statutory deadline for holding a hearing and rendering a decision is ninety days from a hospital's filing of its appeal with OMHA, it is taking far longer than ninety days even to *docket* new requests for an ALJ hearing, let alone decide them.  Indeed, currently there is a twenty to twenty-four week delay for mere docketing into the case processing system.

7.      Delays at the ALJ level of the appeals process created a massive backlog of over 460,000 claim appeals by the end of 2013.  At that time, the average wait for a hearing – to say nothing of a decision – was approximately sixteen months and was expected to continue to rise as the backlog grew.

8.      Now the delays will be even longer still:  In December 2013, OMHA announced a moratorium on assignment of provider appeals to ALJs for at least the next two years, and possibly longer.  The ALJ hearing will not occur for many months after that, with a decision date likely even later.  Thus, the backlog grows as new appeals come in and old ones languish: Over 480,000 claim appeals were awaiting assignment with OMHA as of February 12, 2014, with 15,000 new appeals filed each week.

9.      When these excessive delays at the ALJ level are considered in conjunction with existing delays in other steps of the appeals process, the consequences are startling: hospitals will likely have to wait up to *five years*, and possibly longer, to have their claims proceed through a

four-level administrative appeals process that could otherwise conclude in less than a year according to statute.

10.     The stakes for America's hospitals are high—billions of dollars in Medicare reimbursement hang in the balance.  Deprived of the value of the services they already provided, hospitals are unable to use these funds to furnish patient care in their communities.  For some hospitals, the situation is dire.  Named Plaintiff Baxter Regional Medical Center has so much tied up in the appeals process that it cannot afford to replace a failing roof over its surgery department, purchase new beds for its Intensive Care Unit, engage in other basic upkeep, or purchase other necessary capital items.

11.     Because the appeals process, as currently operating, cannot provide adequate redress, Plaintiffs have no option but to bring this mandamus lawsuit to require the Secretary's compliance with the deadlines established by law.

## PARTIES

12.     Plaintiff AHA is a national non-profit corporation organized and existing under the laws of the State of Illinois with offices in Chicago, Illinois, and Washington, D.C.  The AHA represents more than 5,000 hospitals, health care systems, and other health care organizations, plus nearly 43,000 individual members, in matters before Congress, the executive branch, and courts.  Its mission is to advance the health of individuals and communities by leading, representing, and serving the hospitals, health systems, and related organizations that are accountable to the community and committed to health improvement.  The AHA provides extensive education for health care leaders and is a source of valuable information on health care issues and trends.  It also ensures that members' perspectives and needs are heard in national

health policy development, legislative and regulatory debates, and judicial matters.  The AHA brings this suit on behalf of its members.

13.     Plaintiff Baxter Regional Medical Center ("Baxter") is a 268-bed regional hospital located in Mountain Home, Arkansas—a town of only 15,000 people.  Baxter prides itself on offering a broad range of services in thirty medical specialties, including open-heart surgery, to the community it serves.  Without Baxter, patients living in the surrounding counties of north-central Arkansas and south-central Missouri would need to drive two to three hours for hospital care.  In 2013, Baxter was named by Moody's as America's fifth-most Medicare-dependent hospital, with Medicare responsible for sixty-five percent of its gross revenue.  Baxter currently has approximately $4.6 million tied up in the Medicare appeals process, more than $1.7 million of which is pending at the ALJ level.

14.     Plaintiff Covenant Health ("Covenant") is a community-owned health system located in East Tennessee, consisting of nine individual hospitals: Fort Sanders Regional Medical Center, Parkwest Medical Center, LeConte Medical Center, Methodist Medical Center of Oak Ridge, Morristown-Hamblen Healthcare System, Fort Loudoun Medical Center, Roane Medical Center (these seven hospitals collectively, "Covenant's Hospitals"), and two hospitals recently acquired in 2014.  Medicare accounts for fifty-five percent of gross revenue across Covenant's Hospitals.  Covenant's Hospitals have more than $7.6 million in system-wide claims pending in the Medicare appeals process, approximately $6.6 million of which is pending at the ALJ level.

