**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**AMERICAN HOSPITAL ASSOCIATION,**
*et al.*,

      **Plaintiffs,**

         **v.**

**SYLVIA M. BURWELL, in her official**
**capacity as SECRETARY OF HEALTH**
**AND HUMAN SERVICES,**

      **Defendant.**

Civil Action No. 14-851 (JEB)

---

<u>**MEMORANDUM OPINION**</u>

No one likes the waiting game, and Plaintiffs in this case are no exception.  As hospitals that provide services to Medicare patients, they have reimbursement claims languishing in an administrative process that is unable to manage an ever-growing backlog of appeals.  Without a change, these hospitals will likely have to wait years for resolution of these claims – and their money.  Seeking to break the logjam, Plaintiffs brought this suit against the Secretary of Health and Human Services for an order compelling her to process their administrative appeals in accordance with statutory timelines.  They now move for summary judgment, and the government simultaneously moves to dismiss.  While the Court sympathizes with Plaintiffs' plight, for the time being the waiting game must go on.  HHS's delay in processing their administrative appeals, while far from ideal, is not so egregious as to warrant intervention.  The Court, accordingly, will grant Defendant's Motion to Dismiss and deny Plaintiffs' Motion for Summary Judgment.

I.      **Background**

To understand the basis of Plaintiffs' claim here, a brief primer on Medicare

reimbursement may prove helpful.  After furnishing Medicare-eligible services, health-care

providers submit claims for reimbursement to Medicare Administrative Contractors or MACs.

See 42 U.S.C. §§ 1395kk-1(a)(1)-(4),1395ff(a)(2)(A).  If a claim is denied, a provider may

appeal through a four-step administrative process.  See id. § 1395ff.  First, it may present its

claim to the MAC for redetermination, which decision must occur within 60 days.  Id. §

1395ff(a)(3).  A provider may then appeal a negative redetermination to a Qualified Independent

Contractor.  A QIC must conduct an "independent, on-the-record review of an initial

determination, including the redetermination and all issues related to payment of the claim," and,

in so doing, it must "review[] the evidence and findings upon which the [previous determinations

were] based," together with "any additional evidence the parties submit or that the QIC obtains

on its own."  42 C.F.R. § 405.968(a).  The QIC also has 60 days to resolve claims.  Id. §

1395ff(c).   Both of these stages are overseen by the Centers for Medicare & Medicaid Services

(CMS) within HHS.

After these initial determinations, a provider whose claim has been denied may request a

hearing before an Administrative Law Judge.  See 42 U.S.C. §§ 1395ff(b)(1)(E)(i), (d)(1)(A).

The ALJ level of review is overseen by the Office of Medicare Hearings and Appeals (OMHA),

a division within the Office of the Secretary that is functionally and fiscally separate from CMS.

This is the first opportunity a provider gets for independent review of a denied claim.  See Def.

MTD & Opp., Att. 1 (Declaration of Nancy Griswold), Exh. 1 (July 10, 2014, Written

Testimony) at 3; Medicare Prescription Drug, Improvement, and Modernization Act of 2003

(MMA), Pub. L. No. 108-173, § 931(b)(2), 117 Stat. 2066, 2398 (2003) ("The Secretary shall

assure the independence of administrative law judges . . . .  In order to assure such independence,

the Secretary shall place such judges in an administrative office that is organizationally and functionally separate from [CMS].").  ALJs have 90 days to issue a decision from the time appellants request a hearing.  See 42 U.S.C. § 1395ff(d)(1)(a).  In the last stage of review, an ALJ's decision may be appealed to the Departmental Appeals Board (DAB).  See id. § 1395ff(d)(2).  The division of the DAB that actually reviews these claims is the Medicare Appeals Council, referred to as the "MAC" in regulatory provisions.  Following the convention of the parties, the Court will refer to it as the "DAB" to avoid confusion with the MACs that conduct initial determinations and redeterminations.  The DAB provides the final level of review within HHS, and its decision is considered that of the Secretary, subject to judicial review.  See 42 C.F.R. §§ 405.980, 405.1130; Def. MTD & Opp., Att. 4 (Declaration of Constance Tobias), ¶ 1.

Based on these statutory timelines, a Medicare appeal should pass through all four levels of review within a year or so – and for years they did.  See Griswold Testimony at 3.  Recently, however, the pipeline has become clogged with cases at the ALJ level.  Although OMHA has increased its productivity in response – the average number of dispositions per ALJ more than doubled between 2009 and 2013, and OMHA has added seven new ALJs – the workload far outstrips its capacity.  See id. at 3-4.

