**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN HOSPITAL ASSOCIATION,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **SYLVIA M. BURWELL, in her official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES,** <br><br> Defendant. | Civil Action No.  14-851 (JEB) |

## MEMORANDUM OPINION

The best medicine can sometimes be hard to swallow.  More than two years ago, a set of Medicare service providers asked the Court to issue a writ of mandamus to compel the Secretary of Health and Human Services to process their long-pending claim-reimbursement appeals in accordance with statutory timelines.  The Court declined to do so, believing the matter best left to the political process.  The Court of Appeals disagreed, holding that this Court has jurisdiction to grant mandamus relief and remanding the case here for a determination on the merits.  In response, the Secretary now moves to stay the proceedings until September 30, 2017, to allow HHS to move forward on various administrative and legislative efforts designed to tackle the backlog of reimbursement appeals.  As was true two years ago, the Court is reluctant to intervene.  But the backlog and delays have only worsened since Plaintiffs first sought the

1

Court's help, and the Secretary's proposed solutions are unlikely to turn the tide. The Court accordingly will deny the Secretary's Motion for Stay.

**I.      Background**

The Court offered a primer on Medicare reimbursement in its first Opinion in this case. See Am. Hosp. Ass'n v. Burwell (AHA I), 76 F. Supp. 3d 43, 46-48 (D.D.C. 2014), rev'd, Am. Hosp. Ass'n v. Burwell (AHA II), 812 F.3d 183 (D.C. Cir. 2016). It now briefly reviews the aspects of the administrative-appeals process relevant to the instant Motion.

Health-care providers and suppliers submit an extraordinary number of Medicare fee-for-service claims on behalf of the program's beneficiaries — 1.2 billion in fiscal year 2014. See Gov't Accountability Office, Medicare Fee-for-Service: Opportunities Remain to Improve Appeals Process 1 (May 2016), http://www.gao.gov/assets/680/677034.pdf (GAO Report). A Medicare Administrative Contractor (MAC) processes each claim for reimbursement and decides whether to pay it or deny it as invalid or improper. See 42 U.S.C. § 1395kk-1(a). If the claim is denied, the provider may appeal.

The Medicare Act sets out a sequential four-step administrative-appeal process, each of which must be completed within a statutorily provided deadline: (1) redetermination by the MAC, which must be completed within 60 days, id. § 1395ff(a)(3)(A), (a)(3)(C)(ii); (2) on-the-record reconsideration by a Qualified Independent Contractor (QIC), which must be completed within 60 days, id. §1395ff(c)(3)(C)(i); (3) review, including a hearing, by an administrative law judge in HHS's Office of Medicare Hearings and Appeals (OMHA), which, absent a waiver, must be completed within 90 days, id. § 1395ff(d)(1)(A); and (4) review by the Medicare Appeals Council within the Departmental Appeals Board (DAB), which must render a decision or remand to the ALJ within 90 days. Id. § 1395ff(d)(2)(A). If the provider's claim is worth at

least $1,500, the DAB's decision is subject to judicial review. Id. § 1395ff(b)(1)(E)(i), (b)(1)(E)(iii); 42 C.F.R. § 405.1006(c); 80 Fed. Reg. 57,827 (Sept. 25, 2015). When a statutory deadline lapses before a decision has been made, moreover, a provider may leapfrog its appeal to the next stage through a process referred to as "escalation." See 42 U.S.C. §§ 1395ff(c)(3)(C)(ii), (d)(3)(A), (d)(3)(B); 42 C.F.R. §§ 405.1104, 405.1108(d), 405.1132(b).

Taking the statutory deadlines together, a Medicare-reimbursement claim should proceed through all four steps of the administrative-appeal process within one year — "and for years they did." AHA I, 76 F. Supp. 3d at 46. Recently, however, a massive accumulation of backlogged cases has triggered significant delays, particularly at step three — ALJ review. Between fiscal years 2010 and 2014, the number of appeals filed at step three grew 936% — from 41,733 to 432,534. See GAO Report at 11. By the end of FY2014, 767,422 appeals were pending at step three, see Mot., Exh. 1 (Projections Chart) at 26, and 96% of ALJ decisions were issued well after the 90-day statutory deadline. See GAO Report at 18. In FY2014, it took OMHA an average of 415 days to process a step three appeal; it now takes 935 days. See HHS, Office of Medicare Hearings and Appeals (OMHA): Current Workload — Decision Statistics (July 25, 2016), http://www.hhs.gov/omha/Data/Current%20Workload/index.html.

