**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN HOSPITAL ASSOCIATION, *et al.*,     ) | |
| ) | |
| Plaintiffs,     ) | |
| ) | |
| v.     ) | Civil Action No. 14-CV-851-JEB |
| ) | |
| ERIC D. HARGAN, in his official capacity as     ) | |
| ACTING SECRETARY OF HEALTH AND     ) | |
| HUMAN SERVICES,     ) | |
| ) | |
| Defendant.     ) | |
| ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR
SUMMARY JUDGMENT**

Catherine E. Stetson (D.C. Bar. No. 453221)
Sheree Kanner (D.C. Bar No. 366926)
Sean Marotta (D.C. Bar No. 1006494)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
cate.stetson@hoganlovells.com

Steven F. Barley (*admitted pro hac vice*)
HOGAN LOVELLS US LLP
1000 International Drive
Suite 2000
Baltimore, MD 2102
Telephone: (410) 659-2700
steve.barley@hoganlovells.com

*Attorneys for Plaintiffs*

Dated:  December 20, 2017

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................3

ARGUMENT ................................................................................................................5

I.      THE SECRETARY HAS NOT PROVED THAT IT IS
        IMPOSSIBLE TO ELIMINATE THE BACKLOG OR TAKE
        MORE STEPS THAN HE HAS TO REDUCE IT ......................................................5

        A.  The Secretary Can Lawfully Further Curtail The RAC Program ...........................6

        B.  The Secretary Can Do More To Settle Outstadning Cases ....................................9

        C.  The Secretary Can Delay Repayment And Toll Interest Accrual .........................12

II.     THE COURT SHOULD REIMPOSE ITS PRIOR MANDAMUS
        ORDER OR, AT THE VERY LEAST, DIRECT THE
        SECRETARY TO TAKE ADDITIONAL STEPS TO
        ELIMINATE THE BACKLOG ...............................................................................16

CONCLUSION...............................................................................................................21

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

*Alabama Power Co. v. Costle*,
    636 F.2d 323 (D.C. Cir. 1979) ........................................................................................6

*American Hosp. Ass'n v. Burwell*,
    76 F. Supp. 3d 43 (D.D.C. 2014) ....................................................................................3

\* *American Hosp. Ass'n v. Burwell*,
    812 F.3d 183 (D.C. Cir. 2016) .................................................................................. *passim*

\* *American Hosp. Ass'n v. Price*
    867 F.3d 160 (D.C. Cir. 2017) .................................................................................. *passim*

*Crocker v. Piedmont Aviation, Inc.*,
    49 F.3d 735 (D.C. Cir. 1995) .........................................................................................17

*J.A. Jones Mgmt. Servs. v. FAA*,
    225 F.3d 761 (D.C. Cir. 2000) .......................................................................................18

*Khalil v. L-E Commc'ns Titan Grp.*,
    656 F. Supp. 2d 134 (D.D. C. 2009) ..............................................................................18

*NRDC v. Train*,
    510 F.2d 692 (D.C. Cir. 1974) .........................................................................................5

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994) .......................................................................................................10

STATUTES:

31 U.S.C. § 3711 ....................................................................................................14, 15

31 U.S.C. § 3711(a) ........................................................................................................9

42 U.S.C. § 1315a(a)(1) ...............................................................................................14

42 U.S.C. § 1315a(d)(1) ...............................................................................................15

---

\* Authorities on which we chiefly rely are marked with asterisks.

**TABLE OF AUTHORITIES — Continued**

Page

42 U.S.C. § 1395b-1(a) .................................................................................13

42 U.S.C. § 1395b-1(b) .................................................................................15

42 U.S.C. § 1395b-1(a)(1)(A) .......................................................................14

42 U.S.C. § 1395b-1(a)(1)(J) ........................................................................13

42 U.S.C. § 1395ddd(f)(2)(B) ..................................................................14, 15

42 U.S.C. § 1395ddd(h) ..................................................................................6

42 U.S.C. § 1395ddd(h)(1) .............................................................................6

42 U.S.C. § 1395y(a) ......................................................................................9

**REGULATIONS:**

42 C.F.R. § 405.376(a) ....................................................................................9

42 C.F.R. § 405.376(g)(3) .............................................................................10

42 C.F.R. § 405.376(h)(3) .............................................................................10

42 C.F.R. § 405.378(j)(3)(iv) ........................................................................15

42 C.F.R. § 405.378(j)(3)(v) .........................................................................15

45 C.F.R. § 30.29(a) ......................................................................................16

**OTHER AUTHORITY:**

AHA, *Trendwatch Chartbook 2013: Trends Affecting Hospitals and Health
Systems* 39, chart 4.1 (2013) ...................................................................12

## INTRODUCTION

This case comes back to the Court for a third time for a precise and limited purpose:  To determine whether it is *impossible* for the Secretary to comply with the Court's prior mandamus order to eliminate the Medicare appeals backlog in five years.  Impossibility is a strong word, and it is as demanding as it sounds:  The Secretary must show not just that complying with the Court's order is difficult or unpalatable.  The Secretary must show that there is literally no way he can lawfully comply with what the Court has commanded.

