# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN HOSPITAL ASSOCIATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 14-CV-851-JEB |
| ALEX M. AZAR, in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFFS' REPLY REGARDING NON-DEADLINE REMEDIES

Catherine E. Stetson (D.C. Bar. No. 453221)
Sheree Kanner (D.C. Bar No. 366926)
Sean Marotta (D.C. Bar No. 1006494)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
cate.stetson@hoganlovells.com

*Attorneys for Plaintiffs*

Dated:  August 10, 2018

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.     THE COURT SHOULD REJECT HHS'S LATEST ATTEMPT
TO RELITIGATE THE MANDAMUS ORDER. .................................................. 2

II.    THE COURT SHOULD CONSIDER A DEADLINE REMEDY
IN LIGHT OF HHS'S ARGUMENTS AND PROJECTIONS. ............................. 4

III.   THE COURT SHOULD ORDER PLAINTIFFS' NON-
DEADLINE REMEDIES. ...................................................................................... 6

       A.    The Court Should Order RAC Reforms. ..................................................... 6

       B.    The Court Should Require HHS To Demonstrate, Not Just
Assert, Its Commitment To Good-Faith, Evidence-Based
Settlements By Documenting Its Settlement Activity. ............................. 10

       C.    The Court Should Reduce The Backlog's Impact On
Providers By Reducing Interest On Retained Alleged
Overpayments And Allowing Rebilling. .................................................. 11

       D.    The Court Should Toll The Time To File Section 340B
Appeals. .................................................................................................... 13

       E.    The Court Should Require HHS To Maintain Its Current
Efforts. ...................................................................................................... 14

CONCLUSION ................................................................................................................. 15

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

American Hosp. Ass'n v. Azar,
   No. 18-5004, 2018 WL 3431746 (D.C. Cir. July 17, 2018) ....................................................14

American Hosp. Ass'n v. Burwell,
   68 F. Supp. 3d 54 (D.D.C. 2014) ..........................................................................................13

* American Hosp. Ass'n v. Burwell,
   812 F.3d 183 (D.C. Cir. 2016) ................................................................................................3

* American Hosp. Ass'n v. Price,
   867 F.3d 160 (D.C. Cir. 2017) ...................................................................................2, 3, 4, 5

Family Rehabilitation, Inc. v. Azar,
   No. 3:17-cv-3008-K, 2018 WL 3155911 (N.D. Tex. June 28, 2018).......................................3

Pigford v. Veneman,
   355 F. Supp. 2d 148 (D.D.C. 2005) .........................................................................................3

REGULATION:

78 Fed. Reg. 50,496 (Aug. 19, 2013)............................................................................................13

OTHER AUTHORITIES:

American Hosp. Ass'n, Hospital Groups to Continue Fight to Reverse Cuts for
   340B Hospitals (July 17, 2018), https://tinyurl.com/y8rwwg6z.............................................14

Centers for Medicare & Medicaid Servs., Medicare Fee for Service Recovery
   Audit Program, Resources, https://www.cms.gov/Research-Statistics-Data-
   and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-
   Programs/Recovery-Audit-Program/Resources.html (last updated June 26,
   2018) ........................................................................................................................................8

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

## INTRODUCTION

At this Court's request following the March status conference, Plaintiffs went back to the drawing board and came up with *nine* non-deadline remedies that can make meaningful progress toward eliminating the backlog; prevent additional appeals from entering the backlog; even out settlement incentives; and give the Court a modest oversight role to ensure steady forward progress. Plaintiffs further explained why each remedy was lawful, possible, and tailored to address the Court's concerns at the last hearing.

The Department of Health and Human Services's response can be summed up with a single word: No. HHS's response rejects every single one of Plaintiffs' proposals—except status reports—including proposals offered in direct response to the Court's comments at the March conference.

Not only that: HHS's response rejects proposals *that it previously signaled its willingness to accept* in its own motion for summary judgment. In its motion for summary judgment, for example, HHS stated that if the Court were to impose a mandamus remedy, it should "direct specific measures rather than impose backlog-reduction targets." Dkt. No. 66-1 at 36. HHS now contends that the Court cannot "prescribe specific programmatic changes as part of ordering mandamus." HHS Remedy Br. 16. In its motion for summary judgment, HHS proposed that the Court "could instruct HHS to continue implementing the [Low Value Appeals] and the other settlement programs described above." Dkt. No. 66-1 at 36. HHS now contends that instructing HHS to continue implementing the settlement programs described in its motion for summary judgment would "authorize a court to stand in the shoes of the Secretary of Health and Human Services" and "make predictive judgments about which policy measures will help reduce the backlog in light of the agency's other priorities." HHS Remedy Br. 25. It is one thing for HHS to reject Plaintiffs' proposals; it is quite another for HHS to reject its *own*.

