## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN HOSPITAL ASSOCIATION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services,<br><br>Defendant. | No. 1:14-cv-00851-JEB |

### <u>DEFENDANT'S MOTION FOR MODIFICATION OF THE MANDAMUS ORDER</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.    The System for Administrative Review of Medicare Reimbursement Claims.................. 2

II.    This Litigation ................................................................................................... 4

III.    The Mandamus Order ........................................................................................ 6

IV.    The Secretary's Successful Implementation of the Mandamus Order .............................. 8

V.    Factors Precluding the Complete Elimination of Delays in Adjudications. ...................... 9

STANDARD OF REVIEW ...................................................................................................14

DISCUSSION ...................................................................................................................15

I.    The Mandamus Order Has Achieved Its Purposes. .......................................................... 15

II.    Further Application of the Mandamus Order Would Not Be Equitable. .......................... 19

III.    A Limited Modification of the Mandamus Order Is Appropriate..................................... 20

CONCLUSION....................................................................................................................22

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page**

*Am. Council of the Blind v. Mnuchin*,
   977 F.3d 1 (D.C. Cir. 2020) ................................................................................................ 16

*Am. Council of the Blind v. Mnuchin*,
   878 F.3d 360 (D.C. Cir. 2017) ....................................................................................... 14, 20

*Am. Hosp. Ass'n v. Azar*,
   No. 1:14-cv-00851-JEB, 2018 WL 5723141 (D.D.C. Nov. 1, 2018) ............. 6-7, 15-16, 18, 20

*Am. Hosp. Ass'n v. Burwell*,
   812 F.3d 183 (D.C. Cir. 2016) ............................................................................ 5, 7, 15-18

*Am. Hosp. Ass'n v. Burwell*,
   No. 1:14-cv-00851-JEB, 2016 WL 7076983 (D.D.C. Dec. 5, 2016),
   *rev'd*, 867 F.3d 150 (D.C. Cir. 2017) .................................................................................. 6

*Am. Hosp. Ass'n v. Burwell*,
   209 F. Supp. 3d 221 (D.D.C. 2016) ............................................................................ 6, 15, 18

*Am. Hosp. Ass'n v. Burwell*,
   76 F. Supp. 3d 43 (D.D.C. 2014), *rev'd*, 812 F.3d 183 (D.C. Cir. 2016) ............................ 4, 5

*Am. Hosp. Ass'n v. Price*,
   867 F.3d 160 (D.C. Cir. 2017) .................................................................................... 6, 16, 19

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004) ............................................................................................................. 15

*Gov't of Province of Manitoba v. Zinke*,
   849 F.3d 1111 (D.C. Cir. 2017) .......................................................................................... 20

*Horne v. Flores*,
   557 U.S. 433 (2009) ............................................................................................ 14, 15, 19, 21

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992) ........................................................................................... 7, 14, 20, 21

*Salazar ex rel. Salazar v. D.C.*,
   633 F.3d 1110 (D.C. Cir. 2011) .......................................................................................... 14

*United States v. Motorola, Inc.*,
   No. Civ. 94-2331 (TFH), 1999 WL 631259 (D.D.C. Feb. 16, 1999) ................................. 14

**Statutes:**

28 U.S.C. § 1361 ........................................................................................................... 4

42 U.S.C. § 1320c–4 ..................................................................................................... 9

42 U.S.C. § 1395d ......................................................................................................... 2

42 U.S.C. § 1395ff ......................................................................................... 2-4, 8-9, 16-17

42 U.S.C. § 1395k ......................................................................................................... 2

42 U.S.C. § 1395kk-1 .................................................................................................... 2

42 U.S.C. § 1395ddd ................................................................................................... 15

Medicare Prescription Drug, Improvement, and Modernization Act of 2003,
    Pub. L. No. 108-173, 117 Stat. 2066 ...................................................................... 3

Consolidated Appropriations Act, 2018,
    Pub. L. No. 115-141, 132 Stat. 348 ...................................................................... 16

Department of Defense and Labor, Health and Human Services, and Education
    Appropriations Act, 2019 and Continuing Appropriations Act, 2019,
    Pub. L. No. 115-245, 132 Stat. 2981 (2018) ......................................................... 16

Consolidated Appropriations Act, 2021,
    Pub. L. No. 116-260, 134 Stat. 1182 (2020) ......................................................... 16

Further Consolidated Appropriations Act, 2020,
    Pub. L. No. 116-94, 133 Stat. 2534 (2019) ........................................................... 16

Consolidated Appropriations Act, 2022,
    Pub. L. No. 117-103, 136 Stat. 49 ........................................................................ 16

**Rules:**

Fed. R. Civ. P. 60(b)(5) ....................................................................................... 1, 14, 19

**Regulations:**

42 C.F.R. § 401.613 ................................................................................................... 15

42 C.F.R. § 405.902 ..................................................................................................... 3

42 C.F.R. § 405.904 .................................................................................................. 2, 3

42 C.F.R. § 405.920 ..................................................................................................... 2

42 C.F.R. § 405.928 .................................................................................................... 2

42 C.F.R. § 405.960 .................................................................................................... 3

42 C.F.R. § 405.978 .................................................................................................... 3

42 C.F.R. § 405.1014 .................................................................................................. 9

42 C.F.R. § 405.1016 ............................................................................................. 3-4, 9

42 C.F.R. § 405.1018 .................................................................................................. 9

42 C.F.R. § 405.1030 .................................................................................................. 9

42 C.F.R. § 405.1037 .................................................................................................. 9

42 C.F.R. § 405.1044 .................................................................................................. 9