15.     Plaintiff Rutland Regional Medical Center ("Rutland") is a 133-bed, community-owned rural hospital located in Rutland, Vermont.  Despite its small size, Rutland is the second largest hospital in the state of Vermont.  It offers the full scope of community hospital services,

including an outpatient cancer center and a cardiology department, as well as uniquely important services to the community it serves, such as an outpatient drug treatment center. Rutland also took over responsibility for provision of psychiatric health care when the state's psychiatric hospital closed after flooding from Hurricane Irene. In fiscal year 2013, Medicare was responsible for approximately forty-seven percent of Rutland's gross revenues. Rutland currently has approximately $588,000 tied up in the Medicare appeals process, of which approximately $554,000 is pending at the ALJ level.

16.     Defendant Kathleen Sebelius is the Secretary of HHS. This action is brought against Secretary Sebelius in her official capacity. The Secretary is responsible for implementing the Medicare program, Title XVIII of the Social Security Act, as amended, 42 U.S.C. § 1395 *et seq.* The Secretary administers the Medicare program through CMS, an agency of HHS. CMS also directs its contractors, which are responsible for the first two levels of administrative review of Medicare denials. OMHA and the Departmental Appeals Board ("DAB") within HHS provide the third and fourth levels of administrative review, respectively.

## JURISDICTION

17.     The Court has jurisdiction in this case pursuant to 28 U.S.C. § 1361 (jurisdiction for actions in the nature of mandamus).

## VENUE

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is an action against an officer of the United States in her official capacity, which is being brought in the District where the Defendant resides.

**FACTUAL BACKROUND**

### I.      The Medicare Program

19.     The Medicare program was enacted in 1965 under Title XVIII of the Social

Security Act to provide health insurance primarily to individuals sixty-five years of age and

older.  Social Security Amendments of 1965, Pub. L. 89-97, 79 Stat. 286 (1965) (codified as

amended at 42 U.S.C. §§ 1395-1396v).  The program's main objective is to ensure that its

beneficiaries have access to health care services.  *Id.* at 286.  The Plaintiff hospitals qualify as

providers of hospital services under Title XVIII, also known as the Medicare Act.

20.     In practice, when medical providers, such as hospitals, furnish services to a

Medicare beneficiary, the providers thereafter submit a claim for reimbursement to a Medicare

Administrative Contractor ("MAC").  42 U.S.C. § 1395ff(a)(2)(A).  MACs are government

contractors responsible for processing Medicare claims and making payments.  42 U.S.C.

§ 1395kk-1(a)(3).

21.     Some claims that are initially paid by MACs are then subjected to an additional

level of oversight.  In a process known as "post-payment review," third-party contractors audit,

and frequently reverse, MAC payment decisions.  The post-payment review process has imposed

significant burdens on the claim appeals process, particularly as the result of audits performed by

one type of such contractor, known as a Recovery Audit Contractor ("RAC").

22.     Permitted to audit MAC determinations on hospitals' claims dating back three

years, RACs have engaged in wide-ranging audits that often question the medical judgment of

the hospital and admitting physician.  It is in the RACs' interests to do so:  RACs themselves are

paid based on the amount of Medicare reimbursement they recover from hospitals for

purportedly "improper" payments.  Thus, RACs have an incentive to overturn MAC payment

decisions, particularly for more expensive services.  One of the most common – and very

lucrative – bases for a RAC reversal of a MAC's payment determination is a finding that a

hospital billed for an inpatient hospital stay when, in the RAC's view, appropriate care could

have been provided on an outpatient hospital basis.