To see just how overworked OMHA is, it is instructive to look at the numbers.  Between 2012 and 2013, the backlog of ALJ-level appeals quintupled.  See Pl. MSJ, Exh. 3 (Memorandum from Nancy J. Griswold to OMHA Medicare Appellants dated Dec. 24, 2013) at 1.  In 2013, for example, OMHA received 350,629 appeals and decided only 79,303 of them. See id., Exh. 2 (OMHA Medicare Appellant Forum) at 16.  As of December 2013, it took an average of sixteen months before an ALJ even heard a case, and that wait is expected to continue

to grow along with the queue of pending appeals.  <u>See</u> Griswold Memo at 1.  Things have gotten

so backed up that OMHA has suspended assigning new hearing requests to ALJs (except from

Medicare beneficiaries, who appeal through the same process) for at least two years.  <u>See id.</u>  At

the moment, OMHA receives enough appeals every four to six weeks to keep it busy for a year.

<u>See</u> Griswold Testimony at 4.  The DAB, although not flooded to the same extent, is also

receiving more appeals than it can process.  <u>See</u> OMHA Forum at 106-08.  Based on the

increased caseload, the DAB admits that it is "unlikely" that it will "meet the 90-day deadline for

issuing decisions in most appeals."  <u>Id.</u> at 110.

So what happened?  Plaintiffs blame the surge in appeals on the introduction of Medicare

Recovery Audit Contractors or RACs.  RACs are private entities with whom the Secretary

contracts to audit provider-favorable MAC decisions in "post-payment" review.  <u>See</u> 42 U.S.C. §

1395ddd(f)(7)(A).  These contractors receive a cut of any improper payments they recover and

can challenge claims going back as far as three years.  <u>See</u> 42 U.S.C. § 1395ddd(h)(1); Statement

of Work for the Medicare Fee-for-Service Recovery Audit Program at 9-10, <u>available at</u>

http://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-

audit-program/downloads/090111racfinsow.pdf.  According to Plaintiffs, it is the RACs' over-

auditing that has backed up the appeal process: "As Medicare's only contingency-fee-based

contractors, RACs have engaged in wide-ranging audits of Medicare claims, frequently

questioning the medical judgment of health care providers and denying claims for the types of

services that qualify for the largest amount of reimbursement."  Pl. MSJ at 3.  The way Plaintiffs

see it, more meritless post-payment challenges by RACs means more appeals by providers, and

more appeals means a longer wait.  The agency does not deny that RACs have played a part in

the increased appeals, but it also attributes the spike to "more Medicare beneficiaries, increased

use of covered services," and "additional appeals from Medicaid State agencies."  Def. MTD &
Opp. at 1.

As to the delays, Plaintiffs are not without statutory recourse.  The Medicare Act provides
for a process referred to as "escalation," by which health-care providers may bypass the QIC,
ALJ, and DAB levels of review if those decisionmakers are unable to resolve their claims within
the statutorily prescribed timelines.  If, for instance, a QIC is unable to complete its review
within 60 days, an appellant may "escalate" its appeal to an ALJ.  <u>See</u> 42 U.S.C. §
1395ff(c)(3)(C)(ii).  If an ALJ, in turn, has not rendered a decision within 90 days, a claimant
may escalate to the DAB, <u>id.</u> § 1395ff(d)(3)(A), in which case it is the QIC's decision that is
under review.  <u>See</u> 42 C.F.R. § 405.1104; 42 C.F.R. § 405.1108(d).  On escalated appeal, the
DAB has 180 days within which to act – as opposed to its typical 90-day deadline.  <u>See</u> 42
C.F.R. § 405.1100(c)-(d).  If, however, the DAB cannot render a timely decision, a claimant may
bypass it altogether and seek judicial review in federal court so long as its claim meets an
amount-in-controversy requirement (currently $1,430).  <u>See</u> 42 U.S.C. § 1395ff(d)(3)(B); 42
C.F.R. § 405.1132(b); 42 C.F.R. § 405.1006(c); Medicare Program; Medicare Appeals:
Adjustment to the Amount in Controversy Threshold Amounts for Calendar Year 2014, 78 Fed.
Reg. 59702-03 (Sept. 27, 2013).  Together, these provisions allow that, in the event any level of
the appeals process gets too far behind, claimants may leapfrog it and move on to the next stage.