Plaintiffs point to the Recovery Audit Program, which was "fully implemented" in 2010, AHA II, 812 F.3d at 186, as the "primary culprit in creating and sustaining" the backlog. See Opp. at 5. Congress required the Secretary to set up the Program to identify under- and overpayments and recoup the latter. See 42 U.S.C. § 1395ddd(h)(1). To do so, the Secretary contracts with Recovery Audit Contractors (RACs), who are private entities that "audit provider-favorable MAC decisions in 'post-payment' review." AHA I, 76 F. Supp. 3d at 47 (citing 42 U.S.C. § 1395ddd(f)(7)(A)). RACs are paid on a contingent basis — they "receive a cut of any

improper payments they recover" — "and can challenge claims going back as far as three years." Id. (citing 42 U.S.C. § 1395ddd(h)(1); Statement of Work for the Medicare Fee-for-Service Recovery Audit Program 9-10, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program/downloads/090111racfinsow.pdf). Because a RAC's decision to deny payment of a reimbursement claim is "appealable through the same administrative process as initial denials, the RAC program has contributed to a drastic increase in the number of administrative appeals." AHA II, 812 F.3d at 187.

The Secretary agrees that the RAC Program is a contributor to the backlog, but also points to other sources: an increase in Medicare beneficiaries; a growing practice among some providers to appeal virtually every claim denial through ALJ review; and a significant rise in the number of appeals filed by Medicaid state agencies. See Mot., Exh. A (Declaration of Ellen Murray), ¶¶ 10-13.

Frustrated by the long delays, Plaintiffs — the American Hospital Association, Baxter Regional Medical Center, Covenant Health, and Rutland Regional Medical Center — filed suit in May 2014. They asked the Court to grant mandamus relief to compel the Secretary to adjudicate their pending administrative appeals in compliance with the statutory deadlines, as well as to comply with the statutory deadlines in administering the appeals process for all hospitals. See ECF No. 1 (Complaint) at 21-22. Plaintiffs then filed a motion for summary judgment, see ECF No. 8, and the Secretary moved to dismiss for lack of jurisdiction. See ECF No. 12.

The Court concluded that the jurisdictional and merits inquiries at issue merged and thus resolved the parties' motions together. AHA I, 76 F. Supp. 3d at 50. It analyzed six factors to determine whether the agency's delay was "'so egregious' as to warrant relief," id. (quoting

Telecomm. Research & Action Ctr. v. FCC, 750 F.2d 70, 79 (D.C. Cir. 1984)), and concluded that because of "HHS's budgetary constraints, its competing priorities, and its incipient efforts to resolve the issue," as well as Congress's awareness of the problem, mandamus was not warranted. Id. at 56. It thus denied Plaintiffs' motion for summary judgment and granted the Secretary's motion to dismiss for lack of jurisdiction. Id.

Plaintiffs appealed, and the D.C. Circuit reversed and remanded with instructions for further proceedings. The Court of Appeals explained that the jurisdictional and merits inquiries are distinct and should be approached separately. See AHA II, 812 F.3d at 190. It then addressed only the former, concluded that "the threshold requirements for mandamus jurisdiction are met," and reversed this Court's dismissal for lack of jurisdiction. Id. at 192. The Court of Appeals further directed this Court, on remand, to "determine whether 'compelling equitable grounds' now exist to issue a writ of mandamus," id., and identified factors weighing in favor of and against mandamus. See id. at 192-93.

On remand, this Court held a status hearing at which the Secretary submitted that a stay of proceedings would be appropriate. The Court requested briefing, and the Secretary has now moved to stay this action until September 30, 2017, the close of the next full appropriations cycle.

## II.   Legal Standard

"Cases may be stayed for any number of reasons. Parallel criminal prosecutions may be ongoing; dispositive appellate decisions may be pending; or the parties may otherwise desire some respite." Liff v. Office of the Inspector General for the U.S. Dep't of Labor, No. 14-1662, 2016 WL 4506970, at *2 (D.D.C. Aug. 26, 2016). "To accommodate these ups and downs of litigation," id., the Court possesses a "power to stay proceedings [that] is incidental to the power

5

inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 879 n.6 (1998) (quoting Landis v. N. Am. Co., 299 U.S. 248, 254-55 (1936)).