The Secretary has not carried his burden.  In the last go-around, the Secretary contended that he had done all that he could do.  Now, Secretary has come up with even more programs and initiatives that—he argues—show that he cannot wipe out the backlog.  This second attempt to argue impossibility does not survive scrutiny, particularly the scrutiny of Plaintiffs' depositions of the Secretary's staff.  For instance, the Secretary asserts he has done all he can to limit the new appeals generated by his Recovery Audit Contractors, or RACs.  But dig deeper, and the Secretary essentially concedes that he *could* do more, but that he would prefer not to deny the Treasury additional RAC recoveries.  That—again—is not the impossibility standard.  The Secretary can do more to slow the influx of RAC appeals by restricting topics they may consider, limiting the look-back period used for reviewing claims, and other actions.  Even if slowing RAC appeals may not solve the entire backlog problem, it is an important step to managing it.

The Secretary also can settle more cases in the (still growing) backlog.  The Secretary highlights two new settlement initiatives, and those initiatives—while a start—do not address the vast majority of backlogged cases.  The Secretary claims that further efforts toward settlement would require him to violate the law, which—in the Secretary's view—requires him to settle cases based on an evaluation of only the case's merits and associated litigative risk.  But the law and the Secretary's own practices are to the contrary; the Secretary *routinely* bases settlement

proposals on less-than-comprehensive evaluations of providers' cases, and he can—and should—do so here.  Furthermore, the Secretary offers only conjecture, not proof, that providers will resist all reasonable settlement offers and flood the system with appeals if HHS undertakes a more-comprehensive settlement strategy.

Finally, the Secretary can postpone collecting alleged overpayments and toll interest on overpayments that linger in the backlog for too long, thus relieving providers of at least some of the significant monetary burdens they shoulder while they wait in line for appeal.  The Secretary asserts that he is statutorily obligated to seek overpayments and to collect interest on them.  But he has ample "demonstration authority" under the Medicare Act to experiment with improvements in the payment system by postponing collection on overpayments and tolling interest.  Implementing such an initiative will relieve the burden on hospitals strapped for money while their appeals languish—and create a natural incentive for the Secretary to innovate in managing appeals.

Against this, the Secretary attempts to relitigate the two prior Court of Appeals decisions, arguing that he has not violated any clear duty and that the equities weigh against mandamus. But the Court of Appeals rejected both of those arguments, and this Court should not (indeed, cannot) revisit them.  And because the Secretary has not proved that it is impossible to comply with the Court's previous five-year backlog-elimination order, the Court should reissue it unchanged.  At the very least, the Court should require the Secretary to take concrete steps to stop new cases from entering the backlog, settle the ones in it, reduce the impact on providers from the backlog, and regularly update the Court on his progress.

The Court should deny the Secretary's motion for summary judgment and grant Plaintiffs' cross-motion for summary judgment.

# BACKGROUND

The background of this now over three-and-a-half-year-old case is well-known to the Court. Plaintiffs brought this mandamus action to require the Secretary to resolve the massive delays plaguing the Medicare appeals process. This Court initially dismissed Plaintiffs' complaint for lack of jurisdiction. *American Hosp. Ass'n v. Burwell*, 76 F. Supp. 3d 43 (D.D.C. 2014). The Court of Appeals reversed, holding that the complaint satisfied the threshold requirements for mandamus jurisdiction because the Secretary has a "clear duty" to comply with the statutory deadlines and is violating that duty. *American Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190-192 (D.C. Cir. 2016) (*AHA I*). The Court of Appeals remanded the case for this Court to determine whether to grant mandamus, suggesting that mandamus would be appropriate if the Secretary and political branches failed to make "meaningful progress" towards eliminating the backlog. *Id.* at 192-193. The Court of Appeals further noted that the Secretary's Recovery Audit Contractor, or RAC, program "has contributed to a drastic increase in the number of administrative appeals." *Id.* at 187. Indeed, at the time of the Court of Appeals's first decision, RAC appeals made up 46% of all appeals pending before the Office of Medicare Hearings and Appeals (OMHA). *Id.*

On remand, this Court balanced the factors for and against mandamus and determined that a mandamus remedy was appropriate. Dkt. No. 38 at 8-16. The Court found that it "cannot conclude that the Secretary's current proposals will result in meaningful progress to reduce the backlog and comply with the statutory deadlines." *Id.* at 16. It therefore directed the parties to provide further briefing on what form the mandamus remedy should take. *See* Oct. 3, 2016 Minute Order.

In that further briefing, "Plaintiffs devote[d] serious thought of possible actions the Secretary could take to address the backlog of administrative appeals." Dkt. No. 48 at 3.