The one bright side to HHS's response is the agency's projection that (assuming a steady-state budget and no ballooning RAC appeals) it will have the backlog eliminated by the end of Fiscal Year 2022.  But that projection does not account for the harms that will be inflicted on providers in the three-and-a-half-year interim.  Ending the backlog several years hence does not allow hospitals to upgrade equipment, repair aging facilities, or improve patient care *now*.  And the Court has held—and the D.C. Circuit has affirmed—that HHS has for years been, and is *currently*, in violation of its mandatory statutory duty to resolve ALJ-level appeals in 90 days or less.  A mandamus remedy is necessary now.

HHS's response is emblematic of its overall strategy in this litigation, however.   Instead of working with Plaintiffs to solve the backlog, HHS continues to refight the battles that the D.C. Circuit and this Court have foreclosed and to foot-drag all the way to judgment.  The Court reasonably responded to HHS's intransigence during the last round of this litigation by ordering Plaintiffs' proposed remedies.  The Court should do so again here.

## ARGUMENT

## I.  THE COURT SHOULD REJECT HHS'S LATEST ATTEMPT TO RELITIGATE THE MANDAMUS ORDER.

As it has throughout the litigation, HHS devotes part of its remedies response to relitigating the Court's prior mandamus order.  HHS Remedy Br. 5-7.  This time, HHS argues that the Court should dismiss Plaintiffs' case because HHS is taking "meaningful steps" to resolve the backlog.  *Id.* at 5.  The Court, however, has already rejected that argument.  Dkt. No. 38.  The Court of Appeals then affirmed that aspect of the Court's decision, concluding that the Court "thoughtfully and scrupulously weighed the equities."  *American Hosp. Ass'n v. Price*, 867 F.3d 160 (D.C. Cir. 2017) (*AHA II*).

On remand, then, the Court's mission was not to re-weigh the equities, but to determine whether compliance with a mandamus order would be *possible*. *See* Dkt. No. 61. To change course now would require "extraordinary changed circumstances." *Pigford v. Veneman*, 355 F. Supp. 2d 148, 151 (D.D.C. 2005). And HHS has not shown them. HHS's new projections do not change this Court's prior finding that "hospitals are deeply out of pocket due to denied claims" and that the backlog has "resulted in a 'real impact on human health and welfare.' " Dkt. No. 38 at 8 (citations omitted); *see also American Hosp. Ass'n v. Burwell*, 812 F.3d 183, 193 (D.C. Cir. 2016) (*AHA I*) (explaining that "common sense suggests that lengthy payment delays will affect hospitals' willingness and ability to provide care"); *AHA II*, 867 F.3d at 172 (Henderson, J., dissenting) (emphasizing the "real-world problems" created by the backlog). In fact, as Plaintiffs pointed out (Dkt. No. 84 at 3)—and as HHS does not contest—the situation has grown so dire that one court has found that a provider would *go out of business* as a result of the backlog absent judicial intervention. *See Family Rehabilitation, Inc. v. Azar*, No. 3:17-cv-3008-K, 2018 WL 3155911, at *6 (N.D. Tex. June 28, 2018). The Court's previous findings—affirmed by the D.C. Circuit—that some mandamus remedy is warranted should not be disturbed.

HHS's other move is to attempt to shift the burden to Plaintiffs. It reads *AHA II* as limiting the "possibility" inquiry to the Court's previous order to eliminate the backlog by December 31, 2020. HHS Remedy Br. 2. Beyond that specific deadline remedy, HHS contends that *AHA II* "neither requires nor authorizes some wide-ranging 'possibility' inquiry untethered to the predicate for mandamus relief." *Id*. The predicate for mandamus relief, of course, remains the same: the Medicare Act "imposes a clear duty on [HHS] to comply with the statutory deadlines" and the "statute gives [Plaintiffs] a corresponding right to demand that compliance." *AHA I*, 812 F.3d at 192. And the "wide-ranging 'possibility' " inquiry into appropriate remedies

3

that HHS dismisses is in fact both authorized and required:  "[C]ourts must ensure that it is indeed possible to perform *the act being commanded*."  *AHA II*, 867 F.3d at 170 (emphasis added).