70 Fed. Reg. 36,386 (June 23, 2005) ........................................................................ 3

76 Fed. Reg. 19,995 (Apr. 11, 2011) ........................................................................ 3

82 Fed. Reg. 4974 (Jan. 17, 2017) ............................................................................ 3

**Other Authorities:**

OMHA Case Processing Manual,
    https://perma.cc/DGK8-9AZR .............................................................................. 9

## INTRODUCTION

Pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure, the Defendant, Xavier Becerra, the Secretary of Health and Human Services (HHS), respectfully moves for a modification of this Court's November 1, 2018 order of mandamus on the ground that the prospective application of that order is no longer equitable. The mandamus order directed HHS to reduce the backlog of Medicare reimbursement appeals pending before administrative law judges (ALJs) by 19%, 49% and 75%, respectively over each of the first three years that the order has been in effect. Order, ECF No. 89. HHS has met, and even has exceeded, these targets. The mandamus order, however, also directed the agency to completely eliminate the backlog by the end of fiscal year 2022. *Id.* Although HHS projects that its efforts will have reduced the backlog by more than 96% by the end of this fiscal year, its recent review of the volume and nature of Medicare reimbursement appeals pending before ALJs reveals that it is unlikely that the backlog could be reduced completely to zero by the end of the fiscal year, or—given the constant flux of appeals filings—that it would ever be possible to guarantee that all appeals are decided by ALJs within 90 days of their filing.

This litigation was brought, and this Court's mandamus order was entered, to address a systemic deficiency in the processing of Medicare appeals. The combined efforts of Congress and the agency, along with this Court's mandamus order, have been extraordinarily successful in resolving that systemic problem. HHS has substantially complied with the mandamus order, and it is committed to continuing its efforts to ensure that Medicare appeals are processed in a timely fashion. There will, however, almost certainly continue to be a small number of appeals that ALJs are unable to decide within 90 days. As explained below, these appeals are not the symptom of any continuing programmatic flaw in the adjudication process. Instead, in any system of

1

adjudication, there will always be a certain number of cases that by their nature take longer to resolve.

HHS accordingly requests that the Court modify its mandamus order to direct that the agency achieve a 96% reduction in the backlog of Medicare appeals identified in the Court's November 2018 order by the end of fiscal year (FY) 2022; that it achieve a 98% reduction in that backlog by the end of the second quarter of fiscal year 2023; and that it file status reports for the end of fiscal year 2022 and each of the two following quarters confirming that it has achieved these targets.  Assuming the agency's success in doing so, this Court may appropriately conclude that the purposes of the mandamus order have been fulfilled, and the order may be deemed at that point to have been satisfied.

Counsel for HHS conferred concerning this motion with counsel for the Plaintiffs on September 6, September 7, September 8, and September 9, 2022.  On September 9, 2002, counsel for the Plaintiffs reported that they oppose this motion.

## BACKGROUND

### I.     The System for Administrative Review of Medicare Reimbursement Claims.

The Medicare statute establishes a federal program of health insurance for the elderly and disabled.  In general, Part A covers inpatient hospital stays and other institutional care, as well as home health care, *see* 42 U.S.C. § 1395d, and Part B covers physician and other medical services, *see* 42 U.S.C. § 1395k.  A health care provider that furnishes services it believes to be covered under Medicare Part A or B may submit a claim for payment to a Medicare Administrative Contractor, a private contractor responsible for making an "initial determination" as to what payment (if any) should be made on the claim.  *See* 42 U.S.C. §§ 1395ff(a)(1)-(2), 1395kk-1(a); 42 C.F.R. §§ 405.904(a)(2), 405.920-405.928.  If the provider is dissatisfied with this initial

determination as to its claim for payment under Medicare Part A or B, it can bring a challenge through a four-level administrative appeals process.  *See* 42 U.S.C. § 1395ff.  After administrative appeals are exhausted, if the provider is still dissatisfied, it may bring suit in federal court.

At the first level of administrative review, a provider dissatisfied with an initial determination may seek a "redetermination" by the private contractor.  *Id.* § 1395ff(a)(3).  At the second level of review, a provider dissatisfied with the redetermination may seek "reconsideration" by a Qualified Independent Contractor (QIC), another independent entity under contract with the Centers for Medicare & Medicaid Services (CMS).  *Id.* § 1395ff(b)-(c), (g); 42 C.F.R. §§ 405.902, 405.904(a)(2), 405.960-405.978.  If the provider is still dissatisfied with the QIC's reconsideration decision or if no decision is made within 60 days, the provider may appeal to the third level of administrative review, a hearing before an administrative law judge (ALJ), 42 U.S.C. § 1395ff(b), (d)(1), with a fourth level of administrative review then available before the Medicare Appeals Council, a component within HHS's Departmental Appeals Board.  *Id.* § 1395ff(d)(2).  As the Court is aware, this case concerns appeals pending before ALJs at the third level of review.  HHS's Office of Medicare Hearings and Appeals (OMHA), a division within the Office of the Secretary that is independent of CMS, administers this level of review.  *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 931, 117 Stat. 2066, 2396; 82 Fed. Reg. 4974 (Jan. 17, 2017); 76 Fed. Reg. 19,995 (Apr. 11, 2011); 70 Fed. Reg. 36,386 (June 23, 2005).

The Medicare statute provides that ALJs "shall conduct and conclude a hearing on a decision of a [QIC] and render a decision on such hearing by not later than the end of the 90-day period beginning on the date a request for hearing has been timely filed," *id.* § 1395ff(d)(1)(A); *accord* 42 C.F.R. § 405.1016(a), unless the time for decision has been extended, 42

U.S.C. 1395ff(d)(1)(B), *accord, e.g.*, 42 C.F.R. § 405.1016(d). The statute further specifies the "[c]onsequences of failure to meet [this] deadline[]"; if the ALJ fails to provide a timely determination, the party is excused from having to exhaust ALJ review and may "escalate" the appeal to the fourth level of administrative review. 42 U.S.C. § 1395ff(d)(3)(A).