23.     Aggressive and widespread auditing activity by the RACs predictably has affected

the number of hospital claim appeals.  An increasingly large percentage of the cases received by

OMHA results from RAC appeals.  *See* OMHA Medicare Appellant Forum Presentation at 108

(February 12, 2014), *available at*

http://www.hhs.gov/omha/omha_medicare_appellant_forum.html (last visited May 22, 2014)

(hereinafter "OMHA Forum Presentation").  For example, in fiscal year 2009, the last full fiscal

year before the permanent RAC program was instituted, there were 35,831 appeals filed with

OMHA for ALJ review.  *Important Notice Regarding Adjudication Timeframes*, Office of

Medicare Hearings and Appeals, U.S. Department of Health & Human Services, available at

http://www.hhs.gov/omha/important_notice_regarding_adjudication_timeframes.html

(last visited May 22, 2014) ("*Important Notice*").  In comparison, in fiscal year 2013, well after

the implementation of the RACs, 384,651 appeals were filed—more than ten times as many as

only four years earlier.  *Id.*; *see also* OMHA Forum Presentation at 16.  The value of appealed,

RAC-denied claims alone is well over $1 billion.  *See* AHA, Exploring the Impact of the RAC

Program on Hospitals Nationwide, at 47 (June 1, 2013), *available at*

http://www.aha.org/content/13/13q1ractracresults.pdf.

24.     RAC claim denials are frequently overturned on appeal.  According to data

provided to the AHA through the first quarter of 2013, hospitals reported that when they

appealed RAC denials, including up to an ALJ, the denials were overturned seventy-two percent of the time. *Id.* at 55.

## II.   The Appeals Process

25.   Appeals of both pre- and post-payment claim denials are subject to a four-step process, set forth by statute. *See* 42 U.S.C. § 1395ff.  The first two steps of the process are overseen by CMS; the third is overseen by OMHA; and the fourth is overseen by the DAB.  The steps are as follows:

a.   A denied claim is first presented to the MAC for redetermination. *Id.* § 1395ff(a)(3)(A).  In cases of a RAC denial following an initial MAC approval, the hospital presents the RAC-denied claim to the MAC that originally approved and paid the claim.  The MAC must render a redetermination decision within sixty days. *Id.* § 1395ff(a)(3)(C)(ii).

b.   If unsatisfied with the MAC's redetermination, a hospital can appeal the MAC's decision to a Qualified Independent Contractor ("QIC") for reconsideration. *Id.* § 1395ff(c).  QICs are tasked with independently reviewing the MAC's determination and must render a decision within sixty days. *Id.* § 1395ff(c)(3)(C)(i).

c.   Provided that the amount in controversy is greater than $140 (for calendar year 2014), a hospital may next request a hearing before an ALJ. *Id.* §§ 1395ff(b)(1)(E), 1395ff(d)(1)(A).  Review by an ALJ is the first opportunity for independent review of a claim. The ALJ is required both to hold a hearing and to render a decision within ninety days. *Id.*; 42 C.F.R. § 405.1016(a).  When they have been granted the hearing required by law, this is the level of the appeals process at which hospitals typically have been able to obtain relief from adverse RAC determinations.

d.      Finally, a hospital can appeal its claim to the DAB.  *Id.* § 1395ff(d)(2); 42

C.F.R.§ 405.1108(a).  In that event, the DAB conducts a *de novo* review of the ALJ decision and

either renders its own decision or remands to the ALJ for further proceedings.  *Id.*  In either

event, the DAB must act within ninety days.  *Id.*

26.      There is also a separate "escalation" process applicable to the QIC, ALJ and DAB

levels of review.

a.      Specifically, if the QIC is unable to complete its review within sixty

calendar days, it must notify all parties that it cannot complete the reconsideration within the

statutory timeframe and offer the hospital the opportunity to "escalate" the appeal to an ALJ.  42

U.S.C. § 1395ff(c)(3)(C)(ii); 42 C.F.R. § 405.970.  The QIC will continue the reconsideration

process unless and until the hospital files a written escalation request.  42 C.F.R. § 405.970(c)(2).

b.      Similarly, if an ALJ has not held a hearing and rendered a decision within

ninety days, a hospital may bypass the ALJ level by escalating its claim to the DAB.  42 U.S.C.