According to Plaintiffs, however, escalation is not the panacea it might seem.  This is
because they believe ALJ review to be an invaluable step in the appeals process, which they do
not wish to forgo.  It represents the first opportunity for hospitals to provide oral testimony in
support of their cases, and claimants are able to engage with ALJs and respond to questions in
real time.  <u>See</u> Pl. MSJ, Exh. 11 (Declaration of Ivan Holleman), ¶ 11; <u>id.</u>, Exh. 12 (Declaration

of John Geppi), ¶ 14; <u>id.</u>, Exh. 14 (Declaration of John Wallace), ¶ 14.  Health-care providers are

also able to provide written submissions supporting their arguments to the ALJ.  <u>See</u> Geppi

Decl., ¶ 14.  If, however, a party escalates past the QIC and ALJ, the only record available for

review is the MAC record.  And although the DAB <u>may</u> conduct additional proceedings, it is not

required to do so.  <u>See</u> 42 C.F.R. § 405.1108(d)(2).  Indeed, for escalated claims the DAB has

admitted that it will not hold a hearing "unless there is an extraordinary question of

law/policy/fact."  OMHA Forum at 117.  As a consequence, hospitals find that they are most

likely to succeed on their appeals at the ALJ level.  <u>See, e.g.</u>, Geppi Decl., ¶ 13.

Because escalation does not provide sufficient relief, Plaintiffs feel compelled to bring

this suit.  Those filing are the American Hospital Association, Baxter Regional Medical Center,

Covenant Health, and Rutland Regional Medical Center.  They seek mandamus relief that would

force Defendant Sylvia Burwell, Secretary of HHS, to adjudicate their pending administrative

appeals in a timely fashion.  An Amicus for Plaintiffs, the Fund for Access to Inpatient

Rehabilitation (FAIR), also submitted a brief.  FAIR is a corporation comprised of inpatient

rehabilitation hospitals and rehabilitation units that have Medicare claims tied up in the appeals

process.  Plaintiffs now move for summary judgment, and the Secretary moves to dismiss for

lack of jurisdiction.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Holcomb v.</u>

<u>Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477

U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely

disputed must support the assertion" by "citing to particular parts of materials in the record" or

"showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1).  The moving party bears the burden of demonstrating the absence of a genuine issue of

material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

 Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim for relief

when the complaint "lack[s] . . . subject-matter jurisdiction."  To survive a motion to dismiss

under Rule 12(b)(1), Plaintiffs bear the burden of proving that the Court has subject-matter

jurisdiction to hear their claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992);

U.S. Ecology, Inc. v. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an

"independent obligation to determine whether subject-matter jurisdiction exists, even in the

absence of a challenge from any party."  Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006).

"For this reason 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny

in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."

Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C.

2001) (alterations in original) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal

Practice and Procedure § 1350 (2d ed. 1987)).  Additionally, unlike with a motion to dismiss

under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding

whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharms. v. FDA,

402 F.3d 1249, 1253 (D.C. Cir. 2005); see also Venetian Casino Resort, LLC v. EEOC, 409 F.3d

359, 366 (D.C. Cir. 2005) ("[G]iven the present posture of this case – a dismissal under Rule

12(b)(1) on ripeness grounds – the court may consider materials outside the pleadings."); Herbert

v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

**III.    Analysis**

A.  Jurisdiction vs. Merits

The first question the Court considers is whether the dispute here raises a jurisdictional

issue or can be decided on the merits.  This Court has "original jurisdiction of any action in the

nature of mandamus to compel an officer or employee of the United States or any agency thereof

to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  "Jurisdiction over actions in the

nature of mandamus," however, "is strictly confined."  In re Cheney, 406 F.3d 723, 729 (D.C.

Cir. 2005) (en banc) (internal quotation marks omitted).  Mandamus is "drastic," "it is available

only in extraordinary situations," and "it is hardly ever granted."  Id. (internal quotation marks

omitted).  To be entitled to mandamus relief, Plaintiffs must show they have "a clear and

indisputable right to relief," that the agency "has a clear duty to act," and that there is "no other

adequate remedy" available to them.  See United States v. Monzel, 641 F.3d 528, 532 (D.C. Cir.

2011) (citing Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002)).  "The party seeking

mandamus," accordingly, "has the burden of showing that 'its right to issuance of the writ is

clear and indisputable.'"  N. States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754, 758 (D.C.

Cir. 1997) (quoting Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 289

(1988)).  "[E]ven if the plaintiff overcomes all these hurdles," however, "whether mandamus

relief should issue is discretionary."  Cheney, 406 F.3d at 729.