### III.   Analysis

Whatever this Court originally thought of the merits of this case, it must, of course, follow the Court of Appeals' direction on remand. In its opinion, that court set out several considerations weighing for and against mandamus, each of which this Court addresses in the subsections that follow. See Parts III.A, B, *infra*. Weighing those considerations, as well as acknowledging the fact that the backlog had worsened since this Court's 2014 decision, the Court of Appeals hypothesized that this Court, on remand, "might find it appropriate to issue a writ of mandamus ordering the Secretary to cure the systemic failure to comply with the deadlines." AHA II, 812 F.3d at 193. The Court of Appeals nonetheless cautioned that "if the district court determines on remand that Congress and the Secretary are making significant progress toward a solution, it might conclude that issuing the writ is premature" and "consider such action as ordering the agency to submit status reports." Id. If, however, "the political branches have failed to make meaningful progress within a reasonable period of time — say, the close of the next full appropriations cycle, . . . the clarity of the statutory duty likely will require issuance of the writ." Id.

As a threshold matter, it is important to note that the question immediately before this Court is whether to grant the Secretary's Motion for Stay, not whether to grant mandamus relief. Similar to the issuance of mandamus, however, which requires a balance of the equities, see id.

at 191, deciding whether a stay is appropriate requires the Court to assess the parties' asserted interests, weigh the equities, and exercise its judgment. See Air Line Pilots Ass'n, 523 U.S. at 879 n.6. The stay and mandamus inquiries thus are overlapping. The Court, consequently, structures its analysis of the Secretary's Motion for Stay around the Court of Appeals' factors for and against mandamus and the critical consideration of whether the legislative and executive branches are making "significant progress toward a solution." AHA II, 812 F.3d at 193.

      A.  Factors Against Mandamus

As the Court of Appeals observed, "Perhaps counseling most heavily against mandamus is the writ's extraordinary and intrusive nature, which risks infringing on the authority and discretion of the executive branch." Id. at 192. Granting the writ in this case would almost surely require the Secretary to significantly alter the agency's priorities and operations, particularly as to the RAC Program. The Court is mindful of the agency's "comparative institutional advantage" in this domain and of the practical challenges that would flow from denying the stay and granting the writ. In re Barr Labs, Inc., 930 F.2d 72, 74 (D.C. Cir. 1991); see also AHA I, 76 F. Supp. 3d at 51, 53-54.

Likewise, the Court must consider "the Secretary's good faith efforts to reduce the delays within the constraints she faces." AHA II, 812 F.3d at 192. The Secretary repeatedly has assured the Court that resolving the ALJ backlog is "a matter of the highest priority," Mot. at 2; Reply at 1, and has suggested the agency submit status reports every six months during the stay to enable the Court and Plaintiffs to monitor the political branches' progress in reducing the backlog. See Mot. at 10. Importantly, the Secretary appears to have devoted considerable effort to designing and implementing various administrative initiatives to target the backlog, as

documented in the declaration of Ellen Murray, Assistant Secretary for Financial Resources and HHS's Chief Financial Officer.  See Mot., Exh. A.

Echoing a point the Court made in its prior Opinion, the Court of Appeals also cited as a factor against mandamus "Congress's awareness of and attention to the situation." AHA II, 812 F.3d at 192 (citing 76 F. Supp. 3d at 56).  Though still true, the force of Congress's knowledge and ability to act as a reason to deny mandamus diminishes with the passage of time absent meaningful legislative action, particularly as the backlog and delays have worsened.

Finally, the availability of escalation as a remedy counsels against the conclusion that the delays are so egregious as to warrant mandamus relief.  Id. at 192.  As the Court of Appeals observed, however, escalation "may offer less than full relief." Id.  ALJ review is an appellant's first opportunity for a full evidentiary hearing, during which the provider may provide oral testimony and "engage with ALJs and respond to questions in real time." AHA I, 76 F. Supp. 3d at 48.  If a provider escalates past the QIC and ALJ, the DAB almost certainly will decide the appeal based only on the MAC record, for "although the DAB may conduct additional proceedings," id. (citing 42 C.F.R. § 405.1108(d)(2)), it will not do so "unless there is an extraordinary question of law/policy/fact." Id. (citation omitted).