3

Among other things, Plaintiffs proposed that the Secretary reduce the backlog by certain percentages each year, with the backlog eliminated completely by the end of 2020. *Id.* at 3. In response—other than arguing that *no* relief should issue—the Secretary did not "dispute the specific dates and reduction percentages in Plaintiffs' proposed timetable." *Id.* at 6. The Court therefore adopted the Plaintiffs' proposed targets and deadlines. *Id.* The Court explained that targets and deadlines best respected the Secretary's autonomy in deciding just how to tackle the backlog and kept the Court out of meddling with the Department's internal operations. *Id.* at 5.

The Court of Appeals again reversed. *American Hosp. Ass'n v. Price*, 867 F.3d 160 (D.C. Cir. 2017) (*AHA II*). The Court of Appeals held that the Court "thoughtfully and scrupulously weighed the equities" in "concluding that the scales tipped in favor of mandamus." *Id.* at 162. But it concluded that the Court erred in not explicitly resolving whether it was "impossible" for the Secretary to comply with the Court's time table. *Id.*

The Court of Appeals' opinion again highlighted the role that RACs play in contributing to the backlog and the Secretary's power to restrict the RAC program in order to reduce the backlog. *Id.* at 166-167. The Secretary had argued that "curtailment or suspension of the RAC program" was "not enough to clear the backlog" because "the RAC program is no longer the principal cause of the backlog." *Id.* at 166. The Court of Appeals found that the Secretary's contention "is, at best, suspect." *Id.* The panel noted that the reduction in RAC-related appeals "coincide[d] with a two-year suspension of most of the RAC program, which was instituted while new contracts were being negotiated." *Id.* The panel thus was not "sold on the Secretary's suggestion that concerns regarding the RAC program are behind us" and directed that "the District Court should scrutinize that claim on remand." *Id.* The Court of Appeals further "share[d] [this Court's] skepticism of the Secretary's assertion that he has done all he can to

reduce RAC-related appeals," observing that the Secretary's modest plans to reduce RAC-related appeals "appear[ed] to be curiously weak medicine for an agency facing mandamus." *Id.* at 167.

The Court of Appeals remanded for the Court "to evaluate the merits of the Secretary's claim that lawful compliance [with the Court's mandamus order] would be impossible." *Id.* at 170. The Court of Appeals stated that "[o]n remand, the Court should determine in the first instance whether, in fact, lawful compliance with the timetable is impossible." *Id.* at 168. The Court of Appeals further emphasized that "the Secretary bears the 'heavy burden to demonstrate the existence of an impossibility' " and that the Secretary cannot "shirk[ ] [his] duties by reason of mere difficulty or inconvenience." *Id.* (citation omitted). The Court of Appeals also observed that "on remand, if the Court finds that the Secretary failed to carry his burden of demonstrating impossibility, it could potentially reissue the mandamus order without modification." *Id.* at 168-169. All that is required is a "predicate finding of possibility." *Id.* at 169.

## ARGUMENT

### I.     THE SECRETARY HAS NOT PROVED THAT IT IS IMPOSSIBLE TO ELIMINATE THE BACKLOG OR TAKE MORE STEPS THAN HE HAS TO REDUCE IT.

On remand, *the Secretary* has the obligation to show that it is impossible to comply with any mandamus order from this Court. *AHA II*, 867 F.3d at 168. Impossibility is a "heavy burden," and the Court "must scrutinize such claims carefully," for agency "officials may seize on a remedy"—impossibility—"made available for extreme illness and promote it into the daily bread of convenience." *Alabama Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979) (quoting *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974)). In other words, the Secretary may not "shirk[ ] [his] duties by reason of mere difficulty or inconvenience." *AHA II*, 867 F.3d at 168 (citation omitted).

That is just what the Secretary has done here.  The Secretary has made sweeping

assertions that "[i]t is . . . impossible for HHS to lawfully comply with this Court's prior Order."

Sec'y Br. 27.  But every step along the way, the Secretary shows not that compliance is

*impossible*, but that he thinks compliance might be *difficult* or that he finds compliance

*distasteful*.  That, however, is not the standard.  *See AHA II*, 867 F.3d at 168.  Both the

Secretary's own brief and his staff's depositions demonstrate that the Secretary *can* do more to

reduce the backlog.   In particular, the Secretary can further trim the RAC program,  settle more

backlogged cases, and delay repayment and toll interest accrual.  And because the Secretary *can*

comply—even if just "barely," *cf.* Sec'y Br. 27—he must do so.

**A.     The Secretary Can Lawfully Further Curtail The RAC Program.**

First and foremost, the Secretary can lawfully further curtail the RAC program and

thereby reduce the addition of appeals to the backlog.  Although a RAC program must exist, its

statutory requirements are quite thin, relating mostly to how RACs are retained and paid and how

the Secretary uses RAC-recovered funds.  *See* 42 U.S.C. § 1395ddd(h).  The only overall

constraint on the program is that the RAC contracts be "for the purpose of identifying

underpayments and overpayments and recouping overpayments."  *Id.* § 1395ddd(h)(1).  That

leaves the Secretary with wide discretion to curtail the specific activities undertaken by the

RACs, and thus the appeals generated by the RAC program.