Taken together, the Court of Appeals's decisions mean that Plaintiffs may demand compliance with the 90-day ALJ appeal decision deadline through any *possible* methods HHS has at its disposal.  This Court has agreed with that interpretation; it explained that "the standard is not that we would prefer not to."  Dkt. No. 81 at 36.  In attempting to limit the possibility inquiry to only the deadline remedy, HHS improperly cabins the Court of Appeals's holdings.

## II.   THE COURT SHOULD CONSIDER A DEADLINE REMEDY IN LIGHT OF HHS'S ARGUMENTS AND PROJECTIONS.

The Court requested briefing on non-deadline remedies because it tentatively concluded that it would be impossible for HHS to reduce the backlog on a fixed schedule in the "short and more immediate term."  Dkt. No. 81 at 35.  The Court therefore believed that "the focus should be on what specific steps [it] should require [HHS] to take."  *Id.*

HHS used to agree.  In its motion for summary judgment, HHS told the Court that if the Court were to impose a mandamus remedy, it should "direct specific measures rather than impose backlog-reduction targets."  Dkt. No. 66-1 at 36.  In its remedies response, however, HHS has completely reversed course.  Now the agency claims that the Court cannot "prescribe specific programmatic changes as part of ordering mandamus" and should not interfere with HHS's policymaking discretion.  HHS Remedy Br. 16.  HHS does not even acknowledge its prior position, much less attempt to explain its about-face.

But perhaps deadline remedies *should* be back on the table.  The entire point of the Court's previous deadline-based remedy was to avoid interference with HHS's policymaking discretion—the Court would set the deadlines and HHS would use its discretion in achieving

them.  *See AHA II*, 867 F.3d at 174.  When it suggested in March that the parties develop

"specific measures," the Court may have believed that re-imposing a similar deadline remedy

would be futile because there would be no reliable way to reduce the backlog by fixed

increments; the most recent available statistics at that time showed that more appeals were

entering the system each year than HHS had the capacity to adjudicate.  *See* HHS Remedy Br. 3-

4.

      Now that HHS is projecting that it has the budget to adjudicate more appeals than will

enter the system (*see id.*), and thus make some headway against the backlog, the Court might

reconsider whether a deadline-based remedy is warranted.  After all, both Plaintiffs' proposed

deadline remedy and HHS's projections have the same end date for the backlog.  *Compare* Dkt.

No. 72-4 at 1, *with* HHS Remedy Br. 4.

      HHS suggests that in light of that, the Court should simply "require . . . periodic status

reports."  HHS Remedy Br. 25.  *Ordering* a deadline-based remedy in addition to requiring

periodic status reports, however, will have two important effects.

      *First*, making a deadline binding and not just aspirational will keep HHS from

backsliding.  HHS already hints at that troubling possibility when it argues that it should not be

ordered to maintain its current backlog-reduction programs and that it should be allowed to alter

its programs "in light of [its] other priorities."  HHS Remedy Br. 25.  Formalizing the deadline

will keep HHS on track for the next several years.

      *Second*, entering a deadline with fixed reduction targets each year along the way (*see* Dkt.

No. 72-4 at 1) gives HHS an aggressive goal and ensures steady interim progress.  By setting

goals more ambitious than HHS's projections, Plaintiffs' proposed order ensures that HHS

"continues to evaluate all administrative and legislative options, including new authorities,

funding, and reforms needed to improve the Medicare Appeals process and address the backlog."
Cochran Decl. ¶ 6.  And there is reason to believe that HHS has more solutions available to it.
Between its motion for summary judgment and its remedies response, HHS debuted an "express"
Settlement Conference Facilitation option.  *See* HHS Remedy Br. 13.  Under a mandamus order,
HHS will have an incentive to keep up these policymaking efforts.

## III.    THE COURT SHOULD ORDER PLAINTIFFS' NON-DEADLINE REMEDIES.

Until the backlog is eliminated and HHS complies with the 90-day ALJ-decision
requirement, the Court should impose Plaintiffs' non-deadline remedies.  Those remedies
collectively are designed to ensure that the backlog does not balloon again, that HHS takes
additional steps to remove appeals from the backlog, and that incentives to settle are
appropriately balanced.