Throughout the first several years of this four-tier system of administrative review, OMHA was able to decide the vast majority of the appeals that were subject to the section 1395ff(d)(1)(A) deadline within the statutory 90-day period. From 2008 to 2011, OMHA decided more than 90% of appeals subject to § 1395ff(d)(1)(A) within the applicable deadline. Declaration of McArthur Allen, ¶ 10. For a variety of reasons, some of the appeals filed with OMHA during this period took longer than 90 days for ALJs to adjudicate. *Id.*

Beginning around 2012, however, the number of appeals filed with OMHA began to expand dramatically. *See Am. Hosp. Ass'n v. Burwell*, 76 F. Supp. 3d 43, 46-47 (D.D.C. 2014) (*AHA I*). At its height, the number of appeals pending before OMHA for longer than 90 days reached more than 886,000 cases. Allen Decl., ¶ 5. HHS and OMHA instituted a series of reforms that sought to ensure that appeals could be decided more expeditiously, or that appeals could be settled or otherwise resolved outside of the administrative review process where possible. Decl. of Nancy J. Griswold, ¶¶ 5-18, ECF No. 66-3. Those reforms succeeded in reducing the number of appeals pending before OMHA to less than one half of its former size. Nonetheless, OMHA projected that about 426,000 appeals would be pending at the end of FY 2018. Medicare Appeals Workload Projections—OMHA (June 30, 2018), ECF No. 86-2.

## II.    This Litigation.

In 2014, the Plaintiffs filed their complaint in this action, seeking relief in the nature of mandamus under 28 U.S.C. § 1361 that would direct HHS to clear the backlog. Compl., ECF No.

1.  This Court granted the agency's motion to dismiss, reasoning that "Congress [was] aware of the situation and [was] in a position to address the problem."  *AHA I*, 76 F. Supp. 3d at 56.

The D.C. Circuit reversed.  *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016) (*AHA II*).  It held that the Plaintiffs had demonstrated the three threshold elements for a mandamus action, including that "no adequate alternative remedy exist[ed]."  *Id.* at 189.  The court acknowledged that the Medicare statute affords a provider the opportunity to escalate an appeal that is not decided in a timely fashion, but held that this remedy was not adequate under the circumstances that prevailed at that time:

> If delays occurred only in isolated or occasional cases, escalation might suffice.
> Indeed, we agree with the Secretary that Congress's inclusion of the remedy in the
> statutory scheme indicates that Congress anticipated that violations might occur
> with some measure of regularity.  That said, nothing suggests that Congress
> intended escalation to serve as an adequate or exclusive remedy where, as here, a
> systemic failure causes virtually all appeals to be decided well after the statutory
> deadlines.

*Id*. at 191.  The D.C. Circuit remanded the case to this Court to determine whether the equities weighed in favor of granting a writ of mandamus.  *Id.* at 192.  To guide this Court's discretion, the Circuit "set out the factors that weigh most strongly for and against mandamus in this case."  *Id.* The factors that weighed against mandamus included:  (1) the risk that the writ would "infring[e] on the authority and discretion of the executive branch"; (2) "Congress's awareness of and attention to the situation"; (3) "the fact that Congress has provided escalation as a remedy"; and (4) "the Secretary's good faith efforts to reduce the delays within the constraints she faces," given that "[t]he backlog and delays have their origin in the political branches, and ideally the political branches should resolve them."  *Id.* at 192-93.  The factors that weighed in favor of mandamus included:  (5) the record evidence that "the delays [were] having a real impact on human health and welfare"; and (6) the agency's "substantial discretion" in implementing the Recovery Audit

Contractor program, which the Circuit understood to be the source of much of the backlog.  *Id.* at 193 (internal quotation omitted).  The Circuit further recognized that the writ may be unnecessary if "Congress and the Secretary are making significant progress toward a solution."  *Id.*

On remand, this Court balanced the equities set forth in the D.C. Circuit's opinion and concluded that they weighed in favor of granting a writ of mandamus.  *Am. Hosp. Ass'n v. Burwell*, 209 F. Supp. 3d 221, 230 (D.D.C. 2016) (*AHA III*).  After receiving briefing from the parties as to the appropriate remedy, this Court entered an order instructing HHS to eliminate the backlog of appeals over a four-year period ending on December 31, 2020.  *Am. Hosp. Ass'n v. Burwell,* No. 1:14-cv-00851-JEB, 2016 WL 7076983, at *3 (D.D.C. Dec. 5, 2016) (*AHA IV*); *see also* Order, ECF No. 47.  The D.C. Circuit again reversed and remanded, holding that this Court had erred by ordering such relief "without first finding that lawful compliance was indeed possible."  *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 166 (D.C. Cir. 2017) (*AHA V*).

## III.   The Mandamus Order.

Upon returning to the district court, the parties briefed their competing proposals for the content of an appropriate mandamus order.  "Then, when least expected, a *deus ex machina* arrived"; in March 2018, Congress appropriated sufficient funds to HHS to permit the agency to more than double OMHA's adjudication capacity.  *Am. Hosp. Ass'n v. Azar*, No. 1:14-cv-00851-JEB, 2018 WL 5723141, at *2 (D.D.C. Nov. 1, 2018) (*AHA VI*).  HHS projected that this appropriation would render it possible for the agency to eliminate the backlog of appeals by the end of fiscal year 2022.  Def.'s Status Report & Response to Pls.' Proposed Non-Deadline Remedies at 1, 4, ECF No. 86.