§ 1395ff(d)(3)(A).  In such situations, the QIC's decision becomes the decision subject to DAB

review.  42 C.F.R. § 405.1104; 42 C.F.R. § 405.1108(d).  That means that if the hospital has

previously escalated from the QIC, only the record before the MAC is available for review.  The

DAB may conduct additional proceedings, including a hearing, but (unlike at the ALJ level) is

not required to do so.  42 C.F.R. § 405.1108.  In fact, OMHA has explained that, in escalation

situations, the DAB will "NOT hold a hearing or conduct oral argument unless there is an

extraordinary question of law/policy/fact."  OMHA Forum Presentation at 117.  The DAB has

180 days in which to act on an escalation request, rather than its usual ninety.  42 C.F.R.

§ 405.1100(c)-(d).

c.      Likewise, if the DAB has not rendered a decision within ninety days on its

review of an ALJ's decision, a hospital may bypass the DAB and seek judicial review. 42 U.S.C. § 1395ff(d)(3)(B); 42 C.F.R. § 405.1132. In cases of an initial escalation past the ALJ level, a hospital may escalate the appeal to federal court if the DAB fails to render a decision within 180 days. 42 C.F.R. § 405.1132; 42 C.F.R. § 405.1100(d). In the event of this "double escalation," the only agency decision available to the federal court for review is the QIC's decision, made without a hearing. In the event of a "triple escalation" (from the QIC, from the ALJ, and from the DAB), only the MAC record is available for review.

## III.     The Delay

27.     The statutory time periods governing the appeals process provide for all levels of administrative review to be completed within about one year. In practice, however, the time it takes to pursue a claim appeal through HHS far exceeds the timeframes established by the Medicare Act.

28.     The moratorium declared by OMHA on assignment of appeals to ALJs will only exacerbate this problem, causing the DAB – and potentially the federal courts – to be inundated with claim appeals that never have received the benefit of a hearing

### A.     *The ALJ Backlog*

29.     Enormous increases in the rates of appeal, in significant part by providers challenging inappropriate denials by over-zealous RACs, have caused a massive backlog at the ALJ level of the appeals process. In just two years (2012 and 2013), the backlog of ALJ-level appeals *quintupled,* growing from 92,000 to 460,000 pending claims. Ex. 1, Memorandum from Nancy J. Griswold, Office of Medicare Hearings & Appeals, Chief Admin. Law Judge, to OMHA Medicare Appellants (Dec. 24, 2013) ("Griswold Memorandum").

30.     The ALJs simply have not kept up with the prodigious and growing volume of appeals.  The workload of OMHA's sixty-five ALJs increased by almost 300% from fiscal year 2012 to fiscal year 2013.  *See* OMHA Forum Presentation at 16.  In fiscal year 2013, of the 384,651 appeals that were filed, only 79,303 were decided – a meager twenty-one percent. OMHA Forum Presentation at 12 (reflecting decision figures); *Important Notice* (reflecting adjusted appeals receipts figures).

31.     Indeed, as of December 2013, appeals had languished for an average of sixteen months – approximately thirteen months longer than the ninety-day statutory deadline for a *decision* – before an ALJ even *heard* the case.  OMHA Forum Presentation at 11; s*ee* Ex. 1 (Griswold Memorandum).

32.     The backlog of appeals, and concomitant delay in adjudication, has reached a crisis point.  On December 24, 2013, OMHA's Chief ALJ, Nancy Griswold, announced that OMHA had suspended the assignment of all new provider appeals to ALJs, apparently as of July 15, 2013.  Ex. 1 (Griswold Memorandum).  The suspension is expected to last for a minimum of two years, with additional post-assignment hearing wait times expected to exceed six months when the suspension is eventually lifted.  *Id.*  As recently as February 14, 2014, Judge Griswold conceded that the wait times for a hearing before an ALJ are unacceptable.  Michelle M. Stein, *ALJs Lay Out Path Forward For Stakeholders As Appeals Backlog Continues*, INSIDE HEALTH POLICY, Feb. 14, 2014, *available at*

http://insidehealthpolicy.com/201402142461310/Health-Daily-News/Daily-News/aljs-lay-out-path-forward-for-stakeholders-as-appeals-backlog-continues/menu-id-212.html (last visited May 22, 2014).