"In resolving a motion to dismiss an action for relief in the nature of mandamus, courts

have characterized the issue as involving both a jurisdictional and a merits inquiry because, in

determining whether the court has jurisdiction to compel an agency or official to act, the court must consider the merits question of whether a legal duty is owed to the plaintiff under the relevant statute." Auburn Reg'l Med. Ctr. v. Sebelius, 686 F. Supp. 2d 55, 62 (D.D.C. 2010), rev'd on other grounds and remanded, 642 F.3d 1145 (D.C. Cir. 2011). "[I]f," therefore, "there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action. To this extent, mandamus jurisdiction under § 1361 merges with the merits." Cheney, 406 F.3d at 729; In re Medicare Reimbursement Litig., 309 F. Supp. 2d 89, 95 & n.4 (D.D.C. 2004).

Because the inquiries "merge," some district courts in this Circuit have treated the question of a clear and compelling duty on the merits. See, e.g., Banner Health v. Sebelius, 797 F. Supp. 2d 97, 118 n.18 (D.D.C. 2011) ("[I]f dismissal rests on a plaintiff's failure to point to a clear and compelling duty, it should be treated as a dismissal for failure to state a plausible entitlement to relief, not as a dismissal for lack of subject matter jurisdiction."). Others district courts have treated the question jurisdictionally. See, e.g., Nat'l Sec. Counselors v. CIA, 898 F. Supp. 2d 233, 267 n.21 (D.D.C. 2012) ("The D.C. Circuit has held that, to the extent the court must determine whether a 'clear and compelling' duty exists, 'mandamus jurisdiction under § 1361 merges with the merits' because if no 'clear and compelling' duty exists, the claim fails and the court also has no jurisdiction over the claim under 28 U.S.C. § 1361.") (quoting Cheney, 406 F.3d at 729).

In this case, the dual nature of the inquiry means that the Court can resolve Plaintiffs' Motion for Summary Judgment together with Defendant's Motion to Dismiss for Lack of Jurisdiction. This is so because whether HHS's delay is so unreasonable as to warrant relief requires the same analysis as whether the Court has jurisdiction to grant that relief. See Liberty

Fund, Inc. v. Chao, 394 F. Supp. 2d 105, 114 (D.D.C. 2005) ("Whether [Plaintiffs] have, in fact,

demonstrated unreasonable delay – and thus, a 'clear right' to relief under the Mandamus Act –

is intertwined with the merits inquiry . . . .").

    B.   Analysis of TRAC Factors

       This case, unlike many mandamus actions, does not concern an agency's refusal to act.

Instead, the issue here is agency delay.  In its analysis, the Court must determine whether such

delay is "so egregious" as to warrant relief.  See Telecommunications Research & Action Ctr. v.

FCC, 750 F.2d 70, 79 (D.C. Cir. 1984) (TRAC).  "There is 'no per se rule as to how long is too

long' to wait for agency action . . . .'"  In re Am. Rivers & Idaho Rivers United, 372 F.3d 413,

419 (D.C. Cir. 2004) (quoting In re Int'l Chem. Workers Union, 958 F.2d 1144, 1149 (D.C. Cir.

1992)).  Instead, courts in this Circuit – and the parties here – reference the "hexagonal contours

of a standard" identified in TRAC.  750 F.2d at 80.  In that case, the D.C. Circuit identified the

following six considerations as relevant in evaluating agency delay:

> (1) the time agencies take to make decisions must be governed by a
> rule of reason; (2) where Congress has provided a timetable or
> other indication of the speed with which it expects the agency to
> proceed in the enabling statute, that statutory scheme may supply
> content for this rule of reason; (3) delays that might be reasonable
> in the sphere of economic regulation are less tolerable when human
> health and welfare are at stake; (4) the court should consider the
> effect of expediting delayed action on agency activities of a higher
> or competing priority; (5) the court should also take into account
> the nature and extent of the interests prejudiced by delay; and (6)
> the court need not find any impropriety lurking behind agency
> lassitude in order to hold that agency action is unreasonably
> delayed.

Id. (citations and internal quotation marks omitted).  These factors "are not 'ironclad,' but rather

are intended to provide 'useful guidance in assessing claims of agency delay.'"  In re Core

Commc'ns, Inc., 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting TRAC, 750 F.2d at 80).  Indeed,

"[e]ach case must be analyzed according to its own unique circumstances. . . .  Each case will present its own slightly different set of factors to consider."  Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Board, 750 F.2d 81, 86 (D.C. Cir. 1984).

For the sake of clarity, the Court will reorder the factors to fit the specifics of this case. First, it will address the Secretary's failure to comply with statutory deadlines (factors one and two).  Then, it will examine the consequences of non-intervention to Plaintiffs and the public (factors three and five).  Next, it will consider the effect intervention might have on competing agency priorities (factor four).  Finally, it will weigh the Secretary's good faith in addressing the problem (factor six).