B.  Factors for Mandamus

On the other side of the ledger are "several significant factors" favoring mandamus. AHA II, 812 F.3d at 193.  Notably, the delays have resulted in a "real impact on 'human health and welfare.'" Id. (quoting TRAC, 750 F.2d at 80).  The problem, as this Court earlier explained, is that "[h]ospitals are deeply out of pocket due to denied claims." AHA I, 76 F. Supp. 3d at 52.  In fact, Amicus Curiae The Fund for Access to Inpatient Rehabilitation reports that the problem has worsened.  See Amicus Opp. at 14.  Using statistics not available at the time

Case 1:14-cv-00851-JEB   Document 38   Filed 09/19/16   Page 9 of 16

of its previous brief to this Court, Amicus offers a bleaker picture in connection with this Motion. In March 2015, 249 rehabilitation hospitals — 21.5% of the rehabilitation hospitals that participate in Medicare — together had pending appeals worth $135 million. Id. at 4-5. Rehabilitation hospitals, moreover, win 80% of their reimbursement claims on appeal. Id. at 5. That figure is even higher — 87% — when the win rate is calculated using the value, rather than number, of the claims, id., suggesting the vast majority of that $135 million rightfully belongs with the hospitals. But as long as the claims are tied up in the appeals process, they cannot access those funds. Because of the consequent financial burden, some providers are "forced . . . to reduce costs, eliminate jobs, forgo services, and substantially scale back," all of which affects the quality and quantity of patient care. AHA I, 76 F. Supp. 3d at 52; see also Amicus Opp. at 13-14, 16-17. These problems likely will worsen in the coming years because, as discussed below, the backlog is projected to grow considerably absent legislative intervention. See Projections Chart.

In addition, the "substantial discretion" granted to the Secretary by Congress "to implement [the Recovery Audit Program] and determine its scope" — including to curtail it as necessary to meet the statutory deadlines — favors granting the writ, as "congressionally imposed mandates and prohibitions trump discretionary decisions." AHA II, 812 F.3d at 193 (citing 42 U.S.C. § 1395ddd(h)).

    C. <u>Progress Toward a Solution</u>

Considering only the above arguments, given the extraordinary nature of the writ and the Court's reluctance to insert itself into the management of a complicated agency process, the Court might be inclined to grant the Secretary's Motion for Stay. Yet there is one more consideration critical to the Court's ultimate decision: whether the administrative and legislative

fixes offered in the Secretary's briefing constitute progress sufficient to warrant pausing this litigation until September 30, 2017. Unfortunately, the Court must conclude that they do not.

The Secretary discusses two categories of interventions intended to combat the backlog: (1) administrative actions with and without impact projections — *i.e.*, estimates of the effect on the backlog; and (2) legislation to reform the appeals process and provide the agency with additional funding. The Court looks at each.

1. *Administrative Fixes*

The numerous administrative actions for which the Secretary has impact projections can be grouped into four buckets. First, efforts to promote settlements: The Centers for Medicare and Medicaid Services (CMS) within HHS, which oversees the first two steps in the appeals process — redetermination by the MAC and reconsideration by the QIC — recently settled approximately 260,000 inpatient-hospital claims currently awaiting ALJ review. See Murray Decl., ¶ 19(a). And staff at OMHA — the office that oversees ALJ review – is working to facilitate settlement conferences between CMS and appellants with a threshold number of claims and/or amounts at issue pending before OMHA. Id., ¶ 19(e). The Secretary projects that those settlement-conference facilitations will reduce the number of appeals currently pending at OMHA by 27,000 by the end of FY2020. Id.

Second, changes to the administrative-appeals process: An appellant now may waive its right to an oral hearing before an ALJ and instead have its appeal adjudicated on the record by an OMHA senior attorney advisor and then reviewed by an ALJ on the papers. Id., ¶ 19(g). Appellants with 250 or more claims pending at OMHA may elect to have OMHA adjudicate their claims using statistical sampling and extrapolation. Id., ¶ 19(f). OMHA also has received permission to reemploy retired ALJs on a temporary and intermittent basis to conduct hearings

and issue decisions part-time. Id., ¶ 19(h). Together, those interventions are projected to enable OMHA to process an additional 56,000 appeals by the end of FY2020. Id., ¶ 19(f)-(h). The Secretary, furthermore, has offered suppliers of diabetic-testing and oxygen equipment in certain jurisdictions the opportunity to discuss their claims with the QIC at the reconsideration level, submit additional supporting documentation, and receive feedback and information on CMS policies and requirements. Id., ¶ 19(d). That initiative is projected to reduce by 13,000 the number of appeals that otherwise would have reached OMHA by FY2020. Id., ¶ 19(d)(ii). More significantly, based on the information the QIC obtains from those discussions, it will reopen certain reconsideration decisions pending at OMHA, which will resolve more than 202,000 appeals currently pending at OMHA and, by FY2020, reduce the number of appeals that reach OMHA by 63,000. Id.