The Secretary's own brief confirms that he has broad discretion to limit the RAC

program.  He highlights that he has changed RAC payment incentives, limited the topics that

RACs can review, shifted patient-status reviews from the RAC program to a different quality-

assurance program, and temporarily limited the "look-back" period for certain intensive reviews.

Sec'y Br. 24-25.

There is nothing stopping the Secretary from further constraining the RAC program, such as by further limiting the issues that RACs can review, shifting other issues from the RAC program to another quality-assurance program, or further narrowing the look-back period that RACs use for claims.  The Secretary does not contend that there is.  Rather, he argues that he should not be forced to take further steps to alter the RAC program at the expense of the public fisc.  Sec'y Br. 25.  But whether the Secretary *wants* to alter the RAC program has nothing to do with it.  *See AHA II*, 867 F.3d at 168.  The Court of Appeals has already held that compliance with the mandatory 90-day deadline for an ALJ hearing on Medicare appeals trumps the Secretary's discretionary desire to maximize revenue from the RAC program.  *See AHA I*, 812 F.3d at 193 ("Federal agencies must obey the law, and congressionally imposed mandates and prohibitions trump discretionary decisions.").  The Secretary *can* continue to curtail the RAC program to restrict the addition of new appeals to the backlog, and so he must.  Yet he has shirked that duty; the Secretary's staff testified it was unaware of any new RAC restrictions in the works.  Mills Dep. Tr. 46.

The Secretary can also limit RACs' contributions to the backlog by penalizing RAC clawbacks that are overturned on appeal.  *See* Dkt. No. 39 at 10.  The Secretary has argued—and his staff has claimed—that reducing RACs' payments when their decisions are overturned at the ALJ level would be an impermissible penalty.  *See* Dkt. No. 42 at 27-28; Mills Dep. Tr. 128-131.  But as Plaintiffs have explained, that simply is not so.  Dkt. No. 43 at 10.  A financial disincentive in the RACs contracts for high overturn rates is not a penalty for breach of contract; no one expects the RACs to achieve perfection to comply with their contractual obligations.  Rather, a financial disincentive would assure that RACs do not enter the review process with an

eye towards denial by reducing their overall contingency fee when they erroneously deny too many provider claims.  *See id.*

The need for financial disincentives is particularly acute because it is not clear that the Secretary's financial incentives program—offering additional payment to RACs that have a 95 percent accuracy rate and less than 10 percent overturn rate, Sec'y Br. 24—will have any impact on the backlog.  The Secretary's staff has admitted that it has not considered just how many RACs had accuracy rates of less than 95 percent, such that the accuracy incentives would influence RACs to do more than they currently are to achieve accuracy.  *See* Mills Dep. Tr. 94-99.  And the Secretary's staff has admitted that it cannot quantify the impact of the new RAC provisions on the backlog, and that much of the reduction in the RAC-generated backlog was due to settlements rather than revision of the RAC program.  *See* Bagel Dep. Tr. 47-48.

The Secretary's contention (at 27) that financial penalties would "not . . . have any meaningful impact on the backlog" therefore rings hollow two times over.  For one, there is no reason to suppose that financial *inducements* will have any meaningful impact on the backlog at all, in that they may simply reward RACs for continuing to do what they are currently—and unacceptably—doing.  But more fundamentally, the efficacy of financial penalties is common sense.  A RAC approaching a claim will be naturally inclined to deny it because the RAC will receive payment if the denial is upheld on appeal, but will not be penalized if is overturned.  In other words, so long as a RAC retains a minimum accuracy rate, denying claims comes only with upsides.  Financial penalties for overturned claims counterbalances that natural tendency.  Indeed, the Secretary acknowledges that the patient-status appeal rate dropped when the agency transitioned review of those claims from a contingency-fee RAC to a flat-rate contractor.  *See* Mills Dep. Tr. 44-45.

At bottom, the Secretary's claim regarding RACs is not that he cannot do more, but that he does not think that doing more would help eliminate the backlog:  Even if all RAC activities were suspended, there would still be more appeals than capacity to adjudicate appeals.  *See* Sec'y Br. 26.  Maybe so.  But the Secretary has the obligation to use all tools lawfully at his disposal to keep the problem from getting worse.  After all, the same gap between appeals and adjudicatory capacity existed when the Court of Appeals considered *AHA II*.  867 F.3d at 167.  Yet the Court of Appeals still warned that the "Secretary's RAC-related interventions appear to be curiously weak medicine for an agency facing mandamus."  *Id.*  Additional RAC-program modifications *by themselves* may not eliminate the backlog.  But they will make elimination of the backlog possible in combination with large-scale settlement efforts.  We turn to that topic next.

### B.  The Secretary Can Do More To Settle Outstanding Cases.

The Secretary can also do more to settle the cases in the backlog.  The Secretary continues his protestation that meaningful reduction of the backlog will require him to settle cases without regard to their merits, thus violating the Medicare Act.  *See* Sec'y Br. 15-22.  That is wrong as a matter of law.  And it ignores the Secretary's past practice of settling claims on the basis of providers' histories.