### A.    The Court Should Order RAC Reforms.

Plaintiffs offered two RAC-related remedies in their submission:  HHS should impose a
financial penalty on RACs with a high overturn rate at the ALJ level; and the agency should shift
hospital-related claims to quality improvement organizations (QIOs), as it has done with other
categories of claims.  *Id.*

HHS primarily argues that additional reforms are unnecessary because RAC appeals are
currently just a small percentage of new appeals.  *See* HHS Remedy Br. 6-8.  But the emphasis is
on *currently*.  Without a mandamus remedy, the risk remains that the RACs will resume
unjustifiably denying hospital claims—which must then be appealed—in order to obtain
significant contingency fees.  *See* Pls. Remedy Br. 2-3.

That risk is not just hypothetical.  HHS's response—and the RACs' own public
statements—confirm it.  The agency acknowledges that RACs are clamoring to be let loose again
on hospital claims.  HHS Remedy Br. 12; *see* Pls. Remedy Br. 3 (referencing RAC letter to HHS

and op-ed directed at Congress).  HHS also admits that hospital claims tend to be the ones that make RACs profitable under the current payment schedule.  HHS Remedy Br. 11 (arguing that "in order to remain financially viable, RACs need to be able to review high-dollar claims . . . and most of the high-dollar claims are from hospitals").  And the agency intimates that even the shift of inpatient status reviews away from RACs to QIOs may not be permanent, stating that the shift to QIOs was done "to give providers time to comply with the newly clarified Medicare coverage policy for these particular types of claims."  Mills August 3, 2018 Decl. ¶ 6.  That raises the possibility that once the "time to comply" (whatever that means) has passed, hospital-inpatient-status claims will return to RACs.  Plaintiffs' fears that RACs would soon pivot back to hospital claims are thus not unfounded; they are confirmed by the logic of HHS's own submissions.

HHS also argues that its current RAC reforms are enough.  HHS Remedy Br. 12.  But HHS undercuts those assurances just a few pages later when it says that it should not be required to keep its RAC reforms in place.  *Id.* at 24-25.  HHS cannot have it both ways.  If the agency wants credit for its current RAC reforms, it should be willing to have those current reforms remain until it is again complying with its statutory 90-day deadline for ALJ decisions.

HHS's response is no more convincing on the merits of Plaintiffs' particular proposals.  Once again, HHS argues that a financial penalty on RACs with high overturn rates would be unlawful.  HHS Remedy Br. 8-9.  Plaintiffs have explained why it is not.  *See* Dkt. No. 72-1 at 7-8; Dkt. No. 43 at 10.  And even HHS once thought so; it posted on its public website a Statement of Work that included a 25% reduction of RACs' contingency fees for failing to enter certain information in a timely manner.  Pls. Remedy Br. 3.  HHS now says that was merely a "draft," and that the currently operative Statement of Work does not include the penalty provision.  HHS Remedy Br. 9.  HHS never explains why it posted a draft on its website—without any markings

showing it was a draft—rather than the currently effective Statement of Work.  In fact, to this

day, the current Statement of Work is not on HHS's "Resources" website for the RAC program.

*See* Centers for Medicare & Medicaid Servs., Medicare Fee for Service Recovery Audit Program,

*Resources*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-

Programs/Medicare-FFS-Compliance-Programs/Recovery-Audit-Program/Resources.html (last

updated June 26, 2018).  But more importantly, the differences between the two Statements of

Work do not prove that HHS thinks a penalty provision is impermissible.  Indeed, the declaration

accompanying the current Statement of Work pointedly does *not* say that the provision was

struck because HHS determined that the penalty provision in its draft Statement of Work was

unlawful.  *See* Mills August 3, 2018 Decl. ¶¶ 3-4.

In any event, Plaintiffs explained how the Court could avoid the penalty problem

altogether:  Make the penalty a financial incentive.  Pls. Remedy Br. 4.  HHS calls this "still an

illegal penalty in substance."  HHS Remedy Br. 9.  But HHS cites nothing after that sentence.

And if Plaintiffs' proposed financial incentive for ALJ-level accuracy is a penalty, then why is

HHS's existing financial incentive for RAC accuracy at the first level of appeal *not* a penalty?