This Court held a hearing to address the effect of the new appropriation.  *See* Tr. of Oct. 23, 2018 Status Conf., ECF No. 106.  Counsel for HHS explained that, because of increased

congressional appropriations, the agency expected that it would be able to comply with an order like the one the Court ultimately issued, *id.* at 6:7-16, but he emphasized that this expectation was based on necessarily uncertain projections about the processing of appeals years in the future, *id*. at 6:11-24, 11:12-17.  Given the inherent uncertainty of these predictions, HHS opposed the entry of an order that would set backlog reduction targets years in advance.  *Id*. at 11:12-12:12.

Following the hearing, this Court issued the mandamus order.  It stated its understanding that it had a "narrow task on remand," namely, to determine whether lawful compliance with a mandamus order would be impossible.  *AHA VI*, 2018 WL 5723141, at *3.  The Court found that the new appropriation rendered compliance to be possible (albeit under a revised timetable).  *Id.* The Court added that, even if it were to reweigh the equities identified in the first D.C. Circuit opinion, it would still issue the writ, given that there is a "backlog of hundreds of thousands of appeals," in which "reimbursement claims languish for years."  *Id.* at *4 (citing *AHA II*, 812 F.3d at 193).  The Court acknowledged the agency's caveat that there was a degree of uncertainty as to its projections, and accordingly noted that, "[s]hould a change in circumstances—not limited to an appropriations shortfall—render lawful compliance with the order impossible, … Defendant can return and request modification at that time."  *Id.* at *3 (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)).

The Court accordingly issued an order that established a schedule for the reduction of the backlog, as follows:

> Defendant must achieve the following reductions from the currently projected FY 2018 backlog of 426,594 appeals: a 19% reduction by the end of FY 2019; a 49% reduction by the end of FY 2020; a 75% reduction by the end of FY 2021; and elimination of the backlog by the end of FY 2022[.]

Order, ECF No. 89.

IV.     **The Secretary's Successful Implementation of the Mandamus Order.**

HHS met, and indeed exceeded, the first three benchmarks set forth in the mandamus order. The agency achieved a 31% reduction in the number of appeals pending before OMHA by the end of FY 2019, a 61% reduction by the end of FY 2020, and reduction of more than 85% by the end of FY 2021.  *See* Allen Decl., ¶ 3; *see also* Medicare Appeals Dashboard, Reporting Period Through Quarter 2 of FY 2022, ECF No. 107-1.  And, during the current fiscal year, the agency has continued to significantly reduce the number of pending appeals, having reduced the number to 37,373 by the end of the second quarter of FY 2022, *i.e.*, March 31, 2022.  *See* Medicare Appeals Dashboard, ECF No. 107-1.

The agency has further succeeded in reducing the number of pending appeals that are subject to, but have not been decided within, the 90-day time frame set forth in § 1395ff(d)(1)(A) (*i.e.*, the "backlog").  Although the agency has not yet completed its review of the data underlying the Medicare Appeals Dashboard for the third quarter of FY 2022, OMHA anticipates that the data will show that 28,277 appeals were pending before OMHA as of June 30, 2022, and that 19,802 of those appeals exceeded the 90-day statutory deadline.  Allen Decl., ¶ 4.  This constitutes a reduction of more than 95% from the 426,594 appeals that were projected to be pending at the time of the mandamus order, and a reduction of more than 97% from the number of appeals pending at the height of the OMHA backlog.  *Id.*, ¶ 5.  As of August 31, 2022, approximately 450 backlogged appeals are acute inpatient hospital appeals and 275 are acute inpatient rehabilitation facility (IRF) appeals, which represents only 3.7% of these 19,802 appeals.  *Id.*, ¶ 4.  Just under 1,500 RAC appeals remain in the backlog, which is a 99.7% reduction from the number of RAC appeals that were pending at the end of FY 2015 (437,524).  *Id.*, ¶ 5.

This data includes appeals in which one or more events have extended the 90-day statutory deadline that applies to Medicare Part A and B appeals, either by delaying the commencement of adjudication time frames or by extending the adjudication time frame. *Id.*[1] This data also includes some appeals that are not subject to the 90-day timeline of 42 U.S.C. § 1395ff(d)(1)(A), such as Part A and Part B appeals under 42 U.S.C. § 1320c–4 when a Quality Improvement Organization has issued a reconsideration; appeals of organization determinations made by Part C Medicare Advantage organizations; and appeals of determinations made by the Social Security Administration, such as Medicare eligibility and entitlement determinations, Part B and D Income-Related Monthly Adjustment Amount determinations, or Part B late-enrollment penalty determinations. *Id.*

## V.    Factors Precluding the Complete Elimination of Delays in Adjudications.

Although OMHA does not yet have complete data for the last quarter of 2022, it now projects that there will likely be approximately 12,000 appeals pending at OMHA over the 90-day statutory deadline as of the end of FY 2022, a reduction of slightly more than 97% from the number of appeals projected to be pending as of the time the mandamus order was issued. Allen Decl., ¶ 6. Because the agency's capacity for adjudications generally continues to exceed the pace of