33.     The situation is getting only worse.  OMHA received more than 15,000 appeals per week in February 2014.  OMHA Forum Presentation at 53.  OMHA has stated that it is currently projecting a twenty to twenty-four week delay even in *docketing* new appeals.  *Important Notice*.  From there, the new appeals will await assignment indefinitely, while the moratorium persists.  As of February 12, 2014, 480,000 appeals were awaiting assignment to an ALJ.  OMHA Forum Presentation at 57.  And OMHA's self-imposed suspension in processing of appeals does not alter the requirement that a provider appeal an unfavorable QIC decision within sixty days, meaning that the backlog at the ALJ level will increase dramatically as appeals continue to roll in without being assigned or decided.  *See* 42 U.S.C. § 1395ff(b)(1)(D)(ii); 42 C.F.R. § 405.1014(b)(1).

34.     The more than two-year moratorium on assignment of new appeals to an ALJ, taken together with the likely additional wait times for assignment even after the moratorium is lifted and the predicted wait times to obtain a hearing once a case is assigned to an ALJ, means hospitals lodging new appeals from the QIC to the ALJ can realistically expect to wait close to three years, and probably longer, even to *obtain an ALJ hearing* – let alone to receive a decision.  *See Important Notice*; Ex. 1 (Griswold Memorandum).

B.     *The DAB Backlog*

35.     The DAB – the last level of administrative review – is similarly inundated.  At the end of fiscal year 2013, the DAB had 4,888 pending appeals, 112% more than it had at the end of fiscal year 2012.  OMHA Forum Presentation at 106.  OMHA projects that 7,000 DAB appeals will be received in fiscal year 2014.  *Id.*  That number is expected to rise to over 8,000 for fiscal year 2015.  *Id.*  As with the ALJs, the DAB is seeing an increased caseload due to the behavior of the RACs and other Medicare contractors.

36.     OMHA itself recognizes that, like the ALJs, the DAB cannot keep up with the

dramatic increase in appeals.  It has conceded that the DAB is "unlikely to meet the 90-day

deadline for issuing decisions in most appeals."  OMHA Forum Presentation at 110.

37.     This concession does not even account for the increase in escalated cases the

DAB will receive, where an ALJ has failed to render any decision and the DAB is forced to

remand the case or begin and conclude adjudication from scratch, with only the record from the

QIC (or potentially even from the MAC) as a basis for review.

38.     Even if the DAB could find a way to adjudicate all of the appeals pending before

it, it is not equipped to conduct the full hearing that would otherwise occur at the ALJ level in

escalated cases.  There are just *four* Appeals Officers within the DAB responsible for final

administrative review of Medicare entitlement, managed care, and prescription drug claims in

addition to the hundreds of thousands of claims from providers such as Plaintiff hospitals

challenging fee-for-service payment denials.  OMHA Forum Presentation at 103-104.  And

publicly available information about the DAB's actions in escalated cases reveals that it has not

conducted a hearing in any of them.

39.     Instead, the DAB can take one of only four actions, all of which are inadequate.

First, it may render a summary decision on the basis of only the record established before the

QIC (or, in the case of a triple escalation, the MAC), which would not provide the due process

contemplated by the statute, in the form of an ALJ hearing.  42 U.S.C. § 1395ff(d)(1)(A).

Second, it may remand the appeal to the ALJ, which would place the hospitals in the same

position in which they started, waiting years for a relatively small number of ALJs to wade

through an enormous and increasing backlog of appeals, only now at the back of the ALJ line.

Third, the DAB may issue a notice that it, too, is unable to fulfill its statutory duty within the

required timelines and thereby allow hospitals to escalate their claims to federal court.  Or fourth, it may do nothing at all.

      C.    *Impending Federal Court Involvement*

      40.    Given the immense backlog at the ALJ level and the expected attendant increase in escalations to the DAB, itself already backlogged, hospitals are put to the difficult question whether to escalate their claims from the DAB to federal court, which cannot provide an adequate remedy in any event due to the lack of a meaningful administrative record upon which to base a decision.