1. *Failure to Comply with Statutory Deadlines*

The first TRAC factors ask whether the agency's timeline of action is "governed by a 'rule of reason,'" the content of which may be found in a "timetable or other indication . . . in the enabling statute."  See 750 F.2d at 80.  The Secretary concedes that the 90-day statutory "timetable supplies the applicable rule of reason" in this case, and she does not deny that ALJs are in violation of this rule.  See Def. Rep. at 14.

Emphasizing that these have been called the "most important" factors, see In re People's Mojahedin Org. of Iran, 680 F.3d 832, 837 (D.C. Cir. 2012) (citation omitted), Plaintiffs seize on the agency's failure in this regard and argue that it alone justifies intervention.  They liken this case to People's Mojahedin, where the D.C. Circuit found that a twenty-month failure to act on a 180-day statutory deadline "plainly frustrate[d] the congressional intent and cut[] strongly in favor of granting [the] mandamus petition."  Id. at 837.  As was the case there, Plaintiffs argue that "[t]he specificity and relative brevity" of the deadlines here "manifest[] the Congress's intent" that HHS act promptly on appeals.  See Pl. MSJ at 20 (quoting People's Mojahedin, 680

F.3d at 837).  The deadline here, they point out, is shorter than in People's Mojahedin; the delay

is longer; and the agency has affirmatively declared it will not meet its deadlines in the future.

"In certain situations, administrative delays may be unavoidable," Plaintiffs concede, but

"extensive or repeated delays are unacceptable and will not justify the pace of action."  Id. at 21

(quoting Muwekma Tribe v. Babbitt, 133 F. Supp. 2d 30, 36 (D.D.C. 2000)); see also Am.

Rivers, 372 F.3d at 419 (While there "is 'no per se rule as to how long is too long' to wait for

agency action . . . , a reasonable time for agency action is typically counted in weeks or months,

not years.") (quoting Chem. Workers, 958 F.2d at 1149).

Although the Court agrees that HHS has violated its statutory framework, this conclusion

"does not, alone, justify judicial intervention."  In re Barr Labs., Inc., 930 F.2d 72, 75 (D.C. Cir.

1991).  As will become clear below, competing policy and budgetary concerns distinguish this

case from People's Mojahedin and reduce the heft of these first two factors.

### 2. *Consequences of Non-Intervention*

The Court next examines the possible effects of non-intervention.  The third TRAC factor

looks to the consequences the public faces if the Court does not intervene, and the fifth assesses

the "nature and extent of the interests prejudiced by delay."  750 F.2d at 80.  In this regard,

"delays that might be reasonable in the sphere of economic regulation are less tolerable when

human health and welfare are at stake."  Id.  Plaintiffs address these two together, claiming that

"the prejudice suffered by the Plaintiff hospitals is exactly the harm courts have found

particularly well-suited for mandamus relief: harm to patient health and welfare."  Pl. MSJ at 21.

Their argument runs as follows: Hospitals are deeply out of pocket due to denied claims.

Covenant's hospitals, for instance, have over $7 million worth of appeals currently pending at

the ALJ level.  See Geppi Decl., ¶ 8.  Baxter has so much tied up in appeals that it has been

unable to update its equipment or provide necessary repairs to its facilities, and its bond rating is at risk.  See Holleman Decl., ¶¶ 9, 14, 17.  Overall, the holdups have forced health-care providers to reduce costs, eliminate jobs, forgo services, and substantially scale back.  See Wallace Decl., ¶ 19; Geppi Decl., ¶¶ 18, 19; Holleman Decl., ¶¶ 14, 16.  While these are indisputably economic consequences, Plaintiffs conclude that in a case like this, where there is "a nexus between human welfare and 'economic' considerations," the ultimate consequences on "health services and facilities" "weigh[] in favor of compelling agency action based on unreasonable delay." Muwekma Tribe, 133 F. Supp. 2d at 39; Air Line Pilots Ass'n, 750 F.2d at 86 (finding that the third TRAC factor weighed in favor of relief where agency had delayed in adjudicating claims for unemployment-assistance payments).