Third, front-end limitations on provider activity: In certain jurisdictions, providers and suppliers now must obtain authorization from a MAC before providing particular items or services. Id., ¶ 19(c). Prior authorization is projected to reduce by 269,000 the number of appeals that otherwise would have reached OMHA by the end of FY2020. Id.

Fourth, and finally, changes to the Recovery Audit Program: The Secretary has introduced three modifications to RAC contracts. Before referring a claim for recoupment, RACs must offer providers the opportunity to discuss the basis of the claim and submit additional information to substantiate it; RACs may only conduct a certain number of reviews under a given topic unless they get approval from CMS for further reviews; and RACs will be paid only after their decisions are upheld by a QIC in a reconsideration decision or the timeframe to file an appeal at step two expires. Id., ¶ 19(b). Together, the three contract modifications are

projected to reduce by 22,000 the number of appeals that reach OMHA by the end of FY2020. Id.

In addition to the administrative actions with projected impacts, HHS plans to attack the backlog with several actions for which it cannot currently estimate numerical impact, including expanding access to electronic case-adjudication processing and web-based appeal-management systems; beefing up oversight efforts to increase consistency and reduce erroneous denials; training ALJs and staff on Medicare coverage law, policy, and administrative-appeal procedures; reorganizing and updating existing field offices and opening new ones; assigning appellants with at least 200 appealed reconsiderations to the same ALJ; and improving communication between the various actors involved in the appeals process. Id., ¶ 21. HHS has also implemented initiatives to reduce the current and projected backlog at the DAB, as some of the actions just described will increase the number of appeals it receives. The DAB-focused initiatives involve hiring paralegals to help process cases, improving case management, and processing appeals electronically. Id., ¶ 24. In late June 2016, the Secretary issued a notice of proposed rulemaking that, if adopted, would codify many of the proposed administrative fixes in regulation. See Reply, Exh. A.

Let us pause here. The previous five paragraphs are packed with impressive-sounding action items and numbers appending multiple zeros. Summing up, HHS asserts that these administrative measures now underway for which it can project impact numbers will result in 50% fewer backlogged OMHA appeals in FY2020 than would exist absent the interventions. See Murray Decl., ¶ 20. Sounds like "significant progress toward a solution," doesn't it? Alas, no. As is often the case, the devil is in the details.

Even assuming each one of the Secretary's administrative fixes for which HHS can project impact numbers is implemented according to plan, the OMHA backlog will still grow every year between FY2016 and FY2020 — from 757,090 to 1,003,444 appeals. See Projections Chart. Admittedly, that is less bad than if the Secretary does nothing. Absent any intervention, the OMHA backlog at the end of FY2020 will be over 1,900,000. Id. But "significant progress toward a solution" cannot simply mean that things get worse more slowly than they would otherwise. It has to mean real movement towards statutory compliance. The process must improve. By the Secretary's own numbers, the proffered administrative fixes do not clear that bar.

The scope of the initiatives involving the RAC Program give the Court particular pause. At the end of April 2016, there were around 300,000 RAC-related appeals pending ALJ review, which constituted a sizable portion — 31% — of all pending OMHA appeals. See id., ¶ 2; Projections Chart. Yet the only RAC-related action the Secretary reports to be undertaking or planning to undertake consists of three modifications to RAC contracts that will reduce the number of appeals that reach OMHA by FY2020 by just 22,000. See Murray Decl., ¶ 19(b). Twenty-two thousand is only about 7% of the current RAC-related OMHA backlog; it almost surely will be an even smaller percentage of the RAC-related OMHA backlog in FY2020. The Secretary's failure to offer a more robust response to the high volume of appeals generated by the RAC Program — a program over which she has "substantial discretion," AHA II, 812 F.3d at 193 — is concerning. And that is so even without entertaining the argument from Plaintiffs and Amicus that there are reasons to doubt HHS's estimates regarding the efficacy of its proposed modifications to the RAC contracts. See Opp. at 10; Amicus Opp. at 11-12.