The Secretary grounds his mass-settlement argument in 42 U.S.C. § 1395y(a), which states that "[n]otwithstanding any other provision" *of the Medicare statute* "no payment may be made . . . for any expenses incurred for items or services" that do not meet statutory criteria.  But the Secretary has independent authority under the Federal Claims Collection Act, apart from the Medicare Act, to "compromise" claims against the United States.  31 U.S.C. § 3711(a).  The Secretary understands the Federal Claims Collection Act to authorize settlement outside of the Medicare Act's requirement to pay only substantiated claims, invoking the Act in his claim-compromise regulations.  *See* 42 C.F.R. § 405.376(a) (stating that the claims-compromise

regulations were "adopted under the authority of the Federal Claims Collection Act").  The

Medicare Act's supposed limitation on paying only fully substantiated claims does not exist.

      The Secretary reluctantly admits he has settlement authority, but represents that he can do

so essentially only when he finds that settlement will save the Medicare Trust Fund money.  *See*

Sec'y Br. 17-18 (detailing the Secretary's settlement authority), 20-21 (suggesting that the Low-

Volume Appeals program is justified only because it "maximizes the expected cost savings to the

agency").  The Secretary's regulations are broader than that.  For one, the Secretary can take into

account "pragmatic considerations," which surely include the need to clear the backlog and

comply with the mandatory 90-day period for ALJ hearings.  *See* 42 C.F.R. § 405.376(g)(3).

Further, the threat that the Court may enter defaults on the outstanding appeal claims is a

"litigative probabilit[y] involved" for the claims that the Secretary must take into account in

resolving them.  *See id.* § 405.376(h)(3).  The compromise regulation's text supports mass

settlement of backlog claims, particularly because the Court "give[s] substantial deference to an

agency's interpretation of its own regulations."  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504,

512 (1994).

      The Secretary's own past settlement practices demonstrate that he does not understand

settlement to necessitate an evaluation of the merits of every individual settled claim.  The

Secretary's staff admitted that when HHS seeks to settle with a provider, it reviews only a

sample of claims, and then uses the results of the sample to set the parameters for settlement.

Bagel Dep. Tr. 31-32.  In other words, the Secretary's staff does not review *every* claim as a part

of settlement; it extrapolates from a sample and bases its so-many-cents-on-the-dollar settlement

offer for all outstanding appeals based on the result of that sampling.  *See id.*; *see also id.* at 128-

129 (conceding that the LVA appeals program does not look at the individual merits of every

10

claim).  And that is contrary to the Secretary's apparent assertion in his brief (at 17-18) that he is forbidden from settling claims without considering the merits of each and every one.

To the extent that the Secretary is making the more-modest claim that the need to settle claims would require settlements that bear no relationship to a provider's historical success rate on appeal or accuracy rate, it has no basis in the record.  The Secretary speculates that a mandamus order to resolve a certain number of claims on a timetable would cause providers to appeal every denial and to hold out for a settlement near the face value of the claim.  Sec'y Br. 17-18.  But the Secretary rests his analysis of providers' behavior based on nothing more than his own conjecture; he cites nothing for his belief that providers will flood the system with appeals or that they will insist on almost-full-value for their claims.  Indeed, the Secretary's own staffer testified that he did not consider himself an expert on acceptance of mass settlements and that he did not discuss with providers what they would accept as settlement.  Bagel Dep. Tr. 20, 125-127.

The closest that the Secretary comes to backing up his assertions regarding acceptance of settlements is to relate that not every provider settled all of its claims during some past initiatives.  *See* Sec'y Br. 21-22.  But that is a far cry from the conclusion that the Secretary needs the Court to draw, which is that "fair settlements are impossible."  Sec'y Br. 22 (emphasis omitted).  The Secretary does not tell the Court what (if any) counter-proposals he received from the providers and what (if any) additional steps he took in order to reach a final settlement.  *See* Sec'y Br. 21-22.  A reasonable settlement is not simply whatever the Secretary deigns to offer.  There must be some give-and-take.  And there is reason to think that the Secretary is not willing to give; his staff admitted that the Secretary rejected inpatient rehabilitation facilities' latest offer of settlement and did not make a counter-offer.  *See* Mills Dep. Tr. 149-151.  The Secretary has not shown that fair mass settlements are *impossible*.  It may simply take better—but yet still legal—

offers from the Secretary to make settlement happen.  The possibility that the Secretary may need to try a little harder to make settlement occur—and may need to settle cases as they are added to the backlog—is not enough to carry his burden of showing that lawful compliance with a mandamus order is impossible.

The Secretary's staff testified that it may even be possible to settle with some providers that have outstanding program-integrity issues.  Staff testified that it had a "never say never" approach to settling cases with providers who settled a False Claims Act suit in the last five years and had an "open door" to consider those settlements.  Mills Dep. Tr. 159-160.  Providers may well have to take less on the dollar for resolving those claims given their history, but the claims are not beyond settlement.  And if the appeals with program-integrity concerns cannot be resolved, they can be carved out of any mandamus relief the Court issues.  But the bottom line is the same:  The Secretary has not shown that mass settlements are impossible to eliminate the backlog.  He has—at most—shown that he would prefer settlements on more-favorable terms.  But that is precisely the sort of "difficulty or inconvenience" that the Court of Appeals held does *not* constitute impossibility.  *AHA II*, 867 F.3d at 168.