*Cf.* HHS Remedy Br. 7.  Again, HHS does not say.  It has not carried its burden to prove that a

financial penalty—whether either explicitly structured as a penalty or as a restructured financial

incentive—would be unlawful.

HHS also has not shown that it would be unlawful or impossible to transfer all hospital-

related claims from RACs to QIOs.  HHS argues that a transfer of claims would be "in tension"

with the RAC program.  *See* HHS Remedy Br. 10-11.  "Tension" is not a synonym for "illegal."

And HHS's phrasing is telling.  HHS says that transferring all hospital post-payment reviews to

QIOs would be in tension with the statutory command that RACs review "all services for which

payment is made." HHS Remedy Br. 10.  But HHS already limits the issues that RACs review (*id.* at 7), so it cannot be illegal to limit the issues further by transferring additional hospital claims to QIOs.  HHS also argues that transferring all hospital-related claims to QIOs is in tension with paying RACs on a contingent-fee basis.  *Id.* at 11.  But RACs will still be paid on a contingent-fee basis.  They just will not review hospital claims.

HHS further complains that transferring hospital claims to QIOs might take time and cost money.  *Id.* at 11-12.  These are reasons that HHS would *prefer* not to transfer claims to QIOs or that it might cost HHS some sum to transfer claims to QIOs.  *See id.*  And those objections do not outweigh the benefits to transferring hospital claims to QIOs:  Better-trained reviewers, better-explained payment decisions, better collaboration between reviewers and providers, and— as a result—fewer appeals.  Pls. Remedy Br. 4-5.

HHS also expresses "concern" (HHS Remedy Br. 11) that transferring hospital claims to QIOs would threaten the viability of the entire RAC program, because RACs may not be able to cover their costs without those "high-dollar claims" in their portfolio.  *See* Mills August 3, 2018 Decl. ¶ 9; HHS Remedy Br. 11.  The "concern" HHS identifies is a corollary to the *risk* Plaintiffs have identified: that RACs will, if unfettered by recent reforms and a mandamus order, return to their past practice of capriciously rejecting many thousands of hospital claims.  That aside, the concern that RACs may withdraw from the program does not mean that transferring hospital claims to QIOs is unlawful or impossible.  It just means that HHS might have to find other ways—paying RACs a higher contingency fee, for example—to make up for the loss of those high-dollar hospital claims.

Transferring hospital claims to QIOs is lawful and would prevent additional appeals from entering the backlog.  Pls. Remedy Br. 4-5.  The Court should require it.

**B.      The Court Should Require HHS To Demonstrate, Not Just Assert, Its Commitment To Good-Faith, Evidence-Based Settlements By Documenting Its Settlement Activity.**

The Court should also require HHS to demonstrate its commitment to good-faith, evidence-based settlements by documenting its settlement activity under seal. *See* Pls. Remedy Br. 6-8.[1]  HHS represents that it is making settlement offers based on available evidence, revealing for the first time its general methodology for making settlement offers—a methodology that is in line with Plaintiffs' proposal. *See* HHS Remedy Br. 13-14.  That is a good start.

HHS objects, however, to having to report on its settlement efforts. *See id.* at 14.  But reporting is the only way that the Court can ensure that HHS is living up to its representations and to monitor any misalignment in the parties' settlement incentives.  For instance, HHS has claimed throughout the litigation that the reason more providers are not settling is that they are holding out for an unrealistic payday. *See* Dkt. No. 75 at 13-14.  The only way to know whether that is true is for HHS to provide data exclusively within its control—what HHS is offering, what providers are demanding, and why HHS is not agreeing to providers' demands.

HHS's current information is not particularly illuminating on these questions.  HHS's declarations state that the agency has settled 13,315 appeals through the LVA initiative (McQueen Aug. 3, 2018 Decl. ¶ 3) and 72,000 appeals through the SCF program, Aug. 3, 2018 Griswold Decl. ¶ 4.  But those numbers are not informative without a denominator; the declarations do not say how many appeals were conferenced but not settled or why the appeals that were not settled were unable to reach a resolution.  Without that, the Court is without the

---

[1] HHS repeatedly argues that Plaintiffs are accusing the agency of bad faith.  HHS Remedy Br. 2, 5, 12, 16, 17, 24.  Not at all.  Plaintiffs' proposals guard against the *potential* for bad faith created by HHS's skewed incentives.  But it is striking that HHS has no compunctions about accusing *hospitals* of bad faith in settlement negotiations.  HHS Remedy Br. 19.

information it needs to monitor the parties' incentives to settle and make any necessary adjustments.