---

[1] Under the Secretary's regulations, the period in which an ALJ is expected to issue a decision after an appeal is correctly filed may be tolled, *inter alia*, when an appellant submits an incomplete request for appeal, 42 C.F.R. § 405.1014(b); an appellant requests an extension, *id.* § 405.1016(d)(1); an appellant requests a stay of proceedings, *id.* § 405.1016(d)(2)(ii); an appellant requests that a hearing be rescheduled, *id.* § 405.1030(e); a party delays the submission of evidence, *id.* § 405.1018(b); a party requests the reassignment of an appeal to a different ALJ, *id.* § 405.1026(d); a party requests discovery, *id.* § 405.1037(f); or when it is necessary to waive adjudication deadlines to allow for the consolidation of appeals, *id.* § 405.1044(a). *See also* OMHA Case Processing Manual, ch. 7, § 7.2, https://perma.cc/DGK8-9AZR. OMHA has not historically tracked the number of appeals subject to one or more of these tolling events, so the figure of 19,802 appeals described in the text above represents a conservative estimate, and the true number of appeals pending beyond the statutory deadline is likely lower. Allen Decl., ¶ 4.

incoming appeals, the agency projects that it will continue to reduce the backlog in the coming months, and that it will be able to achieve a 98% reduction in that backlog by the end of the second quarter of FY 2023. *Id.*, ¶ 9. These projections are inherently uncertain, however. *Id.*

Although the number of pending Medicare appeals continued to drop throughout the first two quarters of FY 2022, the rate of reduction unexpectedly slowed during this period. *See* Medicare Appeals Dashboard, ECF No. 107-1. Now that the backlog has been reduced to a small fraction of its original size, OMHA has been able to engage in a more complete review of the causes of this slowed reduction rate and the characteristics of the remaining set of appeals that are not decided within 90 days. Allen Decl., ¶ 7. That review has revealed that there is a relatively small number of appeals that are unlikely to be resolved within 90 days, and accordingly OMHA does not believe that it will be possible to reduce the backlog completely to zero by the end of the fiscal year. Because providers are likely to continue to file similar types of appeals, OMHA does not believe that it could ever guarantee that 100% of all incoming appeals are decided within 90 days. *Id.* Although the agency previously had anticipated that it could reduce the backlog to zero within four years, *see supra*, pp. 6-7, that prediction was based on a straight-line projection of the number of additional appeals that could be decided as a result of the new appropriation, *see* Medicare Appeals Workload Projections – OMHA (June 30, 2018), ECF No. 86-2, and did not take into account that new appeals would be filed after the mandamus order that by their nature, or because of the timing of their filing, could not be decided within the 90-day period, Allen Decl., ¶ 7.

In particular, a certain category of appeals, known colloquially as "big-box" appeals, cannot be expected to be decided within 90 days. A big-box appeal is a single appeal contesting administrative determinations on 30 or more individual claims; such an appeal often cannot be

decided within 90 days given its complicated nature and the high number of claims involved.  Allen Decl., ¶¶ 7, 8.  Some big-box appeals address hundreds or thousands of claims, and they often involve complicated issues of statistical sampling and extrapolation to a larger universe of claims. *Id.*, ¶ 8.  The combination of multiple claims into a big-box appeal allows for more efficient adjudications, given the common issues of law or fact involved, but they are far more complex and time-consuming for ALJs to decide than an appeal addressing a single claim.  *Id.*  From FY 2019 through FY 2021, big box appeal receipts (measured as a percentage of OMHA's total receipts of appeals) steadily increased.  *Id.*, ¶ 7.  The agency has diligently sought to complete the adjudication of these appeals, and as a result, as of August 19, 2022, there are 433 big-box appeals pending at OMHA beyond the 90-day statutory deadline.  *Id.*, ¶ 7.

In addition to big-box appeals, some appeals involving fewer than 30 claims can still involve unusually complex issues that require extensive research, or present difficult evidentiary or procedural issues, and these appeals can take longer than 90 days to adjudicate.  *Id.*  For example, scientific advancements leading to new technology may require adjudicators and staff to research new legal authorities or review peer-reviewed literature and scientific community standards to determine the coverage rules and authorities that apply to the new technology.  *Id.*

The case mix of appeals pending before OMHA has also changed recently in ways that makes it less likely that it could guarantee that particular appeals could be decided within 90 days. Previously, ALJs frequently dealt with appeals presenting repetitive issues filed in large batches, such as hospital appeals involving patient status, and these commonalities created some economies of scale that allowed for quicker processing of individual appeals.  *Id.*  When OMHA receives a high volume of appeals with the same or similar issues, adjudicators and staff are able to become familiar with the applicable law and subject areas, which in turn leads to faster decision-making

and the potential for scheduling combined hearings to address multiple appeals.  *Id*.  More recently, however, appeals filed with OMHA have tended to present a wider variety of issues and providers, and this has resulted in fewer opportunities for the efficiencies provided in adjudicating appeals with common issues.  *Id.*

The rate at which appellants withdrew appeals before an ALJ hearing and at which OMHA dismissed appeals, including dismissals from administrative settlements, has also changed in a way that was not anticipated four years ago, and that has affected the agency's ability to further reduce the backlog.  From fiscal years 2014 through 2018, the average withdrawal and dismissal rate was 33.3%, and the 2018 projections assumed that that rate would increase as OMHA worked through the backlog and started assigning appeals, but that the rate would gradually decline in 2022 as the backlog diminished.  *Id.*  As projected, the average withdrawal and dismissal rate increased, reaching 50.5% in fiscal year 2020 and 60.4% in fiscal year 2021.  *Id.*  But for fiscal year 2022, the rate of withdrawals and dismissals has fallen to a much greater extent than OMHA had anticipated:  30.3% of appeals were withdrawn or dismissed in the first quarter of fiscal year 2022, 22.4% in the second quarter, and 19.4% in the third quarter.  *Id.*  This unexpected decrease in the withdrawal and dismissal rate significantly reduced the disposition rate at OMHA because a larger than expected percentage of the remaining appeals required a greater investment of time prior to disposition.  *Id.*