      41.    Under the regulations, a hospital may file an action in federal district court if the DAB notifies it that no decision will be issued and if its claim meets an amount-in-controversy requirement (currently $1,430).  42 C.F.R. § 405.1132(b); 42 C.F.R. § 405.1006(c); Notice of Adjustment to the Amount in Controversy Threshold Amounts for Calendar Year 2014, 78 Fed. Reg. 59702-03 (Sept. 27, 2013).  Hospitals having claims that do not meet the amount-in-controversy requirement for escalation must simply wait out the delays at the agency level.

      42.    Those that do meet the amount-in-controversy requirement must decide whether to undertake an attempt at escalation.  As an initial matter, escalation may be thwarted by the DAB:  The DAB may prevent escalation to federal court by remanding the claim to the ALJ level, 42 C.F.R. §405.1108(d)(3), where the claim will languish in a futile loop of escalation and remand.  Under that scenario, hospitals that attempt to escalate may instead merely forfeit their position in the ALJ queue.

      43.    Alternatively, if the DAB permits escalation to federal court by providing notice that it will not issue a decision, hospitals must face the dilemma of whether to wait out the

lengthy administrative review delays or incur the cost of a federal court lawsuit that is neither an adequate remedy nor a viable alternative.

44.     Federal court escalation is not an adequate remedy for Plaintiffs and other hospitals because (a) an escalating Plaintiff or other hospital will have had no hearing as contemplated by the Medicare Act; and (b) the court will have before it only the record and determination made by the QIC (or the MAC) without a hearing and will lack the benefit of an independent ALJ's findings of fact and conclusions of law.

45.     In view of the undeveloped record before the federal court in the event of "double- or triple- escalation," because neither the ALJ nor the DAB (and possibly not even the QIC) rendered a timely decision on a hospital's claim, the federal court might remand the matter to the agency for fact-finding.  This result would leave Plaintiffs and other hospitals stuck in an endless loop of escalation and remand with no meaningful opportunity to be heard and no merits decision.

46.     Further, the cost of litigating claims in federal court may render escalation worthless in many cases.  Because the amount-in-controversy requirement for escalation to federal court is relatively low, hospitals must weigh the cost of federal court litigation against the total possible recovery.  In circumstances in which hospitals would pay more to litigate their claims than they could even recover, federal court escalation is not a viable alternative for Plaintiffs and other hospitals.  They are thus left with no adequate remedy for HHS's unlawful delays.

## III.    The Impact of the Backlog on Hospitals

47.     Hospitals are suffering nationwide under HHS's refusal to render decisions on appeals in a timely manner.  Whether claims denials are pre-payment – in which case hospitals

never receive payment for the value of their services – or post-payment – in which case hospitals must repay the amount initially reimbursed before they ever get to the ALJ level – hospitals are deeply out-of-pocket for services they already have rendered.

48.     The deprivation of funds tied up in the appeals process is a profound problem. These are funds that otherwise could be dedicated to patient care or to sustaining the hospital infrastructure necessary to provide patient care.  The delays in the system strain the cash flows of hospitals, many of which are already cash-strapped.  HHS's delay in meeting the statutory Medicare claim appeal deadlines thus presents a serious threat to hospitals nationwide and their ability to continue to provide quality patient care while maintaining financial viability.

49.     The Plaintiff hospitals have numerous claim denials delayed at various stages of the appeals process.  The delays, and the concomitant deprivation of funds, have caused and are continuing to cause severe harm to the Plaintiff hospitals.

A. *Baxter*

50.     Plaintiff Baxter currently has 144 claims at the ALJ level of the appeals process, of which 133 have been filed since July 15, 2013 and thus are subject to the moratorium on assignment of appeals to an ALJ.  Thirty-eight appeals, accounting for more than $337,000 in Medicare reimbursement, have been pending at the ALJ for longer than ninety days.  All told, more than $1.7 million in reimbursement for services that Baxter provided to Medicare beneficiaries is tied up at the ALJ level of the appeals process.