Even if Plaintiffs are correct about the nexus, they point to very few specific services that are actually less available to the public as a result of the delays.  Besides generalized concerns that hospitals may have to scale back, the best they can do is to note that some rehabilitation facilities represented by Amicus have been "forced to avoid admitting certain types of patients" – i.e., those "with a lower extremity joint replacement or debilitated physical condition following an extended acute care hospital admission" – due to uncertainty about timely reimbursement. See Amicus Brief at 23.  While these are real consequences to health and welfare, they are not the kind of immediate and undisputed dangers that have weighed heavily in the TRAC analysis in other cases.  See, e.g., Pub. Citizen Health Research Group v. Comm'r, Food & Drug Admin., 740 F.2d 21, 34 (D.C. Cir. 1984) ("All scientific evidence in the record points to a link between salicylates and Reye's Syndrome . . . ."); Pub. Citizen v. Heckler, 602 F. Supp. 611, 613 (D.D.C. 1985) ("Officials at the highest levels of [the agency] have concluded that certified raw milk poses a serious threat to the public health.").

Plaintiffs' argument, moreover, ignores the bigger picture.  Nearly everything HHS does affects human health and welfare – and that context matters.  As the D.C. Circuit has noted, "[A]lthough this court has required greater agency promptness as to actions involving interests relating to human health and welfare, . . . this factor alone can hardly be considered dispositive when, as in this case, virtually the entire docket of the agency involves issues of this type." Sierra Club v. Thomas, 828 F.2d 783, 798 (D.C. Cir. 1987).  For this reason, the third and fifth TRAC factors weigh, if at all, only very lightly in favor of granting relief.  This now leads to the related and most significant consideration in this case: competing priorities.

     3.   *Competing Priorities*

Here lies the knotty heart of this case.  In analyzing the fourth TRAC factor, the Court must consider "the effect of expediting delayed action on agency activities of a higher or competing priority."  750 F.2d at 80.  On this front, the Secretary likens her situation to Barr Labs., a case in which the D.C. Circuit rejected a petition for mandamus against the Food and Drug Administration for prompt resolution of generic drug applications.  That case resembles the present one in several key respects.  First, the FDA in Barr Labs. had also violated a statutory deadline.  See 930 F.2d at 74.  Second, it had done so in similar orders of magnitude – taking up to 669 days to resolve applications it should have decided in 180.  See id.  Finally, the FDA's inaction there resulted in "fewer resources for other aspects of health care."  Id. at 75.  The Circuit, accordingly, faced the same question the Court does here: "not whether the [agency's] sluggishness has violated a statutory mandate," or whether its inaction affects health and welfare, "but whether [the Court] should exercise [its] equitable powers to enforce the deadline."  Id. at 74.  The Circuit declined to do so, and its rationale is instructive.

"Equitable relief," the Circuit noted, "particularly mandamus, does not necessarily follow a finding of a violation: respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." Id. That is why the effect on health and welfare was "irrelevant." Id. at 75. As is the case here, moreover, "[a]gency officials . . . [had] not just been 'twiddl[ing] their thumbs.'" Id. (quoting Board of Trade v. SEC, 883 F.2d 525, 531 (7th Cir. 1989)). In refusing to grant relief, the Circuit emphasized that it "ha[d] no basis for reordering agency priorities," and that "[t]he agency is in a unique – and authoritative – position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." Id. at 76. "Such budget flexibility as Congress has allowed the agency is not for [the Court] to hijack," it concluded. Id. "Perhaps," the Circuit observed, "Congress should earmark more funds specifically to the . . . program, but that is a problem for the political branches to work out." Id. at 75 (citation omitted). Because it was not the Circuit's place to enter into questions of agency priorities and budgetary constraints, it refused to do so. Id.; see also United Mine Workers, 190 F.3d at 552-53 (refusing to compel agency to act in face of eight-year delay that violated statutory requirements because expediting one rulemaking "might well delay rulemaking for other contaminants that are at least as dangerous"); Chao, 394 F. Supp. 2d at 120 ("The [D.C. Circuit has] suggested that competing priorities would be the most significant factor in any case where the agency delay was due to 'lack of resources' and the agency applied a 'first-come' approach.") (quoting Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003)).

These conclusions in regard to the FDA strike as strong a note with HHS in an area similarly constrained by budgetary concerns and competing agency priorities. As in Barr Labs.,

HHS's delays might injure hospitals and possibly affect health and welfare, but they do so as to all Medicare provider-appellants equally.  <u>See</u> Def. MTD & Opp. at 21.  HHS, OMHA, and the DAB have fixed resources to address the unprecedented appeals they are currently facing.  <u>See</u> Griswold Decl., ¶ 3; Tobias Decl., ¶ 6.  And although the Secretary has limited authority to transfer funds – the details of which are discussed below – myriad other concerns compete for any funding she might bring to the problem.  <u>See</u> Def. Rep. at 17 (noting examples such as operating the health-insurance Marteplace and housing unaccompanied alien children who arrive in the United States).  This is precisely the kind of conundrum the D.C. Circuit has cautioned courts against trying to solve.  <u>See</u> <u>Barr Labs.</u>, 970 F.2d at 76.