2. *Legislative Fixes*

Administrative reforms are not the only arrows the Secretary has in her quiver. She also points to the improvements proposed by her sister branch — Congress. According to the Secretary, these legislative fixes will happen via two vehicles — the President's FY2017 Budget and the Audit & Appeal Fairness, Integrity, and Reforms in Medicare Act of 2015 (AFIRM Act). If passed, they would increase OMHA and DAB appropriations by $1.3 billion over ten years and permit HHS to use RAC Program recoveries to supplement annual OMHA and DAB appropriations. See Murray Decl., ¶ 22(b). With that additional funding, OMHA would be able to dramatically expand ALJ review, on-the-record adjudications, and settlement-conference facilitations. Id., ¶ 22(b), (h), (i).

The Secretary also focuses on the AFIRM Act's policy reforms, which include letting OMHA use less expensive Medicare Magistrates instead of ALJs to adjudicate cases with low amounts in controversy; giving the Secretary the authority to require prior authorization for non-emergency items or services; instituting a filing fee for appeals, refundable to those appellants who receive a fully favorable determination; permitting the Secretary to adjudicate appeals using sample and extrapolation techniques and consolidate related appeals; requiring an adjudicator to remand an appealed claim to step one when a party submits new documentary evidence at or beyond step two; and allowing OMHA to issue decisions without a hearing if there are no material facts in dispute and the ALJ determines that binding authority controls the outcome. Id., ¶ 22(a), (c)-(g).

Combining the administrative measures and the legislative fixes would reduce the number of pending OMHA cases to 50,000 by FY2020 and totally eliminate the backlog of pending OMHA cases older than 90 days by FY2021. See Projections Chart. Plaintiffs scoff at

the notion that this Congress should be expected to deliver on the fixes the Secretary says it will, and certainly not within the period of time requested for the stay, which includes the upcoming elections, a lame-duck congressional session, and the new President's first eight months in office, when he or she will be focused on his or her most critical legislative priorities.  See Opp. at 12.

The Secretary rejoins that dismissing Congress' potential to act is premature because the Court of Appeals "contemplated that Congress would be afforded some time to respond to [its] ruling."  Reply at 15.  But it has been seven months since the Court of Appeals issued its decision, and Congress has taken no action.  The Chairmen of the Senate and House Budget Committees have refused to hold hearings on the President's FY2017 budget.  See Amicus Opp. at 6 (citing Ryan Murphy & William Allison, Joint Announcement from House and Senate Budget Committees on OMB Hearing, U.S. House of Representatives Comm. on the Budget (Feb. 4, 2016), http://budget.house.gov/news/documentsingle.aspx?DocumentID=394136). Finally, as the Secretary acknowledges, Congress did not fund the "robust increase in budget authority designated for increased adjudication capacity at OMHA" included in the President's FY2016 budget.  See Reply at 16.  That Congress refused to do so when it had ample knowledge of the backlog supports the conclusion that it is unlikely to approve an increase for FY2017.  The Secretary gives no reason to believe things will be different this year.  In addition, it has been 21 months since the AFIRM Act was reported by the Senate Finance Committee to the full Senate on December 8, 2015.  See S. Rep. No. 114-177 (2015).  No debate or vote has been scheduled, and the Secretary offers no evidence that any legislative action is imminent, that the bill has support in the House of Representatives, or that the President would sign it.  See Amicus Opp. at 8.

While it is not the Court's role to comment on the priorities of a co-equal branch of government, it must draw the conclusion that Congress is unlikely to play the role of the cavalry here, riding to the rescue of the Secretary's besieged program.

* * *

In sum, the Court cannot conclude that the Secretary's current proposals will result in meaningful progress to reduce the backlog and comply with the statutory deadlines. Although the Court remains loath to intervene in the legislative and executive branches' efforts — or lack thereof, as it may be — to respond to the problem, its "ultimate obligation is to enforce the law as Congress has written it." AHA II, 812 F.3d at 193. The balance of interests drives the conclusion that there are equitable grounds for mandamus, and the Court will not issue a stay and further delay the proceedings.

The Court, however, does not possess a magic wand that, when waved, will eliminate the backlog. Plaintiffs' suggestion that the Court simply order HHS to resolve each of the pending appeals by the statutorily prescribed deadlines is extremely wishful thinking. See Opp. at 2. The Court will thus ask the parties to appear for a status conference to discuss how next to proceed.

## IV. Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion for Stay. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: September 19, 2016