## C.    The Secretary Can Delay Repayment And Toll Interest Accrual.

The Secretary can also ameliorate the backlog—and its effect on providers—by deferring repayment of disputed claims and tolling the accrual of interest on those claims for all periods of time for which an appeal is pending beyond the statutory maximum for any level of administrative review.  Both components are critical: A delay in repayment means that the plaintiff hospitals and others whose payments were clawed back in post-payment review can maintain control of the capital that they need for operations and improvements—which is particularly important to the almost 30% of hospitals operating with negative margins.  *See* AHA, *Trendwatch Chartbook 2013: Trends Affecting Hospitals and Health Systems* 39, chart 4.1

(2013), http://www.aha.org/research/reports/tw/chartbook/2013/13chartbook-full.pdf.  A delay in the accrual of interest, meanwhile, means that unsuccessful claimants will not be penalized by hefty and ever-growing interest payments.  Nor should they be, when the statutory deadlines preclude the accrual of significant interest by requiring the Secretary to resolve claims within a year.

There are multiple ways that the Secretary could defer repayment and interest accrual.  Most notably, the Secretary has express authority to conduct "demonstration projects" related to the provision of health care.  42 U.S.C. § 1395b-1(a).  As relevant here, the Secretary may use his demonstration authority "to develop or demonstrate improved methods for the investigation and prosecution of fraud in the provision of care or services" under Medicare programs.  *Id.* § 1395b-1(a)(1)(J).  Because the post-payment review of Medicare reimbursement is such a "method[]," the Secretary has the authority to adopt demonstration projects to improve that postpayment review process.  Delaying repayment and interest penalties would effect a substantial improvement for those providers and suppliers stuck waiting in line due to no fault of their own.  And if the Secretary elects not to exercise his demonstration authority to provide relief to all claimants, he can at least reach a substantial subset of claimants.  For example, he might limit the demonstration to hospitals or other Part A providers, who are suffering most acutely from the delays in the appeals process and whose financial difficulties most directly affect the public health.  Or he might limit the demonstration to providers whose pending claims exceed a certain monetary threshold.  If, say, the demonstration applied to all providers whose pending claims, in the aggregate, exceeded $10,000, it would provide relief to those claimants with the most money at stake, that would otherwise be penalized severely by accumulating interest and hamstrung by their inability to obtain access to critical funds.

There are other means, too, of enacting this reform.  The Secretary may conduct a demonstration "to determine whether, and if so which, changes in methods of payment or reimbursement . . . for health care and services under health programs established by this chapter, including a change to methods based on negotiated rates, would have the effect of increasing the efficiency and economy of health services under such programs through the creation of additional incentives to these ends without adversely affecting the quality of such services." 42 U.S.C. § 1395b-1(a)(1)(A).  Because a delay in repayment would save the Secretary from paying interest on categories of claims frequently overturned by an ALJ, that change might boost the "efficiency and economy of health services" (and a delay in interest accrual would be a necessary corollary).  Alternatively, the Center for Medicare and Medicaid Innovation within HHS is empowered "to test innovative payment and service delivery models to reduce program expenditures," *id.* § 1315a(a)(1), which could be justified under a similar rationale.  The Secretary is instructed to select models that "improve the coordination, quality, and efficiency of health care services." *Id.*  Permitting hospitals to retain the capital sorely needed for purchasing equipment and offering certain services, particularly in rural areas, would accomplish just that. *See* Dkt. No. 38 at 8 (recognizing that the backlog was having a "real impact on 'human health and welfare' " by harming patient care at hospitals with large amounts of money tied up in appeals) (quoting *AHA I*, 812 F.3d at 193).

The Secretary continues to maintain that he is statutorily barred from suspending repayment of disputed claims and from tolling interest accrual for waiting times beyond the statutory maximums.  *See* Sec'y Br. 26.  He points to two statutory provisions that he believes say so: 42 U.S.C. § 1395ddd(f)(2)(B) and 31 U.S.C. § 3711.  Neither prevents the reforms that Plaintiffs propose.

First, the Medicare Act provides that "interest on the overpayment shall accrue on and after the date of the original notice of overpayment." 42 U.S.C. § 1395ddd(f)(2)(B).  But the statutory deadlines require that, as a general matter, "appeals will work their way through the administrative process within about a year."  *AHA I*, 812 F.3d at 186.   Because the Secretary is responsible for much longer delays, the Secretary should not be entitled to recover *several years'* worth of interest from claimants, when proper implementation of the statute would never allow such large amounts of interest to accrue.  In fact, in other circumstances in which providers and suppliers are responsible for a delay that might work to the Secretary's detriment, the Secretary's regulations toll the accrual of interest.  *See* 42 U.S.C. § 1395ddd(f)(2)(B) (requiring Secretary to pay same interest rate as providers); 42 C.F.R. §§ 405.378(j)(3)(iv)-(v) (providing for tolling for certain claimant-induced delays).  The Secretary can—and should—do the same here.