HHS's refusal to provide more detailed information about its settlement processes also has implications for the Court's evaluation of whether HHS is taking adequate steps towards resolving the backlog.  For instance, it is unclear whether the initial batch of settlements through the LVA and SCF programs are the low-hanging fruit and that further settlements are unlikely without further modification to HHS's programs.  Detailed updates on the back-and-forth of settlement negotiations will shed light on these issues.

Contrary to HHS's arguments (HHS Remedy Br. 16), Plaintiffs are not attempting to force HHS to settle any particular appeals or for the Court to be a super-mediator.  Rather, Plaintiffs are proposing to put HHS's theories about providers' settlement behaviors to the test. If providers are truly holding out in bad faith, the settlement-conference records will show that. If HHS is using the backlog as leverage to offer lowball settlements to desperate providers, the settlement-conference records will show that, too.  That information-gathering approach is a *less* intrusive remedy than requiring mass settlements, and the Court should order it.  *See* Pls. Remedy Br. 8.

C.     **The Court Should Reduce The Backlog's Impact On Providers By Reducing Interest On Retained Alleged Overpayments And Allowing Rebilling.**

The Court should also reduce the backlog's impact on providers by ordering the reduction of the interest on overpayments retained by providers while the appeals process plays out and by allowing providers to rebill allegedly miscoded claims.  *See* Pls. Remedy Br. 8-11. Reducing interest will equalize providers' and HHS's incentives to settle cases by making it more feasible for providers to retain alleged overpayments while the appeals process plays out.

*Id.* at 8-10.  And allowing rebilling will give providers an opportunity to settle some cases out of the backlog by submitting them under a different code.  *Id.* at 10-11.

On interest reduction, HHS argues that the interest providers pay is set by statute and regulation.  HHS Remedy Br. 17-18.  But Plaintiffs have explained that HHS's demonstration-program authority provides a ready workaround.  *See* Pls. Remedy Br. 10.  Indeed, that is the very point of a demonstration project:  To allow what current statutes and regulations do not. HHS protests (HHS Remedy Br. 19) once more that its demonstration-program authority would not authorize Plaintiffs' proposal, and Plaintiffs will not relitigate that dispute here.  Suffice it to say that it is surprising for HHS to suddenly find limitations on its statutory authority when it suits its own interests.

Beyond that well-trod debate, HHS argues that there is currently a level playing field between it and providers because HHS pays interest at an equally outrageous rate when a provider prevails on appeal.  HHS Remedy Br. 18.  But the practicalities of the parties' positions could not be more different.  Providers forced to turn over an alleged overpayment while its appeal lingers for years in limbo can be kept from providing needed patient services or upgrading facilities or equipment.  *Supra* at p. 3.  HHS, meanwhile, has the full faith and credit of the United States behind it.  Although the dollar amount that each side pays may be the same, the effect of that payment on each side's operations is markedly not.  The Court should not be troubled by a potential mismatch between the interest rate providers pay and the interest rate HHS pays.  *Cf.* HHS Remedy Br. 18-19.

HHS's response to Plaintiffs' proposal to allow rebilling also misses the mark, largely because HHS misunderstands the proposal.  *Cf.* HHS Remedy Br. 20-23.  HHS frets that Plaintiffs' proposal allows for providers to appeal every coding denial, knowing that they will be

offered the settlement of rebilling if they appeal.  *Id.* at 22.  No.  Under Plaintiffs' proposal, the rebilling period extends for only six months from the date of the Court's judgment precisely to keep rebilling from becoming a long-term incentive for providers.  Pls. Remedy Br. 10.  And to the extent the Court believes there is a risk of repeated return trips to the backlog—either during that six month period or after a rebilled claim is denied—the Court can tweak the proposal so that it applies only to appeals in the backlog as of date of the Court's judgment and so that a claim cannot be appealed again after it is rebilled.

HHS offers a pocket history of providers' rebilling concerns, calling them "not a creation of the OMHA backlog."  HHS Remedy Br. 21.  But the question is not whether rebilling is a creation of the backlog, but whether rebilling would help alleviate the backlog.  For all of the reasons Plaintiffs have explained, it would.  *See* Pls. Remedy Br. 10-11.