Although, as noted above, the agency has been extraordinarily successful in reducing the size of the backlog over the last three and a half years, several events prevented the agency from making even greater progress on this score.  The unanticipated arrival of the COVID-19 pandemic had a significant effect on OMHA's adjudication capacity.  *Id.*  OMHA used the 2018 appropriation from Congress to establish four new field offices and one satellite office throughout

the country.  *Id.*  These new offices were not fully operational until just before March 2020, when physical offices were closed due to the Covid-19 public health emergency (PHE).  *Id.*  At the time, many appeals files were not available in an electronic format and were still processed in paper.  *Id.*  OMHA rotated staff into offices to convert volumes of paper case files to electronic format so ALJ teams could conduct business off-site without convening together in physical offices.  *Id.*  This delayed ALJ dispositions of older cases.  *Id.*  The Covid-19 PHE negatively affected the ability of OMHA adjudicators to decide appeals as adjudicators and staff were forced to adjust to a virtual environment, implement new processes and conduct training on those new processes, maintain an in-office presence with volunteers, which in turn reduced the amount of time spent processing appeals.  *Id.*

Overall processing rates also slowed for a short period because ALJs began adjudicating older, more complex appeals at higher rates.  *Id.*  As noted above, complex appeals and big-box cases take longer to decide because they tend to require significant substantive research and often present unique procedural and evidentiary issues that are time-consuming to resolve, such as incomplete hearing requests, changes in appellant entities and ownership, missing evidentiary or procedural records, and voluminous administrative records.  *Id*.

In addition, any number of other unforeseen circumstances may prevent an individual appeal from being decided within 90 days.  *Id.*  For example, an ALJ may become sick, or may retire, requiring a new ALJ to come up to speed on an appeal.  *Id.*  The rate at which appeals are filed may spike in a way that poses a temporary challenge for OMHA's adjudicatory capacity.  *Id.*, ¶ 9.  These types of circumstances are not within OMHA's institutional capacity to control, and they cannot be predicted with certainty in advance.  *Id.*

13

**STANDARD OF REVIEW**

Rule 60(b)(5) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons … applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Prospective application of a final judgment may be inequitable, for example, if compliance with that judgment is impossible. *See Salazar ex rel. Salazar v. D.C.*, 633 F.3d 1110, 1122 (D.C. Cir. 2011). But "courts have not required that continued compliance with a consent decree be impossible to warrant modification; a showing that continuation of the injunction would be inequitable is sufficient." *United States v. Motorola, Inc.*, No. Civ. 94-2331 (TFH), 1999 WL 631259, at *2 (D.D.C. Feb. 16, 1999). Continuation of an injunction order may also be "inequitable" if satisfaction of the order "proves to be unworkable because of unforeseen obstacles." *Rufo*, 502 U.S. at 384. The obstacles need not have been unforeseeable, just unforeseen. *Id*. at 385.

In institutional reform cases—like this one—courts take a "flexible" approach to modification under Rule 60(b)(5) because these cases "reach beyond the parties involved directly in the suit." *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 368 (D.C. Cir. 2017) (internal quotations omitted). "A critical question in this Rule 60(b)(5) inquiry is whether the objective" of an order of equitable relief "has been achieved." *Horne v. Flores*, 557 U.S. 433, 450 (2009). "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id*.

**DISCUSSION**

**I.   The Mandamus Order Has Achieved Its Purposes.**

This Court entered its mandamus order to address defects in a system that had created a "backlog of hundreds of thousands of appeals," in which "reimbursement claims languish[ed] for

14

years." *AHA VI*, 2018 WL 5723141, at *4.  In combination with the efforts of Congress and the agency, this Court's mandamus order has been extraordinarily successful in achieving its aims. The currently projected backlog of 19,802 appeals is a reduction of over 97% from its maximum size, and of over 95% from the number of appeals addressed in the mandamus order.  In short, the objective of the mandamus order "has been achieved," *Horne*, 557 U.S. at 450, and the continued enforcement of that order on its current terms is unnecessary.  *See also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004).

None of the equitable factors that this Court and the D.C. Circuit have identified weigh in favor of the continued enforcement of the mandamus order on its current terms.  *See AHA II*, 812 F.3d at 192-93; *AHA III*, 209 F. Supp. 3d at 226-27; *AHA VI*, 2018 WL 5723141, at *4.  Consider each of these factors in turn:

1.  <u>The infringement on the authority and discretion of the executive branch</u>.  The agency has made extraordinary progress in reducing the backlog of appeals to a small fraction of what it once was.  For the reasons described above, however, the agency could not ensure that every appeal pending before OMHA as of September 30, 2022, or any other given date, is decided within 90 days.   There will inevitably be a certain number of appeals that, due to their individual circumstances, require longer to process.  Indeed, the only way for the agency to guarantee the complete absence of a backlog would be to settle, or stipulate to payment of, any Medicare Part A or B appeal still pending on its 90th day.  The agency could not do so consistent with its duties to protect the Medicare Trust Funds from waste, fraud and abuse, 42 U.S.C. § 1395ddd, and to enter into only those settlements that "bear a reasonable relation to the amount of the claim," 42 C.F.R. § 401.613(a)(1).  These duties counsel heavily against the enforcement of the mandamus order on

its current terms.  *See AHA V*, 867 F.3d at 167; *AHA VI*, 2018 WL 5723141, at *3; *see also Am. Council of the Blind v. Mnuchin*, 977 F.3d 1, 9 (D.C. Cir. 2020).