51.     The delays in the appeals process have had a crippling effect on Baxter's cash flow.  Funds tied up in appeals are funds that cannot be used to meet Baxter's essential needs. For example, the hospital has not been able to purchase basic equipment, like beds for its Intensive Care Unit.  Instead of replacing a failing roof over its surgery department, Baxter has

been able only to patch it.  The costs of Baxter's voluminous appeals of rehabilitation-related claim denials, combined with the delay in achieving resolution of those claims, has become so prohibitive that Baxter has considered whether it would be more financially prudent to *close* its rehabilitation center rather than to pursue the appeals.

   B.  *Covenant*

   52.    Covenant's Hospitals have approximately 1388 appeals currently pending at the ALJ level, of which approximately 812 have been filed since July 15, 2013 and are subject to the moratorium on ALJ assignment, and approximately 1350 have been pending for longer than ninety days.

   53.    The delays in adjudicating these pending appeals have significantly impaired Covenant's cash flow as it tries to "do more with less" across its system.  Funds tied up in the appeals process are not available for allocation among Covenant's Hospitals to address patient care needs in the various communities those hospitals serve.  Covenant, like Baxter, has considered whether, in light of the severe ALJ delay, it is financially prudent to continue to offer the full scope of rehabilitative services to the entire population of patients it currently serves.

   C.  *Rutland*

   54.    Rutland currently has 98 appeals pending at the ALJ level, of which 54 are newly-filed appeals that are subject to the moratorium on ALJ assignment and 7 are appeals that have been pending for longer than ninety days.  These pending appeals represent more than a half a million dollars in Medicare reimbursement for services that Rutland provided to its patients.

   55.    These are funds that Rutland could be using to advance its mission, but instead are held up in the ALJ delay.  Rutland also has had to implement a number of cost-cutting

measures in the wake of the ALJ delay to accommodate the cash flow deficiencies caused by the delay.

**V.      HHS Has Not Resolved The Unlawful Delays.**

56.      Despite public outcry and mounting pressure from the wide range of medical providers harmed by the unlawful delays, HHS has not taken action to remedy the situation.

57.      Prior to bringing this lawsuit, Plaintiff AHA sent a letter to CMS – responsible for the first and second levels of administrative review – urging it to cooperate with OMHA to remedy the backlog, noting that the moratorium is "a direct violation of [the] Medicare statute that requires ALJs to issue a decision *within 90 days of receiving the request for hearing*."  Letter from Rick Pollack, Executive Vice President of AHA, to Marilyn Tavenner, Administrator of CMS (January 14, 2014), *available at* www.aha.org/letters/2014?&p=8 (last visited May 22, 2014).

58.      On February 12, 2014, ninety-eight organizations sent a letter to Chief ALJ Griswold, "urg[ing] OMHA to develop a comprehensive solution to the Medicare appeal backlog problem" because "[t]he numerous appeals requirements, actual costs of filing appeals, and often lengthy delays undermine the ability of physicians to deliver patient-centered care."  Letter from the American Medical Association, et al., to The Honorable Nancy J. Griswold, Chief Administrative Law Judge, Office of Medicare Hearings and Appeals (February 12, 2014), *available at* http://www.aafp.org/dam/AAFP/documents/advocacy/payment/medicare/LT-HHS-MedicareAppealsBacklog-021214.pdf.

59.      On March 27, 2014, the Advanced Medical Technology Association ("AdvaMed") wrote to Defendant Sebelius and to the Administrator of CMS to express its concerns about the moratorium, explaining that "the policy will create significant harm for both

patients and providers."  Letter from Donald May, Executive Vice President of Payment &

Healthcare Delivery Policy at AdvaMed, to Kathleen Sebelius, Secretary of HHS, and Marilyn

Tavenner, Administrator of CMS, at 1 (March 27, 2014), *available at*

http://advamed.org/res/472/office-of-medicare-hearing-and-appeals-decision-to-suspend-

assignment-of-new-request-for-administrative-law-judge-hearings-for-adjudication-of-appeals

(last visited May 22, 2014).  AdvaMed criticized OMHA's moratorium as "plainly violat[ing]

the statute and contradict[ing] the purpose of the Medicare appeals process," and noted that the

moratorium only "perpetuates the backlog that eliminates the statutory schedule of appeal

reviews."  *Id.* at 2.