Plaintiffs are not persuaded.  They counter that there are several steps the Secretary could take to rectify the situation.  For instance, Plaintiffs claim, she could avail herself of funds within HHS to hire more ALJs.  <u>See</u> Pl. Opp. & Rep. at 17.  As the Secretary explains, however, OMHA is funded through its own appropriation.  <u>See</u> Department of Health & Human Services Appropriations Act, 2014, Pub. L. No. 113-76, Div. H, Title II, 128 Stat. 363, 380 (Jan. 17, 2014).  Transferring money into this appropriation requires authorization by Congress.  <u>See</u> 31 U.S.C. § 1532 ("An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law.").  And while it is true that the 2014 HHS Appropriations Act authorizes the Secretary to make certain transfers, it narrowly cabins that authority.  Transfers between appropriations cannot exceed 1% of any discretionary Department fund or 3% of a receiving appropriation.  <u>See</u> 2014 HHS Appropriations Act § 206, 128 Stat. 382 ("Not to exceed 1 percent of any discretionary funds . . . which are appropriated for the current fiscal year for HHS in this Act may be transferred between appropriations, but no such appropriation shall be increased by more than 3 percent by any such

transfer."). In OMHA's case, 3% of its $83,381,000 appropriation in 2014 would be less than $2.5 million. <u>See</u> Def. Rep. at 20. Such a meager bump in funding would do little to stanch the tide of appeals.

Plaintiffs offer a second option: the Secretary might "reprogram" funds in order to address the backlog. This suggestion, however, is no more helpful than the first. Reprogramming is generally a non-statutory arrangement by which an agency utilizes funds in an appropriation account for purposes other than those contemplated at the time of appropriation. <u>See</u> 1 Gov't Accountability Office, <u>Principles of Federal Appropriations Law</u> at 2-30 (3d ed. 2004). In other words, reprogramming merely shifts funds within an appropriation – an action that would not help Plaintiffs since it is the lack of funds <u>within</u> OMHA that is causing the problem.

Plaintiffs offer one final financial suggestion: force the Secretary to seek greater appropriations for OMHA. They note that in the same legislation in which Congress created OMHA, it also ensured that the Secretary could fund new ALJs. Specifically, Congress allowed that "[i]n addition to any amounts otherwise appropriated, to ensure timely action on appeals before [ALJs] and the [DAB] consistent with [statutory deadlines], there are authorized to be appropriated . . . to the Secretary such sums as are necessary for fiscal year 2005 and each subsequent fiscal year to," among other things, "increase the number of [ALJs]" and "increase the staff of the [DAB]." MMA § 931(c), 117 Stat. 2398–99. Plaintiffs argue that the Secretary could use this authorization to seek funding sufficient to meet the problem, and they invite the Court to force the Secretary to do so. <u>See</u> Pl. Opp. & Rep. at 19.

The Court declines that invitation. To begin, mandamus jurisdiction is not a license to intermeddle, and the Court is loath to horn in on the problem-solving efforts of the other two

branches of government.  Congress funds OMHA, Congress created the RAC program, and Congress is aware of the inundation of appeals – indeed, it has recently held hearings on the subject.  See Nancy Griswold, Testimony before the House Oversight and Government Reform Subcommittee on Energy Policy, Health Care and Entitlements, C-SPAN 11:55-13:35 (July 11, 2014), available at http://www.c-span.org/video/?320374-1/hearing-medicare-appeals-process. HHS and Congress are actively discussing what might be done about the glut of appeals.  So what might the Court do?  It makes little sense to force the Secretary to ask Congress for funding to solve a problem of which Congress is well aware.  At best, that would be an empty gesture, at worst judicial overstepping.