In any event, even if there were no general statutory authority for tolling interest accrual, there is specific statutory authority for tolling in the context of a demonstration project or model.  For demonstrations, the Secretary may "waive compliance with" other statutory requirements that "relate to reimbursement or payment"—including rules governing repayment and interest accrual—"for such services or items as may be specified in the experiment."   42 U.S.C. § 1395b-1(b).  The same goes for payment models.  *See id.* § 1315a(d)(1).

*Second*, a generally applicable federal statute provides that heads of agencies "shall try to collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency."  31 U.S.C. § 3711.  That provision does not impose a blanket rule that an agency must recoup payment as soon as permissible, or must charge interest on that claim even when the agency is responsible for delays in its resolution.  Indeed, the Secretary's own regulations provide that "[t]he Secretary may suspend collection activity on a

debt" if a "debtor has requested a waiver or review of the debt."  45 C.F.R. § 30.29(a).  The

ordinary responsibility of government agencies to collect debts owed them does not tie the

Secretary's hands.

Importantly, these changes would not just ease the financial pain for providers and

suppliers; they would create an appropriate incentive for the Secretary to put his best efforts

toward resolving the backlog.  *Cf.* Sec'y Br. 26.  As things stand, the Secretary retains the funds

recovered by Medicare contractors (whether RACs or others) during the entire appeals process.

As a result, the Secretary has no financial incentive to expedite the appeals process to bring it in

line with the statutory deadlines.  Basic economics dictate that implementing these changes to

repayment and interest accrual will force the Secretary to resolve the backlog more quickly.

## II.     THE COURT SHOULD REIMPOSE ITS PREVIOUS MANDAMUS ORDER OR, AT THE VERY LEAST, DIRECT THE SECRETARY TO TAKE ADDITIONAL STEPS TO ELIMINATE THE BACKLOG.

Because the Secretary can forestall new appeals from joining the backlog through

additional RAC reforms, can eliminate or significantly reduce the backlog through further mass

settlements, and can reduce the backlog's impact on providers by delaying repayment and tolling

interest accrual, he must do so.  *See AHA II*, 867 F.3d at 169 (explaining that the Court can issue

a remedial mandamus order so long as it "make[s] the predicate finding of possibility").  The

Secretary offers two rejoinders, but both are foreclosed by the Court of Appeals' prior decisions.

First, the Secretary argues that mandamus should not issue because he has "not

committed any statutory violation that could give rise to a mandamus order."  Sec'y Br. 28.  But

as the Secretary admits, that was the position he advanced—and that the Court of Appeals

rejected—in *AHA I*.  812 F.3d at 190-192.  This Court is bound to follow it on remand.  *See AHA*

*II*, 867 F.3d at 165 ("We, of course, do not revisit our previous conclusion regarding mandamus

jurisdiction.").

Second, the Secretary argues that mandamus is no longer equitable.  Sec'y Br. 28-30.
But the Court has already weighed the equities (Dkt. No. 38 at 8-16), and the Court of Appeals
upheld that weighing, concluding that the Court conducted its analysis "thoughtfully and
scrupulously."  *AHA II*, 867 F.3d at 162.  Under the law-of-the-case doctrine, the Court "should
not re-open questions decided . . . in earlier phases" of the case.  *Crocker v. Piedmont Aviation,
Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995).  And the Secretary gives no reason for the Court to do so.
The Secretary highlights the Low Volume Appeals program as a viable path for providers facing
financial hardship as a result of having money tied up in appeals in the backlog (at 29), but his
staff has admitted that it has not quantified how many appeals the LVA settlement program will
actually resolve.  *See* Bagel Dep. Tr. 67.  It is therefore far-from-clear that the LVA settlement
program will provide any succor to providers whose quality of care might suffer due to the
backlog.  The LVA program also does nothing for providers whose quality of care is suffering
because of money tied up in the backlog but who do not qualify for the LVA settlement program
because they have more than 500 appeals or have appeals valued at more than $9,000.  *See* Sec'y
Br. 21 (describing the LVA program).  It cannot overcome the Court's prior holding that the
equities favored mandamus.

The Secretary also continues to insist that mandamus is no longer appropriate because he
has somehow shown that the RAC program is not significantly contributing to the backlog.
Sec'y Br. 29.  But the Secretary's argument is that there are more non-RAC claims entering the
backlog than OMHA can adjudicate in a year—the same mismatch he relied on in *AHA II*.  *See*
867 F.3d at 167.  The Court of Appeals found that train of logic unpersuasive before.  *Id.*  This
Court should now, as well.