HHS also argues that rebilling would be unauthorized because it has previously rejected a rebilling proposal through notice-and-comment rulemaking and had that rejection upheld by the Court.  HHS Remedy Br. 23.  But HHS's previous rulemaking decided not to allow rebilling past the one-year default period as a matter of agency discretion.  *See* 78 Fed. Reg. 50,496, 50,927 (Aug. 19, 2013).  Indeed, HHS explicitly recognized that "we have the ability to create exceptions to the 1-calendar year time limit to file claims."  *Id.*  That previous discretionary denial cannot foreclose rebilling as a mandamus remedy.  And HHS's suggestion that this Court approved of its rebilling decision is not accurate.  In the opinion HHS cites, the Court rejected the suit on jurisdictional grounds, not the merits.  *American Hosp. Ass'n v. Burwell*, 68 F. Supp. 3d 54, 64-65 (D.D.C. 2014).

### D. The Court Should Toll The Time To File Section 340B Appeals.

The Court should also require HHS to toll the time to appeal denied Section 340B claims.  Pls. Remedy Br. 12-13.  As HHS notes, the D.C. Circuit affirmed the Court's dismissal of

AHA's challenge against HHS's reduction in reimbursement that Section 340B hospitals receive for purchasing certain drugs. *See American Hosp. Ass'n v. Azar*, No. 18-5004, 2018 WL 3431746 (D.C. Cir. July 17, 2018). But the D.C. Circuit affirmed on the ground that the hospitals had not first presented their claims to HHS under the Medicare Act—not that payment reductions of the sort that the hospitals challenged were not subject to administrative or judicial review. *See id.* at *3-*5.

The Court therefore should still require HHS to toll the time to file Section 340B administrative appeals. The hospitals will soon refile their suit in this Court with the jurisdictional defect the D.C. Circuit identified cured. American Hosp. Ass'n, *Hospital Groups to Continue Fight to Reverse Cuts for 340B Hospitals* (July 17, 2018), https://tinyurl.com/y8rwwg6z. Once the suit is refiled, the hospitals will be in the same position as they were before—forced to file protective administrative appeals, including to the ALJ level, to protect their rights while the suit proceeds. *See* Pls. Remedy Br. 12-13. The Court should avoid that wasteful addition of appeals to the backlog by requiring tolling. *Id.*

**E.     The Court Should Require HHS To Maintain Its Current Efforts.**

Finally, the Court should require HHS to maintain its current efforts to fight the backlog by requiring HHS to secure the Court's approval for alterations or reductions in its current efforts. Pls. Remedy Br. 13-14. HHS's opposition to this proposal (HHS Remedy Br. 24-25) is both new and surprising, given that it previously stated that the Court "could instruct HHS to continue implementing the [Low Value Appeals] and the other settlement programs described" in the motion. Dkt. No. 66-1 at 36. HHS must have necessarily contemplated requiring leave of Court to modify or reduce its programs because an "instruct[ion]" that allowed HHS to change its mind at any time is not an instruction at all. HHS (again) does not explain its sudden change of position.

Either way, a maintenance-of-efforts provision is an essential part of any mandamus remedy. Without it, HHS can alter its current programs at its whim, threatening to undo any current progress. And that possibility is not remote; even now, HHS signals that it might choose to alter its efforts based on unspecified "other priorities." HHS Remedy Br. 25. If the Court is to ensure that its remedies stick until the backlog is eliminated, it should prevent HHS from unilaterally suspending its current backlog-reduction programs.

## CONCLUSION

For the foregoing reasons and those in Plaintiffs' prior briefs, the Court should grant Plaintiffs summary judgment and enter Plaintiffs' proposed deadline and non-deadline remedies.

Respectfully submitted,

/s/ Catherine E. Stetson
Catherine E. Stetson (D.C. Bar. No. 453221)
Sheree Kanner (D.C. Bar No. 366926)
Sean Marotta (D.C. Bar No. 1006494)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
cate.stetson@hoganlovells.com

*Attorneys for Plaintiffs*

Dated: August 10, 2018.

**CERTIFICATE OF SERVICE**

I certify that on August 10, 2018, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all counsel, who are registered users.

/s/ Catherine E. Stetson