In addition, holding the agency to the current terms of the mandamus order would interfere with its efforts to ensure the timely processing of appeals by Medicare beneficiaries.  Section 1395ff(d)(1) applies only to Medicare Part A and Part B appeals.  OMHA, however, has designated appeals by Medicare beneficiaries as priority appeals—even those arising under Medicare Part C or D—with the goal of adjudicating these appeals within 90 days unless another time frame applies, in an effort to ensure that individual beneficiaries are not prejudiced by any delays in ALJ adjudications.  *See* Allen Decl., ¶ 3.  An order compelling the agency to process provider appeals exclusively would "infring[e] on the authority and the discretion" of the agency to protect the procedural interests of Medicare beneficiaries in this way, even in the absence of a statutory requirement that it do so.  *See AHA II*, 812 F.3d at 192.

2. <u>Congress's awareness of and attention to the situation</u>.  Congress has paid close attention to the Medicare appeals backlog, and in 2018 it appropriated $182.3 million for OMHA to address the issue.  *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. H, tit. II, 132 Stat. 348, 734.  Congress has maintained, and even has increased, the appropriation for Medicare appeals in each of the following fiscal years.[2]  As described above, this appropriation has enabled OMHA to reduce the backlog of Medicare appeals to a small fraction of its former size.  The fact that "Congress and the Secretary [have made] significant progress toward a solution," *AHA II*, 812

---

[2] *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, tit. II, 136 Stat. 49, 464; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. H, tit. II, 134 Stat. 1182, 1588 (2020); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. A, tit. II, 133 Stat. 2534, 2576 (2019); Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. B, tit. II, 132 Stat. 2981, 3088 (2018).

F.3d at 193, counsels strongly against continuing to enforce the mandamus order as it is currently phrased.

3. <u>The availability of escalation as a remedy</u>.   The Medicare statute specifies the "[c]onsequences" when an appeal pending before an ALJ is not decided within 90 days:   the appellant is excused from having to exhaust ALJ review and may "escalate" its appeal to the fourth level of administrative review.  42 U.S.C. § 1395ff(d)(3)(A).  The D.C. Circuit acknowledged that "Congress's inclusion of the remedy in the statutory scheme indicates that Congress anticipated that violations might occur with some measure of regularity," but discounted the adequacy of this alternative remedy on the record that existed at that time, when more than 800,000 appeals were pending before OMHA and "a systemic failure cause[d] virtually all appeals to be decided well after the statutory deadlines."  *AHA II*, 812 F.3d at 191.  That systemic failure no longer exists; again, the backlog of appeals is now a small fraction of what it once was, and inpatient appeals from hospitals and IRFs account for an even smaller fraction of that total.  Although there will continue to be some appeals that are not decided within 90 days, if an appellant is dissatisfied with that state of affairs, it may exercise its right to proceed to the next level of review without waiting for a decision from an ALJ, as Congress intended.  Escalation is, therefore, once again an adequate alternative remedy.

4. <u>The agency's good faith efforts</u>.  Both before and after the issuance of the mandamus order, the agency has used all of the tools at its disposal first, to limit the growth of the appeals backlog, and then to use appropriated funds to reduce the size of the backlog dramatically.  *See* Allen Decl., ¶ 11; Griswold Decl., ¶¶ 5-18, ECF No. 66-3.  Indeed, those efforts were so successful that the agency succeeded in reducing the size of the backlog even more quickly than it had projected over the first three years that the mandamus order has been in effect.  Allen Decl., ¶ 3.

Although the backlog will not be completely eliminated by September 30, 2022, this is not attributable to any lack of good faith on the agency's part.  Instead, as noted above, there will inevitably a certain number of appeals that require longer than 90 days to adjudicate, and OMHA cannot perfectly time the staffing of ALJs and their workload capacity to match newly filed appeals.

5.  <u>The effect on human health and welfare</u>.  The D.C. Circuit and this Court previously reasoned that delays in ALJ adjudications posed a threat to health and welfare, relying on record evidence indicating that "lengthy payment delays [had affected] hospitals' willingness and ability to provide care."  *AHA II*, 812 F.3d at 193; *see also AHA VI*, 2018 WL 5723141, at *3.  The cited evidence indicated that health care providers were unable to provide certain forms of care because systemic delays in the appeals process for inpatient claims had impaired the providers' financial standing.  *See* Decl. of Ivan Holleman, ¶¶ 14-17, ECF No. 8-11; Amicus Br. of Fund for Access to Inpatient Rehab. at 23, ECF No. 18.  But, again, those systemic delays no longer exist; the backlog is a small fraction of what it once was, and appeals of inpatient claims by hospitals or IRFs constitute an even smaller fraction of that reduced total.  *See* Allen Decl., ¶ 4.  Even if a provider still experiences a delay in the adjudication of an ALJ appeal, there is no reason to think that such a delay would adversely affect the provider's finances to the point that its ability to provide care could be affected.  Nor is there any reason to believe that a provider could not protect itself in individual cases by escalating its appeal, if it feels the need to do so.

6.  <u>The agency's discretion with respect to the RAC program</u>.  The D.C. Circuit and this Court previously reasoned that HHS retained substantial discretion in its implementation of the RAC program, and that the agency could use that discretion to meaningfully reduce the size of the backlog.  *AHA II*, 812 F.3d at 193; *see also AHA III*, 209 F. Supp. 3d at 226.  RAC-related appeals,

however, no longer place any significant strain on the ALJs adjudicative capacity.  Although RAC-related appeals accounted for more than 50% of new appeals reaching OMHA in 2013 and 2014, *see AHA V*, 867 F.3d at 166, they now account for fewer than 6% of OMHA's incoming appeals. *See* Medicare Appeals Dashboard, ECF No. 107-1.  And just under 1,500 RAC appeals remain pending in the backlog, which is a 99.7% reduction from the number of RAC appeals that were pending at the end of FY 2015.  Allen Decl., ¶ 5.  There is no reason, therefore, to believe that any further modifications to the RAC program would substantially reduce the number of appeals pending before OMHA.