      60.     Yet the moratorium remains in place.  The ALJ backlog problem is egregious and

growing more so as appeals continue to mount without resolution by HHS.  OMHA has admitted

that it is not meeting its statutory deadlines and will not be able to do so any time in the near

future.  In the meantime, hospitals are deprived of crucial funds and stuck in endless

administrative holding patterns or forced to opt out of the only meaningful opportunity for

hearing by undertaking attempts at escalation.

## COUNT I
## Relief Under the Mandamus Act (28 U.S.C. § 1361)

      61.     Plaintiffs reallege and incorporate herein by reference all of the allegations

contained in paragraphs 1 through 60 above as if fully set forth herein.

      62.     The Mandamus Act, 28 U.S.C. § 1361, vests district courts with original

jurisdiction over any action in the nature of mandamus to compel an officer or employee of the

United States or any agency thereof to perform a duty owed to Plaintiffs.

      63.     Under federal law, HHS has a clear, indisputable, and non-discretionary duty to

"conduct and conclude a hearing on a decision of a qualified independent contractor . . . and

render a decision on such hearing by not later than the end of the 90-day period beginning on the

date a request for hearing has been timely filed." 42 U.S.C. §1395ff(d)(1)(A).

64.     HHS has breached this duty by acting in derogation of statute by, *inter alia*,

permitting its delegee, OMHA, to suspend the assignment of all new provider appeals to ALJs

for a minimum of twenty-four months and by failing to hold hearings and render decisions

within ninety days at the ALJ level.

65.     HHS's delays throughout the appeals process, and most notably at the ALJ level,

plainly violate the timetables set forth by Congress in the Medicare Act.

66.     HHS's delays in resolving Medicare appeals affect human health and welfare by

compromising the economic well-being of hospitals across the country.

67.     Absent mandamus, Plaintiffs have no adequate remedy.  Neither the DAB nor the

federal district courts can provide an adequate remedy to Plaintiffs.  The escalation process does

not provide a meaningful option for the reasons alleged above, including, *inter alia*, because it

deprives Plaintiffs of their right to a hearing, while imposing costs that threaten the very value of

the remedy Plaintiffs seek.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)  enter a declaratory judgment that HHS's delay in adjudication of Medicare appeals

violates federal law;

(b)  enter an order:

(i)  requiring HHS forthwith to provide Baxter Regional Medical Center, Covenant

Health, and Rutland Regional Medical Center the hearing before an ALJ and ALJ decision

required by law in each of their claim appeals pending at the ALJ level for ninety days or more;

(ii)  requiring HHS forthwith to provide Baxter Regional Medical Center, Covenant Health, and Rutland Regional Medical Center the resolution required by law in each of their claim appeals pending at the DAB for ninety days or more; and

(iii)  requiring HHS to otherwise comply with its statutory obligations in administering the appeals process for all hospitals;

(c) enter a judgment for costs and reasonable attorney's fees pursuant to 28 U.S.C. § 2412; and

(d)  grant such other relief at law and in equity as justice may require.

Respectfully submitted,

HOGAN LOVELLS US LLP

Dated:  May 22, 2014                    By:  /s/ Adam K. Levin
                                     Sheree R. Kanner (D.C. Bar No. 366926)
                                     Mitchell E. Zamoff (D.C. Bar No. 439383)
                                     Adam K. Levin (D.C. Bar No. 460362)
                                     Rebecca C. Mandel (D.C. Bar No. 976808)
                                     Jaclyn L. DiLauro (D.C. Bar No. 1010951)
                                     555 Thirteenth Street, N.W.
                                     Washington, D.C. 20004
                                     (202) 637-5600

                                     Melinda Reid Hatton (D.C. Bar No. 419421)
                                     Lawrence Hughes (D.C. Bar. No. 460627)
                                     American Hospital Association
                                     325 Seventh Street, NW
                                     Washington, DC 20001
                                     (202) 638-1100

                                     *Attorneys for Plaintiffs*