Plaintiffs are not done yet.  Finally, and perhaps tellingly, they claim that HHS should "rein in" RAC audits.  See Pl. MSJ at 25.  At the end of the day, this appears to be their true aim in bringing suit.  Although the other potential remedies are urged, the RACs are Plaintiffs' *bête noire*.  This suggestion, however, is no more helpful than the others.  As noted above, the RAC program was created by Congress with the purpose of recouping Medicare overpayments.  See, e.g., CMS, Recovery Auditing in Medicare and Medicaid for Fiscal Year 2012 at iv-v, 11, available at http://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/Recovery-Audit-Program/Downloads/Report-To-Congress-Recovery-Auditing-in-Medicare-and-Medicaid-for-Fiscal-Year-2012_013114.pdf. Although Medicare depends on prompt payment and the presumed honesty and accuracy of providers, Congress concluded that an outside check was necessary to discourage some from seeking to recover improper payments.  See Def. MTD & Opp. at 23.  RACs were introduced to serve as that check and have been successful in their role, recouping, for instance, $2.3 billion in 2012.  See Recovery Auditing at iv-v, 11.

Plaintiffs counter that this "success" is really just the result of overzealous auditing. According to one survey, hospitals have reported RAC denials being overturned 66% of the time on appeal.  <u>See</u> Pl. MSJ, Exh. 5 (RAC Survey) at 4, 55.  This, they take, as evidence that the Secretary is not doing enough to limit the scope of RAC activity and thereby reduce the influx of appeals.  <u>See</u> Pl. Opp. & Rep. at 24.  Plaintiffs' data, however, also reveals that those hospitals that won two-thirds of appealed RAC denials only filed appeals in half of the cases – which means that only a third of all reported RAC denials in that survey were ultimately overturned. <u>See</u> RAC Survey at 4.  More to the point, whether this or some other ratio of overturned RAC denials reveals auditing excess is a question fraught with policy considerations best left to the judgment of the Secretary and Congress.  To the extent that the RAC program is the cause of the delays, it was created by Congress and should be addressed by the Secretary and Congress together.

In the end, here is the state of affairs: OMHA has been saddled with a workload it cannot, at present, possibly manage.  Congress is well aware of the problem, and Congress and the Secretary are the proper agents to solve it.  In such situations – where an agency is underfunded and where it is processing Plaintiffs' appeals on a first-come, first-served basis – the Court will not intervene.  <u>See</u> <u>Chao</u>, 394 F. Supp. 2d at 120.  <u>TRAC</u> factor four, therefore, weighs heavily against intervention.

### 4. *Bad Faith*

Lastly, under <u>TRAC</u> factor six, "the good faith of the agency in addressing the delay weighs against mandamus."  <u>Chao</u>, 394 F. Supp. 2d at 120; <u>In re Am. Fed'n of Gov't Employees, AFL-CIO</u>, 837 F.2d 503, 507 (D.C. Cir. 1988) (refusing mandamus relief where agency showed "marked improvement in managing its docket, and there [was] little reason to believe" a court

order "necessary to sustain that improvement or . . . helpful in spurring greater effort").  Here

HHS has taken modest steps to increase ALJ work capacity: it is moving to electronic

processing, has added ALJs, provided support for ALJs, and offered alternative adjudication

options.  See Def. MTD & Opp. at 8-10.  Plaintiffs criticize these efforts.  They claim that such

measures do not establish good faith, considering the fact that even the Secretary acknowledges

that they will not solve the backlog problem.  See, e.g., Pl. Opp. & Rep. at 20-21.  That an

agency's efforts do not offer a perfect resolution, however, does not render them "bad faith," and

"the absence of bad faith" itself "is relevant to the appropriateness of mandamus."  Barr Labs.,

930 F.2d at 76 (citing Monroe Commc'ns, 840 F.2d at 946-47).  These steps, while not

substantial, are a move in the right direction.  The Court, accordingly, finds that TRAC factor six

weighs somewhat against intervention.

*      *      *

No one denies that OMHA's ALJs are unable to render decisions in accord with the

statutory guidelines laid out by Congress.  No one denies that this is a problem in need of a fix.

This Court, however, is not in a position to provide that fix.  Although a superficial accounting

might reveal a 2-2 tie among the factor groups, HHS's budgetary constraints, its competing

priorities, and its incipient efforts to resolve the issue together dictate that mandamus is not

warranted.  This conclusion is bolstered by the fact that Congress is aware of the situation and is

in a position to address the problem.  The Court hopes that the Secretary and Congress will

continue working together toward a solution and that OMHA will receive the resources

necessary to fulfill its obligations.  Hospitals that are owed reimbursement should not be

indefinitely deprived of funds.  The Court cannot predict whether, over time, if HHS and

Congress cannot adequately address the overflow of appeals, the <u>TRAC</u> factors might shift toward Plaintiffs.  In the meantime, they will have to wait along with everyone else.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss and deny Plaintiffs' Motion for Summary Judgment.  A separate Order so stating will issue this day.


<u>/s/ James E. Boasberg</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>December 18, 2014</u>