With the Secretary's rehash of *AHA I* and *AHA II* to one side, the Court should re-impose its previous mandamus order. The Secretary's own staff admitted that—with sufficient provider buy-in for settlements—it is possible to remove the backlog and bring the Secretary into compliance with the 90-day ALJ-hearing mandate within the five-year period set out in the Court's prior mandamus order. Mills Dep. Tr. 32-33, 192-195. The Secretary has not shown that it would be impossible to secure sufficient buy-in for settlements if he were to make additional efforts to engage with providers or if he were willing to exercise more creativity. *See supra* pp. 9-12. The Court should therefore find that the Secretary has not proven that it would be impossible to eliminate the backlog in five years and reissue its previous mandamus order. *See AHA II*, 867 F.3d at 168-169 (explaining that "if the Court finds that the Secretary failed to carry his burden of demonstrating impossibility, it could potentially reissue the mandamus order without modification").

Even if the Court does not reissue its five-year timetable for eliminating the backlog, it should still require the Secretary to bring the backlog under control within a time certain. The Secretary never addresses whether he could comply on a six-, seven-, or even eight-year timeframe, instead generically asserting over and over again that he cannot comply with the Court's previous mandamus order or "any similar order." Sec'y Br. 4, 7, 15, 22, 28. Such unsupported assertions are not enough to carry the Secretary's burden of proving impossibility. *See J.A. Jones Mgmt. Servs. v. FAA*, 225 F.3d 761, 765 (D.C. Cir. 2000) (declining to "credit [a party's] unsupported assertion"); *Khalil v. L-E Commc'ns Titan Grp.*, 656 F. Supp. 2d 134, 136 (D.D.C. 2009) (declining to credit an "unsupported conclusory assertion"). At some point, the Secretary must bring himself into compliance with the statute.

If, however, the Court opts to require the Secretary to take specific steps to reduce the backlog rather than imposing the previous (or a modified) timetable, it should require the Secretary to take additional RAC-, settlement-, and collection-related actions in addition to those the Secretary is currently taking.  As for RACs, the Secretary should impose a financial penalty on RACs with high reversal percentages at the ALJ level; further limit the issues that RACs can consider in their review of providers' claims; shift additional categories of claims from RACs to other quality-assurance contractors, who are not paid on a contingency-fee basis; and further-reduce the look-back window for categories of intensive claims.

On the settlement side, the Court should direct the Secretary to make settlement offers to all providers with claims in the backlog in an amount consistent with their historical overturn rate at the ALJ level or the historical overturn rate for claims of a similar type at the ALJ level, adjusted as necessary for characteristics of the provider, such as program-integrity concerns. Alternatively, the Court could carve-out providers with program-integrity concerns from the settlement program and direct the Secretary to focus settlement efforts on providers without such concerns.

The Court should also require that the Secretary maintain a history of settlement communications and the analysis that led to the Secretary's settlement offer, so that the Court can confirm that the Secretary is undertaking settlement efforts in good faith.  And while settlements move forward, the Secretary should suspend collection of alleged overpayments on cases in the appeal system for longer than the statutory maximum and toll interest on those appeals.  Finally, the Court should require—as it has thus far—that the Secretary file status reports every 90 days.  That will ensure that the Secretary remains current with the obligations

the Court imposes and updates the Court on the new initiatives that he is apparently

contemplating.  *See* Mills Dep. Tr. 199 (stating that "there are still things in the works for sure").

    In the end, the Secretary's argument is not that he *cannot* do more to resolve the backlog.

His own staff "wouldn't say" that there was "nothing else that [the Secretary] can do or going to

do from this point forward to try to reduce the backlog."  Mills Dep. Tr. 198.  Rather, the

Secretary would *prefer* not to do more to resolve the backlog; he argues that he has done all that

he "reasonably and lawfully" can.  *See* Sec'y Br. 29.  But the Secretary's preferences about what

is "reasonable" have nothing to do with it.   In *AHA II*, the Court of Appeals held that "[o]ught

implies can."  867 F.3d at 161 (emphasis omitted).  The Secretary has only an impossibility

defense to rest on, and so the reverse is true as well: Can implies ought.  Because the Secretary

*can* do more—even if it is costly, and even if it is not what the Secretary would do under

ordinary circumstances—he must.  And because the Secretary will not, the Court should order

him to.

**CONCLUSION**

For the foregoing reasons, the Secretary's summary-judgment motion should be denied

and Plaintiff's summary-judgment motion granted.

Respectfully submitted,

/s/ Catherine E. Stetson
Catherine E. Stetson (D.C. Bar. No. 453221)
Sheree Kanner (D.C. Bar No. 366926)
Sean Marotta (D.C. Bar No. 1006494)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
cate.stetson@hoganlovells.com

Steven F. Barley (*admitted pro hac vice*)
HOGAN LOVELLS US LLP
1000 International Drive
Suite 2000
Baltimore, MD 2102
Telephone: (410) 659-2700
steve.barley@hoganlovells.com

*Attorneys for Plaintiffs*

Dated:  December 20, 2017.

**CERTIFICATE OF SERVICE**

I certify that on December 20, 2017, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all counsel, who are registered users.

/s/ Catherine E. Stetson