In sum, although these equitable factors may have weighed at one time in favor of the issuance of the mandamus order, they no longer weigh in favor of the continuation of that order on its current terms.  The order has achieved its objective, namely, the restoration of a functional appeals process for Medicare claimants.  Because the mandamus order has already fulfilled its purpose, there is no longer any need for its continued enforcement, at least on its current terms. *See Horne*, 557 U.S. at 450.

## II.  Further Application of the Mandamus Order Would Not Be Equitable.

What is more, the continued enforcement of the mandamus order (again, at least as it is currently phrased) would no longer be equitable under Rule 60(b)(5).  For the reasons explained above, it is not possible for the agency to completely eliminate the backlog by September 30, 2022, or for the agency ever to guarantee that ALJs will decide every Medicare Part A or B appeal within 90 days.  The agency could only provide such an assurance by settling or paying appeals in the backlog *en masse*, options that would violate the agency's fiduciary duties, create a perverse incentive for providers to file additional appeals, and ignore the remedy that Congress prescribed for such circumstances. *See supra*, p. 15.  Forcing the agency to pursue those options would be

inequitable, particularly when the agency has acted in good faith, using the tools available to it (including the new Congressional appropriation) to reduce the backlog to a small fraction of its former size.

As this Court previously recognized might be the case, a "change in circumstances" has rendered it to be appropriate to modify the mandamus order. *AHA VI*, 2018 WL 5723141, at *3. Given the overwhelming success of the agency's efforts to date, and the agency's inability to guarantee that every single appeal is decided in 90 days, the continued enforcement of the mandamus order on its current terms would be "detrimental to the public interest." *Rufo*, 502 U.S. at 384. In an institutional reform case such as this one, this Court should apply a "flexible approach" to Rule 60(b)(5), *Am. Council of the Blind*, 878 F.3d at 366, that recognizes the "public interest" may provide a "particularly significant reason" to provide relief from an order that has fulfilled its purposes, *Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1118 (D.C. Cir. 2017) (internal quotation omitted). Here, the public interest, including the interest of Medicare beneficiaries, weighs strongly against applying the current version of the mandamus order to hold the agency to a standard that it has now determined it cannot meet.

## III.   A Limited Modification of the Mandamus Order Is Appropriate.

HHS, however, does not seek wholesale relief from the mandamus order. Instead, the agency seeks a limited modification of the order that would provide the agency with appropriate relief, while at the same time providing the Court with an assurance of the agency's continued commitment to the timely processing of Medicare appeals. A modified mandamus order would (1) recognize that HHS has achieved the first three targets for the reduction of the backlog that were specified in the November 1, 2018 order; (2) direct the agency to achieve a 96% reduction in the backlog of Medicare appeals (measured from the 2018 baseline) by the end of fiscal year 2022;

(3) direct the agency further to achieve a 98% reduction in that backlog by the end of the second quarter of fiscal year 2023; and (4) direct the agency to file status reports for the end of fiscal year 2022 and each of the two following quarters confirming that it has achieved these targets. Assuming the agency's success in doing so, this Court may appropriately conclude that the purposes of the mandamus order have been fulfilled, and the order may be deemed at that point to have been satisfied.

This proposed modification "is tailored to resolve the problems created by the change in circumstances." *Rufo*, 502 U.S. at 391.  The agency does not seek to be excused from its commitments to reduce the Medicare appeals backlog; to the contrary, the agency has already succeeded in substantially complying with the mandamus order by reducing that backlog by more than 95%, and it intends to continue its efforts to provide for the timely processing of Medicare appeals.  Instead, HHS simply seeks a targeted modification of the order that reflects that it is not feasible to ensure the complete elimination of all backlogged Medicare appeals.  Although "continued enforcement of the [mandamus order on its current terms is] detrimental to the public interest," *Horne*, 557 U.S. at 453 (internal quotation omitted), the proposed modification addresses the public interest that would be harmed by the order as it currently stands, by providing for a minor alteration to the order's terms to account for that consideration.  The agency seeks this modification in good faith, as evidenced both by the agency's proposal for a temporarily extended period of compliance beyond the original four-year period, as well as its prompt effort to inform the Court of the need for relief upon its identification of that need, in advance of the agency's status report for the third quarter of FY 2022, and well in advance of when a final status report would otherwise be due to the Court on December 31, 2022 under the existing schedule.

21

**CONCLUSION**

For the foregoing reasons, the Secretary respectfully requests that the Court modify its November 1, 2018 mandamus order on the terms reflected in the attached proposed order.


Dated: September 9, 2022                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            JEAN LIN
Of Counsel:                                 Special Litigation Counsel
                                            Federal Programs Branch
SAMUEL R. BAGENSTOS
General Counsel                             */s/ Joel McElvain*
JANICE L. HOFFMAN                           JOEL McELVAIN
Associate General Counsel                   Senior Trial Counsel
SUSAN MAXSON LYONS                          United States Department of Justice
Deputy Assistant General Counsel            Civil Division, Federal Programs Branch
     for Litigation                         1100 L Street, NW
KIRSTEN FRIEDEL RODDY                       Washington, DC 20005
Attorney                                    Phone: (202) 616-8298
U.S. Department of Health                   Fax: (202) 616-8470
     and Human Services                     E-mail: joel.l.mcelvain@usdoj.gov

                                            *Counsel for Defendant*

22