## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN HOSPITAL ASSOCIATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 14-CV-851-JEB |
| XAVIER BECERRA, in his official capacity as SECRETARY OF HEALTH AND HUMAN SERVICES, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO MODIFY THIS COURT'S MANDAMUS ORDER

<div style="margin-left:40%">

Sean Marotta (D.C. Bar No. 1006494)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-4881
sean.marotta@hoganlovells.com

*Attorney for Plaintiffs*

</div>

Dated:  September 23, 2022

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 8

    I.      THE COURT CAN MODIFY ITS ORDER *ONLY IF* COMPLIANCE IS
          IMPOSSIBLE, AND HHS HAS NOT ATTEMPTED TO MEET THAT
          STANDARD ................................................................................................ 8

    II.     EVEN IF THE STANDARD WERE A FREEWHEELING EQUITABLE
          INQUIRY, HHS HAS NOT SHOWN THAT MODIFICATION IS
          WARRANTED AND HAS NOT PROPOSED A REMEDY TAILORED
          TO THE PROBLEMS IT IDENTIFIES ...................................................... 11

          A.     HHS Has Not Shown Significant Changed Circumstances
                 Warranting Modification ............................................................... 12

          B.     HHS Has Not Shown The Equities Or The Public Interest Favors
                 Modification .................................................................................. 15

          C.     HHS Has Not Shown Its Proposed Modification Is Tailored To
                 The Difficulties It Has Identified ................................................. 21

    III.    THE COURT SHOULD ALLOW HHS A MODEST EXTENSION TO
          CLEAR THE BACKLOG BUT IMPOSE ENHANCED REPORTING
          MEASURES TO ENSURE THOSE DEADLINES ARE MET ........................... 22

CONCLUSION .................................................................................................................. 23

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

*Alabama Power Co. v. Costle*,
   636 F.2d 323 (D.C. Cir. 1979) ........................................................................8

* *American Hosp. Ass'n v. Burwell*,
   812 F.3d 183 (D.C. Cir. 2016) ............................................................ *passim*

* *American Hosp. Ass'n v. Price*,
   867 F.3d 160 (D.C. Cir. 2017) ...................................................................4, 5, 9

*Cassell v. Taylor*,
   243 F.2d 259 (D.C. Cir. 1957) ......................................................................16

*DeFoe v. Town of Rutherfordton*,
   122 F.2d 342 (4th Cir. 1941) ........................................................................12

*Evans v. Williams*,
   206 F.3d 1292 (D.C. Cir. 2000) ....................................................................14

*Government of Province of Manitoba v. Zinke*,
   849 F.3d 1111 (D.C. Cir. 2017) ....................................................................12

*Hudson v. American Fed. of Gov't Emps.*,
   281 F. Supp. 3d 11 (D.D.C. 2017) ...............................................................15

*Jordan v. U.S. Dep't of Labor*,
   331 F.R.D. 444 (D.D.C. 2019) ......................................................................18

*LaShawn A. ex rel. Moore v. Fenty*,
   701 F. Supp. 2d 84 (D.D.C. 2010) ...............................................................15

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ..........................................................................20

*NLRB v. Harris Teeter Supermarkets*,
   215 F.3d 32 (D.C. Cir. 2000) ........................................................................12

*NRDC v. Train*,
   510 F.2d 692 (D.C. Cir. 1974) ....................................................................9, 11

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992) ..........................................................................12, 13, 21

* Authorities upon which we chiefly rely are marked with an asterisk.

**TABLE OF AUTHORITIES—Continued**

Page

*Salazar ex rel. Salazar v. District of Columbia*,
   896 F.3d 489 (D.C. Cir. 2018)..................................................................13

*Salazar v. District of Columbia*,
   729 F. Supp. 2d 257 (D.D.C. 2010)..........................................................20

*Sandifer v. U.S. Steel Corp.*,
   571 U.S. 220 (2014)..................................................................................16

*Shelby County v. Holder*,
   570 U.S. 529 (2013)..................................................................................19

*Twelve John Does v. District of Columbia*,
   861 F.2d 295 (D.C. Cir. 1988)..................................................................12

*Washington v. Reno*,
   35 F.3d 1093 (6th Cir. 1994)....................................................................20

STATUTES:

42 U.S.C. § 1395ff(d)(1)(A) .............................................................................3

42 U.S.C. § 1395ff(d)(1)(B) .............................................................................3

RULE:

Fed. R. Civ. P. 60(b)(5)......................................................................11, 18, 21

OTHER AUTHORITIES:

American Hosp. Ass'n, *Massive Growth in Expenses and Rising Inflation Fuel
   Continued Financial Challenges for America's Hospitals and Health Systems*
   (Apr. 2022), https://tinyurl.com/2s48a58c.........................................18, 19

American Hosp. Ass'n, *Rural Hospital Closures Threaten Access: Solutions to
   Preserve Care in Local Communities* (Sept. 2022),
   https://tinyurl.com/466zj2yb....................................................................18

Centers for Medicare & Medicaid Services, *Biden-Harris Administration Takes
   Action to Expand Access to Emergency Care Services in Rural Communities*
   (June 30, 2022), https://tinyurl.com/4xvw6nzt...........................................2

FitchRatings, *2022 Mid-Year Outlook: U.S. Not-for-Profit Hospitals and Health
   Systems* (Aug. 16, 2022), https://tinyurl.com/4edzcr76.............................2

**TABLE OF AUTHORITIES—Continued**

Page

* Kaufman, Hall & Associates, LLC, *The Current State of Hospital Finances: Fall 2022 Update* (2022), https://tinyurl.com/mr6a7un9 ..........................................................2, 19

**INTRODUCTION**

Over four years ago, Congress allocated the Department of Health and Human Services' Office of Medicare Hearings and Appeals enough funds for 170 ALJ-led teams to adjudicate the hundreds of thousands of Medicare appeals that had piled up at the agency.  ECF No. 86 at 3.  The funding would allow HHS to, in its own words, "eliminate the backlog entirely in FY 2022."  *Id.* at 4.

With its augmented staff, HHS has made great strides in digging itself out of the hole it created.  But with 19,802 appeals to go, HHS has seemingly thrown in the towel.  Despite initially making faster-than-expected progress on the backlog—a result of both more-than-expected dispositions and fewer-than-expected appeal receipts—HHS now contends that it cannot fully comply with the Court's mandamus order.  HHS now says that "it is *unlikely* that the backlog could be reduced completely to zero by the end of the fiscal year."  Mot. 1 (emphasis added).  But under this Court's prior opinion, HHS "can return and request modification" of the mandamus order if "a change in circumstances . . . render[s] lawful compliance with the order *impossible*."  ECF No. 90 at 6 (emphasis added).  HHS *never*, *anywhere* claims that compliance with the mandamus order is impossible.  That is a complete and sufficient reason to deny the motion.

Ignoring the standard that the D.C. Circuit set in this very case, HHS seeks to relitigate its appeal *sub silentio* by applying its own legal test:  whether continued application of this Court's order is equitable.  But that is not the test the D.C. Circuit announced and this Court applied when entering its mandamus order.  And even if the question before the Court were some freewheeling equitable inquiry, HHS's proposed modification would still be unwarranted.  Most

of HHS's arguments are yet another attempt to relitigate the fairness of the Court requiring the agency to follow the law.

None of the equities have changed from four years ago, except that America's hospitals have been battered by COVID and need every dollar to care for their patients and communities. Recent reports make clear that hospitals are suffering.  Margins for all U.S. hospitals are "down 37% relative to pre-pandemic levels" and "more than half of hospitals are projected to have negative margins through 2022."  Kaufman, Hall & Associates, LLC, *The Current State of Hospital Finances: Fall 2022 Update* 1, 3-5 (2022), https://tinyurl.com/mr6a7un9 (*State of Hospital Finances*).  The financial condition of non-profit hospitals and health systems, in particular, is "deteriorating."  FitchRatings, *2022 Mid-Year Outlook: U.S. Not-for-Profit Hospitals and Health Systems* (Aug. 16, 2022), https://tinyurl.com/4edzcr76.  As CMS itself has noted, "[s]ince 2010, 138 rural hospitals have closed—with a record-breaking 19 hospitals closing in 2020 alone.  These closures occur disproportionately within communities with a higher proportion of people of color and communities with higher poverty rates."  Centers for Medicare & Medicaid Services, *Biden-Harris Administration Takes Action to Expand Access to Emergency Care Services in Rural Communities* (June 30, 2022), https://tinyurl.com/4xvw6nzt.  And ultimately, "U.S. hospitals are likely to face billions of dollars in losses in 2022 under both optimistic and pessimistic models, which would result in the most difficult year for hospitals and health systems since the beginning of the pandemic."  *State of Hospital Finances*, *supra*, at 1.  Given these precarious financial conditions, every appeal matters.  Every backlogged appeal is a claim for services that the claimants have already provided and that they believe they are entitled to be paid for.

Plaintiffs understand, however, that HHS is not going to clear the backlog by next Friday and that some new plan is required.  Plaintiffs therefore proposed to HHS before it filed its motion—and propose again here—a modest extension for HHS to clear the backlog, supported by enhanced accountability measures to make sure that the agency meets its new targets.  But the end goal must be the elimination of substantially all of the backlog.  Anything less is contrary to what the Court, the D.C. Circuit, and, most importantly, Congress required.  HHS's motion should be denied and Plaintiffs' proposed order entered.

## BACKGROUND

This Court has lived with this case for a long time.  But it's been four years since it was last on the Court's active docket, so a brief review is in order.

After a Medicare provider, like a hospital, "performs Medicare-eligible services, it submits a claim for reimbursement to a Medicare Administrative Contractor (MAC)."  *American Hosp. Ass'n v. Burwell*, 812 F.3d 183, 185 (D.C. Cir. 2016) (*AHA I*).  If the contractor denies the claim, the provider has a right to a four-level administrative process within HHS, followed by judicial review.  *Id.*  This case involves the third step in the administrative-review process, "de novo review by an administrative law judge, including a hearing."  *Id.*

The Medicare statute requires that ALJs "shall conduct and conclude a hearing . . . and render a decision" within 90 days, 42 U.S.C. § 1395ff(d)(1)(A), unless the appealing provider waives the deadline, *id.* § 1395ff(d)(1)(B).  If the ALJ fails to act within 90 days, a provider can "escalate" the claim to the Departmental Appeals Board, the fourth step of the internal HHS appeals process.  If the Departmental Appeals Board does not act within 90 days, the provider can escalate the claim to the district court for judicial review.  *AHA I*, 812 F.3d at 186.

For a while, the administrative appeal process functioned as it was designed, with ALJ hearings typically conducted within the 90-day period. *Id.* But after HHS's Recovery Audit Contractor, or RAC, program started, appeals began to balloon. *Id.* Circumstances grew so dire that by December 2013, new appeals were no longer being assigned to ALJs, and by July 2014 there were 800,000 appeals in the backlog. *Id.* at 187.

Plaintiffs—three hospitals or hospital systems and the American Hospital Association— filed suit seeking a writ of mandamus to compel HHS to meet the statutory deadlines for adjudicating ALJ appeals. *Id.* at 188. This Court initially dismissed, holding that "the agency's delay was not so unreasonable as to justify mandamus." *Id.* The D.C. Circuit reversed, concluding that the Medicare "statute imposes a clear duty on [HHS] to comply with the statutory deadlines, that the statute gives [Plaintiffs] a corresponding right to demand that compliance, and that escalation—the only proposed alternative remedy—is inadequate in the circumstances of this case." *Id.* at 192. The D.C. Circuit therefore remanded to this Court to determine "whether 'compelling equitable grounds' now exist to issue a writ of mandamus." *Id.* The D.C. Circuit explained that "although courts must respect the political branches and hesitate to intrude on their resolution of conflicting priorities, our ultimate obligation is to enforce the law as Congress has written it." *Id.* at 193.

On remand, this Court balanced the equities identified in *AHA I* and concluded that mandamus was appropriate. *American Hosp. Ass'n v. Price*, 867 F.3d 160, 164 (D.C. Cir. 2017) (*AHA II*). The Court then considered what form of mandamus was appropriate. Plaintiffs presented two sets of options for the Court's consideration: "a means-oriented plan requiring [HHS] to take specific actions, or an ends-oriented plan setting a timetable for clearing the

backlog." *Id.* The Court opted for the latter, ordering HHS to eliminate the backlog by December 31, 2020. *Id.*

HHS appealed to the D.C. Circuit, which held that this Court "should [have] determine[d] in the first instance whether . . . lawful compliance with the timetable [was] impossible." *Id.* at 168. The D.C. Circuit observed, however, that HHS bore "the 'heavy burden to demonstrate the existence of an impossibility,' " a burden which "serves to prevent an agency from shirking its duties by reason of mere difficulty or inconvenience." *Id.* (citation omitted).

Back on remand to this Court, HHS again argued that mandamus should not issue because it was taking "extraordinary measures" to address the backlog. ECF No. 66-1 at 2, 5. After briefing on what non-deadline measures HHS could take to further cut down on pending appeals, "a *deux ex machina* arrived": Congress appropriated OMHA sufficient funds to double its adjudication capacity, which would allow the agency to finally begin to adjudicate more appeals than it was receiving. ECF No. 90 at 4-5. In fact, HHS projected that it would be able to "*eliminate* the backlog entirely in FY 2022." *Id.* at 5 (emphasis in original).

Given this development, the Court asked the parties to address whether HHS could now comply with a deadline-based remedy. *Id.* HHS once again argued that no mandamus order should issue. ECF No. 106 at 6:7-7:8. But HHS admitted that in light of its projections, it could, in fact, eliminate the backlog by 2022. *Id.* at 6:7-19.

The Court entered a mandamus order requiring HHS to eliminate the backlog in line with its projections. ECF No. 89 (order); ECF No. 90 (memorandum opinion). The Court explained that it could "easily conclude that it would be *possible* for [HHS] to comply with a mandamus order requiring that the backlog be reduced and then eliminated on the precise timeline that [HHS] itself has projected." ECF No. 90 at 5. "In other words, the Government cannot claim it

is impossible to follow its own projections." *Id.*  The Court acknowledged HHS's caveat that it could only meet its projections if Congress continued to appropriate the same level of funding for OMHA adjudicators.  *Id.* at 6.  The Court accordingly observed that "[s]hould a change in circumstances—not limited to an appropriations shortfall—render lawful compliance with the order impossible, . . . [HHS] can return and request modification at that time."  *Id.*

The Court declined to re-evaluate the equities, explaining that *AHA II* "provided a narrow instruction on remand for this Court to make a finding regarding the possibility of compliance." *Id.*  The Court further held that even if it were inclined to reweigh the equities, "it would still conclude that mandamus should issue."  *Id.*  The Court explained that appeals were continuing to languish at OMHA; that hospitals " 'with money tied up in the appeal process' have a difficult time maintaining facilities and procuring supplies and may even 'avoid admitting certain types of patients' whose treatment might be the subject of a lengthy review process"; and that HHS had not shown, in light of the additional Congressional funding, that a mandamus order would adversely affect other equal or higher priority HHS activities.  *Id.* at 7 (quoting *AHA I*, 812 F.3d at 193).

Finally, the Court declined to issue Plaintiffs' proposed set of non-deadline remedies.  *Id.* at 8-9.  The Court explained that "[w]here the agency is held to a set of deadlines, it is unnecessary—and unwise—to further specify the steps it must take."  *Id.* at 9.  The Court's ultimate order requires HHS to reduce the Fiscal Year 2018 backlog of 426,594 appeals by fixed percentages for the next four years: a 19% reduction by the end of Fiscal Year 2019; a 49% reduction by the end of Fiscal Year 2020; a 75% reduction by the end of Fiscal Year 2021; and the elimination of the backlog by the end of Fiscal Year 2022, which is to say the end of September 2022.  ECF No. 89 (¶ 3) (order); ECF No. 106 at 10:22-11:1 (explaining that the end

of Fiscal Year 2022 is September 30, 2022).  The Court also directed quarterly status reports on HHS's progress.  ECF No. 89 (¶ 4).

For years, HHS made steady—even rapid—progress in clearing the backlog.  By the end of Fiscal Year 2019, HHS had cleared 31.4% of the backlog.  ECF No. 95 at 1.  By the end of Fiscal Year 2020, with COVID impacts presumably at their highest, HHS had cleared 61%.  ECF No. 100 at 1.  And by the end of Fiscal Year 2021, HHS had cleared 85%.  ECF No. 104 at 1.  In reporting figures from the end of Fiscal Year 2021, HHS represented that "HHS has met the reduction target for FY 2021 . . . and is on track to meet the subsequent reduction target set forth in the Court's" mandamus order.  *Id.*

In Fiscal Year 2022, however, Plaintiffs grew concerned concerned that HHS's pace was slowing and that the agency might not eliminate the backlog by the end of the fiscal year.  *See* ECF No. 105 at 1 (88% of backlog cleared by end of first quarter of Fiscal Year 2022); ECF No. 107 at 1 (91% of backlog cleared by end of second quarter of Fiscal Year 2022).  But HHS represented as late as June 27, 2022 that the agency "continues to make significant progress in reducing the number of pending appeals at" OMHA.  ECF No. 107 at 1.

Plaintiffs' counsel emailed HHS's counsel at the end of June expressing Plaintiffs' concern that "at current pace OMHA will not eliminate all pending appeals by the end of FY2022" and asking how many appeals were in the backlog.  Marotta Decl. Ex. A.  HHS's counsel responded that as of March 31, 2022, there were 9,924 pending appeals pending for fewer than 90 days, leaving approximately 26,300 in the backlog, minus some appeals that were subject to tolling events or are not subject to the statutory 90-day deadline.  *Id.*  Plaintiffs' counsel asked HHS to keep in touch if it appeared that OMHA would miss the September 30 deadline to clear the backlog; HHS's counsel said that he would.  *Id.*

The next Plaintiffs heard from HHS was on September 6.  Counsel for HHS stated that now HHS believed it could *never* clear the backlog; offered a proposal identical to the one that HHS makes in its motion; and demanded that Plaintiffs respond by close of business.  Marotta Decl. Ex. B.  After obtaining some additional information from HHS, Plaintiffs' responded that they were willing to agree to a reasonable extension, but that any modified order would need to have as its goal the complete elimination of the backlog because that was the law.  *Id.*  HHS filed its motion the same day as Plaintiffs' counterproposal.  *Id.*

## ARGUMENT

I.    **THE COURT CAN MODIFY ITS ORDER *ONLY IF* COMPLIANCE IS IMPOSSIBLE, AND HHS HAS NOT ATTEMPTED TO MEET THAT STANDARD.**

In its original mandamus order, the Court laid out the standard for modification.  The Court explained that "[s]hould a change in circumstances—not limited to an appropriations shortfall—render lawful compliance with the order *impossible* . . . Defendant can return and request modification at that time."  ECF No. 90 at 6 (emphasis added).  HHS mentions this passage exactly once—in its background section, Mot. 7—and never revisits it in the argument.  That is understandable; HHS never tries to prove that lawful compliance with the Court's order is *impossible*.  Instead, in what is undoubtedly careful phrasing, HHS's declarant states that compliance is "not reasonably possible."  Allen Decl. ¶ 7.

The D.C. Circuit has rejected similar attempts by agencies to fudge the impossibility standard before.  The D.C. Circuit has explained that impossibility is a "heavy burden," and the Court "must scrutinize such claims carefully," for agency "officials may seize on a remedy"—impossibility—"made available for extreme illness and promote it into the daily bread of convenience."  *Alabama Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979) (quoting

*NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974)).  HHS may not "shirk[ ] [its] duties by reason of mere difficulty or inconvenience."  *AHA II*, 867 F.3d at 168.

What HHS views as "reasonably possible," then, is largely beside the point.  HHS's declarant does not say whether there are steps the agency *can* take—albeit steps that the agency subjectively views as unreasonable—that would allow the agency to clear the backlog.  Can adjudicators be held to more-stringent production goals?  Can adjudicators work more overtime?  Can HHS reallocate funds from other parts of the agency or seek additional funds from Congress to obtain additional personnel to dedicate to the most-complex appeals?  Has HHS tried these measures or anything else to hit the targets it proposed to this Court years ago?  HHS never says.

HHS also has not addressed whether it can reduce new appeals, freeing up adjudicators to tackle the backlog.  In the first two quarters of Fiscal Year 2022, receipts were 10,447 and 11,894, respectively, an increase over Fiscal Year 2021 where new appeals were approximately 7,000 or 8,000 a quarter.  ECF No. 107-1.  HHS in the past diverted claims that would be considered by RACs, which are paid on a contingency-fee basis, to Quality Improvement Organizations, which are paid a flat fee to examine claims, reducing the claims that ended up as backlogged appeals.  *See* ECF No. 82-1 at ¶¶ 4-5.  What ever happened to that initiative?  Can HHS shift examination of other claims to Quality Improvement Organizations?  Has HHS examined the uptick in receipts to see if they suggest areas where HHS can encourage better claims-processing decisions by Medicare Administrative Contractors or better compliance practices by providers so that claims do not end up denied and become appeals?  Again, HHS never says.  In fact, HHS's declarant shrugs at the entire problem of receipts, stating that "OMHA does not have control over, nor can it predict with certainty in advance, what new appeals will be filed, when those appeals will be filed, how many appeals will be filed at the

same time, or the overall volume of appeals, their subject matter, size, or complexity."  Allen Decl. ¶ 9.  Even if *OMHA* cannot control appeal receipts, the obligation to resolve appeals in 90 days falls on *HHS as a whole*, and it is an obligation that requires the entire agency's efforts, not just OMHA's.

As vague as HHS's submissions are, there is at least one step we know HHS *can* take:  It can redeploy the resources it has committed to determining beneficiary-initiated Medicare Part C and D appeals in 90 days.  *See* Mot. 16; Allen Decl. ¶ 3.  HHS objects to an order that would "interfere with its efforts to ensure the timely processing of appeals by Medicare beneficiaries," but the agency admits that Medicare Part C and D appeals are not subject to "a statutory requirement" that they be decided within 90 days.  Mot. 16.[1]  "Federal agencies must obey the law, and congressionally imposed mandates and prohibitions trump discretionary decisions." *AHA I*, 812 F.3d at 193.  Promptly resolving beneficiary-initiated Part C and D appeals is an admirable goal, but it is one that Congress has ranked below promptly resolving Part A and B appeals.

The closest that HHS gets to asserting impossibility is by raising its favorite bugaboo: The only way it can prevent appeals from becoming backlogged is by allowing or settling them without regard to their merits, measures that HHS contends are unlawful.  *See* Mot. 15-16.  For all the reasons just described, HHS has not come close to demonstrating that the *only* way the agency can clear the backlog is through capitulation on an appeal's 91st day.  But HHS's argument about settlements raises yet more un-answered questions.  In Fiscal Year 2022,

---

[1] HHS is wrong that redeploying resources from Part C and D appeals will "compel[ ] the agency to process provider appeals exclusively."  Mot. 16.  Beneficiary-initiated Part A and B appeals are subject to the 90-day statutory deadline, and OMHA may prioritize these appeals vis-à-vis providers' appeals however it would like.

resolutions through OMHA's Settlement Conference Facilitation program have declined.  ECF No. 107-1.  Why?  Can HHS redouble its settlement efforts?  Can HHS sweeten the pot to encourage appeals in the backlog to settle?  Can HHS dedicate additional resources to try to settle so-called big-box appeals, which, according to HHS, are the most-complex appeals at OMHA?  Once again, HHS's declarant has nothing to say.

Plaintiffs are not asking questions for the sake of asking questions.  The point of the D.C. Circuit's demanding impossibility standard—and the point of putting the burden of satisfying it on the agency—is to make sure that an agency has turned over every potential stone before a court relieves the agency of its nondiscretionary legal obligations.  The Court must be "convinced by the official involved that he has in good faith employed the *utmost* diligence in discharging his statutory responsibilities."  *Train*, 510 F.2d at 713 (emphasis added).  HHS's current approach—which effectively treats both the pace of receipts and decisions as external factors that HHS is powerless to control—smacks of an agency resting on its laurels when it should be working to eliminate the last of the unlawful backlog.  HHS's failure to prove impossibility is reason enough to deny its motion.

## II.   EVEN IF THE STANDARD WERE A FREEWHEELING EQUITABLE INQUIRY, HHS HAS NOT SHOWN THAT MODIFICATION IS WARRANTED AND HAS NOT PROPOSED A REMEDY TAILORED TO THE PROBLEMS IT IDENTIFIES.

Instead of the impossibility standard the Court wrote in its order, HHS contends that it is subject to a looser standard from Federal Rule of Civil Procedure 60(b)(5) that allows modification whenever "applying [the order] prospectively is no longer equitable."  HHS Br. 14.  But the general modification standard of Rule 60(b)(5) is a poor fit for mandamus; it presumes an order imposed based on general equitable principles, whereas mandamus is for duties that the law requires an agency to undertake.  In the one mandamus-specific modification case we have

located, the Fourth Circuit explained that a court "may modify an order in the nature of a writ of mandamus, where in the light of subsequent events its commands have become improper, as where they would conflict with constitutional or statutory limits . . . or would interfere with the support of necessary governmental functions." *DeFoe v. Town of Rutherfordton*, 122 F.2d 342, 345 (4th Cir. 1941). "But manifestly a modification is not justified where its effect is to deny to a party the relief to which he is entitled as a matter of right." *Id.* So it is here. The Medicare statute "imposes a clear duty on [HHS] to comply with the statutory deadlines" and it "gives [Plaintiffs] a corresponding right to demand that compliance." *AHA I*, 812 F.3d at 192.

Even under HHS's preferred standard, modification is still inappropriate. "Modification [of a judgment] is an extraordinary remedy . . . ." *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000) (quoting *Twelve John Does v. District of Columbia*, 861 F.2d 295, 298 (D.C. Cir. 1988)) (alteration in *Harris Teeter*). And it is a remedy that HHS has not shown its entitlement to.

### A.    HHS Has Not Shown Significant Changed Circumstances Warranting Modification.

HHS, as "[t]he party seeking modification[,] 'bears the burden of establishing that a significant change in circumstances warrants [its] revisions.' " *Government of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1117 (D.C. Cir. 2017) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992)) (alteration in original). HHS has not.

HHS's primary argument in favor of modification is that, having cleared out the relatively easier appeals earlier in the process, only the more-difficult appeals remain. *See Allen* Decl. ¶ 7 (faulting "big box" cases, "unusually complex cases," and the "case mix"). In some respects, this may be a problem of HHS's own making. Nothing has significantly *changed* about the backlog; it is the same backlog, viewed from a different perspective. Except for saying that

12

"big box" appeals have, "as a percentage of total receipts, steadily increased," *id.*,[2] HHS does not

claim that the pace of more-complex appeals has appreciably changed since the mandamus order

in 2018.  So far as HHS's declaration reveals, the more-complex appeals were always there; they

have just now risen to prominence because they cleared out the low-hanging fruit.  *Cf. id.*

(stating that, with the backlog reduced, OMHA "has been able to analyze the nature of the

remaining appeals").

 For compliance difficulties to support modification of an order, compliance must have

become "substantially more onerous."  *Salazar ex rel. Salazar v. District of Columbia*, 896 F.3d

489, 492 (D.C. Cir. 2018) (quoting *Rufo*, 502 U.S. at 383).  But clearing the backlog hasn't

gotten any harder than it was in 2018.  HHS has instead proved an immutable law, which has

been learned the hard way over the generations: If you do the easy parts of a project first, you'll

think you're making excellent progress until the hard parts at the end slow you down—even if

nothing about the project has changed.  *Cf.* Allen Decl. ¶ 7 (stating that "[t]he overall ALJ

disposition rates slowed for a short period when ALJs focused [on] adjudicating older and more

complex appeals at higher rates").

 Nor has HHS proved there are "unforeseen obstacles" preventing it from complying with

the Court's order.  *Salazar*, 896 F.3d at 492 (quoting *Rufo*, 502 U.S. at 383).  HHS certainly

anticipated that new appeals would join the queue; in fact, new appeals have run significantly

*below* HHS's forecasts.  *Compare* ECF No. 86-2, *with* ECF No. 107-1.  HHS projected 74,572

new appeals in Fiscal Year 2019; it received 43,887.  *Id.*  HHS projected 76,368 new appeals in

---

[2] Much about big-box appeals—a term that has not appeared in this case's long history until just now—is under-explained.  Although HHS says that big-box appeals have "increased," the agency does not give any specifics on *how much* they have increased, either in relative or absolute terms.  And there are other aspects of big-box appeals that make them an inappropriate ground to modify the mandamus order.  *See infra* pp. 17-18, 21, 23.

Fiscal Year 2020; it received 29,729.  *Id.*  And HHS projected 84,414 new appeals in Fiscal Year

2021 and received just 31,400.  *Id.*  Over the three full years the mandamus order has been in

effect, new receipts have lagged behind HHS's projections by over *86,000*—a full year's worth.

*See id.*

Dispositions, too, have exceeded expectations.  For the three full fiscal years the

mandamus order has been in effect, OMHA dispositions have run *ahead* of projections, even

during COVID.  HHS projected 98,650 OMHA dispositions in Fiscal Year 2019; OMHA

disposed of 119,848 appeals that year.  *Id.*  HHS projected 97,850 OMHA dispositions in Fiscal

Year 2020; OMHA disposed of 136,699 appeals.  *Id.*  And HHS projected 97,850 OMHA

dispositions in Fiscal Year 2021; OMHA disposed of 117,127 appeals.  *Id.*  OMHA has not

experienced unforeseen difficulties; it has experienced unforeseen *success*.

HHS also contends that there was an unforeseen early decrease in the number of appeals

withdrawn and dismissed in Fiscal Year 2022.  Allen Decl. ¶ 7.  Yet HHS admits that it, back in

2018, it "projected . . . that the withdrawal and dismissal rate would gradually decline in 2022 as

the backlog was near elimination."  *Id.*  HHS tellingly does not share what its 2018 expectations

for 2022 withdrawals and dismissals were; the forecasts in the record do not break these

categories of dispositions out.  *See* ECF No. 86-2.  The Court accordingly has no way to judge

whether the difference between anticipated and actual rates is material to HHS's elimination of

the backlog or within an acceptable margin of error.

HHS's success over its projections is a weighty reason to deny modification.  Although a

change of circumstances need not be unforeseeable, "modification should not be granted because

of 'events that actually were anticipated' by the parties."  *Evans v. Williams*, 206 F.3d 1292,

1298 (D.C. Cir. 2000) (citation omitted).  HHS in 2018 not only anticipated workload and

resolution rates *similar* to what has actually experienced; HHS anticipated workload and resolution rates *worse* than what it actually experienced.  The only thing unforeseen is HHS now declaring defeat with the finish line in sight.

> **B.      HHS Has Not Shown The Equities Or The Public Interest Favors Modification.**

HHS must also show that "the equities— . . . the relative harms to applicant and respondent, as well as the interests of the public at large" favor modification.  *Hudson v. American Fed. of Gov't Emps.*, 281 F. Supp. 3d 11, 14 (D.D.C. 2017) (Boasberg, J.).  HHS never does.

HHS principally attempts to re-weigh the various factors *AHA I* identified as relevant to the Court's initial decision to enter a mandamus order.  *See* Mot. 15-19.  But Rule 60(b)(5) "is not . . . a vehicle for relitigating underlying violations or for challenging a ruling."  *LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 95 (D.D.C. 2010).  It is not enough to show—as HHS tries to do—that things are not quite as bad as they were when the order was entered.  HHS must show that the balance of equities affirmatively warrants modification of the Court's remedy.

Judged against that standard, HHS's arguments miss the mark.  HHS argues that the mandamus "order has achieved its objective, namely, the restoration of a functional appeals process for Medicare claimants."  Mot. 19.  But that was never the objective.  In reality, the order's objective was to eliminate the backlog and for appeals to be decided in 90 days—that is, to bring HHS into compliance with "the law as Congress has written it."  *AHA I*, 812 F.3d at 193; *see also* ECF No. 90 at 5 (describing the Court's order as "requiring that the backlog be reduced and then eliminated on the precise timeline that [HHS] itself has projected").  Yet HHS's repeated refrain is that HHS will never eliminate the backlog and will not decide appeals in 90 days.  *See*, *e.g.*, Mot. 1.  That is the antithesis of achieving the order's goals.

HHS is likewise wrong that there are no longer "systemic" problems with the OMHA process. *Id.* HHS is seeking modification because it believes OMHA is institutionally unable to decide big-box or unusually complex appeals within the 90 days required by statute. That is the definition of a systemic weakness. Congress surely recognized that some appeals would be bigger or harder than others. Yet Congress required the same 90-day resolution for *all* of them, and HHS is apparently unwilling to comply with that deadline.

In the same vein, HHS contends that it has "substantially complied" with the mandamus order. Mot. 1. If HHS had only a handful of appeals left, that argument might have some force; Plaintiffs are not claiming that mandamus is appropriate every time an appeal slips past 90 days, because they recognize that an ALJ can fall sick, be transferred to another agency, or retire. *Cf.* Allen Decl. ¶ 7. But HHS predicts it will have approximately 12,000 backlogged appeals pending when it is supposed to have zero (Mot. 9), and "*de minimis non curat lex* is not Latin for *close enough for government work*," *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 234 (2014).

Even if the Court were to indulge HHS's discussion of the equitable factors *AHA I* identified, they do not weigh in favor of modification. *First*, HHS contends that the remedy order's continuation "infringe[s] on the authority and discretion of the executive branch." Mot. 15-16. But as we have explained, HHS has not shown that unlawful adjudications and settlements are the only way to comply with the Court's mandamus order. *Supra* pp. 8-11. Nor is it equitable to allow HHS to put other appeals ahead of those that must be decided in 90 days, *supra* p. 10; "equity follows the law," *Cassell v. Taylor*, 243 F.2d 259, 261 (D.C. Cir. 1957).

*Second*, HHS contends that Congress is aware of the backlog and has appropriated increasing amounts to ensure that OMHA can continue to adjudicate cases. Mot. 16-17. But the Court's mandamus order was premised on Congress continuing appropriations. *See* ECF No. 90

at 6.  That Congress has done so makes this factor neutral at best.  In fact, that Congress has appropriated increasing amounts demonstrates its steadfast commitment to reducing the backlog—not its acceptance that the backlog will always exist.

*Third*, HHS contends that escalation is now a sufficient remedy for any delays that providers face.  Mot. 17.  But the appeals that HHS now claims are driving the backlog—big-box appeals and "[u]nusually complex cases," Allen Decl. ¶ 7—are the ones that most need ALJ hearings.  According to HHS, big-box appeals "often involve complicated and sophisticated statistical sampling and extrapolations to a larger universe of claims" and "they require . . . assessment and resolution of evidentiary and procedural issues, pre-hearing conferences, [and] long and complex hearings occasionally involving experts."  *Id.* ¶ 8.  An appeal to the Departmental Appeals Board, which "holds hearings only where an 'extraordinary question' is involved," *AHA I*, 812 F.3d at 191, is not an adequate substitute.  Nor is escalation to the district court, where "review would be deferential . . . an adequate substitute for a de novo hearing before an administrative law judge."  *Id.*  The same is true for unusually complex cases, where "scientific advancements leading to new technology may require adjudicators and staff to research new legal authorities or review peer-reviewed literature and scientific community standards."  Allen Decl. ¶ 7.

*Fourth*, HHS contends it has engaged in good-faith efforts to eliminate the backlog.  Mot. 17-18.  But, as we have described, there remain significant unanswered questions as to whether HHS is doing all it can to maximize adjudications and minimize incoming receipts.  *Supra* pp. 9-11.  Moreover, good-faith efforts to comply with a court order is the absolute floor of what providers have the right to expect from their government.  The absence of good-faith effort

would warrant *enforcement* of the mandamus order, but its presence does not warrant *modification*.

     *Fifth*, HHS hypothesizes "there is no reason to think that . . . a delay would adversely affect [a] provider's finances to the point that its ability to provide care could be affected." Mot. 23. That flips the evidentiary burden; HHS must show with evidence that delays are not adversely affecting providers, not speculate that delays will not adversely affect providers. *See Jordan v. U.S. Dep't of Labor*, 331 F.R.D. 444, 453 (D.D.C. 2019) (movant did not meet his Rule 60(b)(5) burden when he "fail[ed] to . . . provide any evidence for" his arguments).

     In any case, hospitals will continue to suffer from delays at the ALJ level. By HHS's description, big-box appeals are ones with 30 or more claims at issue, suggesting they are ones with the most money at stake for providers and whose delays will have the biggest impact on their operations. *See* Allen Decl. ¶ 7. Delays in unusually complex cases, such as those involving new technology, may imperil providers' attempt to offer cutting-edge services to their patients. *Id.*

     More broadly, each appeal that languishes in the backlog is a claim for services rendered that the provider believes in good faith that it is owed money for. And hospitals like Plaintiffs need every dollar they can get. Indeed, the most significant changed circumstance since entry of this Court's mandamus order is the current state of hospital finances. A hundred and thirty-six rural hospitals have closed between 2010 and 2021, 19 of them in 2020, the most in any year in the past decade. American Hosp. Ass'n, *Rural Hospital Closures Threaten Access: Solutions to Preserve Care in Local Communities* 3 (Sept. 2022), https://tinyurl.com/466zj2yb. Hospitals' costs per patient are up 20.1% as labor and supply costs rise and hospitals treat more-acute patients, COVID and non-COVID alike. *See* American Hosp. Ass'n, *Massive Growth in*

*Expenses and Rising Inflation Fuel Continued Financial Challenges for America's Hospitals and Health Systems* 1 (Apr. 2022), https://tinyurl.com/2s48a58c.  Pulling these threads together, a recent AHA-commissioned analysis found that hospitals' operating margins will be down 37% relative to pre-pandemic levels; that more than half of all hospitals will lose money this year; and that hospitals will collectively spend $135 billion more than last year in expenses without any offsetting federal aid.  *State of Hospital Finances*, *supra*, at 3-5.  The analysis' bottom line was bleak: "U.S. hospitals are likely to face billions of dollars in losses in 2022 under both optimistic and pessimistic models, which would result in the most difficult year for hospitals and health systems since the beginning of the pandemic with no foreseeable federal support."  *Id.* at 1.  Appeal delays are not just a dashboard statistic; they are depriving providers of the payments they need to care for their patients and their communities.

*Finally*, HHS touts that the RACs are no longer—at least for now—a significant source of new appeals.  *See* Mot. 18-19.  That is good.  But the mandamus order is what keeps HHS focused on limiting new appeals from the RAC program; if released from the order, HHS could let the RACs loose on providers once more.  *Cf. Shelby County v. Holder*, 570 U.S. 529, 590 (2013) (Ginsberg, J., dissenting) ("Throwing out preclearance when it has worked and is continuing to work to stop discriminatory changes is like throwing away your umbrella in a rainstorm because you are not getting wet.").

Beyond the *AHA I* factors, HHS's declarant leaves out critical information that the Court needs to decide whether the equities warrant modification.  For instance, what is the 25th percentile, median, and 75th percentile age of backlogged appeals?  A system where backlogged appeals are resolved in 100 days is a lot different than a system where backlogged appeals are

resolved in years.  But HHS's status reports say only how many appeals are backlogged, not the length they have been backlogged.

The one data point HHS provides is concerning.  HHS touts that of the projected 19,802 backlogged appeals, 98.8% were received after the Court's mandamus order.  Allen Decl. ¶ 4. That statistic means that there are *237* appeals that have been pending for *nearly four years or more*.  How many other of the 19,802 appeals in the backlog are mired in similar years-long delay?  We don't know.

HHS likewise does not give any indication of the amounts of money tied up in backlogged appeals, making it difficult for the Court to weigh the impact on providers from the backlog.  In fact, HHS cannot even tell the Court the exact number of cases *in* the backlog because it does not reliably track tolling events that can keep an appeal from being backlogged. *See* Allen Decl. ¶ 4.

HHS is also incorrect that the public interest favors modification.  *See* Mot. 19-20. "There is generally no public interest in the perpetuation of unlawful agency action," and "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.' "  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  Nor has HHS identified any harm to the public from the agency having to continue to work to reduce backlogged appeals.  Instead, HHS has just decided to give up.  *See* Mot. 20 (arguing that "the public interest . . . weighs strongly against applying the current version of the mandamus order to hold the agency to a standard that it has now determined it cannot meet").

Last, HHS is wrong that it has pursued modification promptly and in good faith.  *See* Mot. 21; *see also Salazar v. District of Columbia*, 729 F. Supp. 2d 257, 260 (D.D.C. 2010) (a

party seeking modification under Rule 60(b)(5) "must do so 'within a reasonable time' ") (quoting Fed. R. Civ. P. 60(c)(1)).  HHS does not suggest that big-box appeals or unusually complex appeals are a recent phenomenon, and HHS does not explain why it did not raise its supposed inability to comply with the court's order sooner.  Surely HHS did not think a projected deficit of 12,000 appeals could be made up in one month.  In fact, *Plaintiffs* were able to identify a slowdown in HHS's clearing of the backlog nearly three months ago that was troubling enough that their counsel asked HHS to let Plaintiffs know if it appeared that HHS would miss the Court's final deadline.  Marotta Decl. Ex. A.  But HHS did not contact Plaintiffs' counsel until early September with a modification proposal and demanded a response by the end of the day, suggesting that HHS's consultation was a formality.  Marotta Decl. Ex. B.  And that is a perception HHS confirmed by filing for modification immediately after its counsel rejected Plaintiffs' more-limited proposal without a counter.  *See id.*  HHS's goal is to rid itself of what it views as bothersome court oversight, not to work collaboratively with Plaintiffs to eliminate the backlog.

### C.    **HHS Has Not Shown Its Proposed Modification Is Tailored To The Difficulties It Has Identified.**

HHS has not carried its burden to show that its "proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.  Although HHS stresses that it seeks only a "limited" and "targeted modification," Mot. 20-21, there is little-to-no fit between the problems HHS identifies and its fixes.

HHS's proposal that it reduce the backlog by 98% by the end of the second quarter of Fiscal Year 2023 means that the agency will be allowed leave over 8,500 appeals in the backlog and still have complied with the Court's order.  But HHS never explains where its 8,500-appeal number comes from.  HHS says there are only 433 backlogged big-box appeals, Allen Decl. ¶ 7,

far fewer than 8,500.  And HHS does not give any figures on how many backlogged appeals it

deems "unusually complex" or how many backlogged appeals are caused by ALJ illness, transfer

to another agency, or retirement.  *See id.*  A tailored remedy would be limited to these distinct

categories of supposedly time-consuming appeals, but it appears that HHS has picked its 8,500-

appeal number out of thin air.

HHS also does not explain why its proposal completely relieves it from compliance once

it clears 98% of the backlog.  If HHS is unable to resolve substantially all appeals within 90

days, then the agency ought to remain under Court supervision so that the Court can ensure that

HHS does not backslide on its existing commitments to limit appeal receipts and resolve

backlogged appeals as promptly as possible.  HHS should not be allowed to walk away from

judicial oversight while providers have thousands of claims denied the 90-day resolution that

Congress promised them.

## III.   THE COURT SHOULD ALLOW HHS A MODEST EXTENSION TO CLEAR THE BACKLOG BUT IMPOSE ENHANCED REPORTING MEASURES TO ENSURE THOSE DEADLINES ARE MET.

The Court would be justified in denying HHS's motion and leaving it there.  But

Plaintiffs accept that OMHA is not going to eliminate the backlog by the end of next week and

that some new plan is needed.

Plaintiffs propose that HHS be given until the end of the third quarter of Fiscal Year 2023

to eliminate substantially all of the backlog.  Along the way, HHS should achieve a 96%

reduction by the end of Fiscal Year 2022 and a 98% reduction by the end of the second quarter

of Fiscal Year 2023.  These are the same interim milestones that HHS has set for itself.  *See* Mot.

20-21.  Plaintiffs' proposal only differs in that it requires HHS to finally eliminate the backlog,

thereby fulfilling the original goals of the Court's mandamus order and the law that Congress wrote.

The Court also should impose enhanced reporting measures on HHS to ensure that these revised interim deadlines are met and that the Court and Plaintiffs have the information necessary to evaluate the status of the backlog. To that end, the Court should require HHS to file monthly, not quarterly, status reports. The Court should also require that HHS's future status reports include, in addition to the information contained in past status reports, (1) the number of appeals subject to tolling events; (2) the number of big-box appeals; (3) the aggregate amount in controversy in the remaining backlogged appeals; and (4) the 25th percentile, median, and 75th percentile age of backlogged cases.

Finally, the Court should direct that if HHS projects it will not meet any of the deadlines in the order, it must meet and confer with Plaintiffs 45 days before the deadline. An early meet-and-confer requirement will allow the parties and the Court to avoid the eve-of-filing ultimatum that HHS delivered here.

## CONCLUSION

For the foregoing reasons, HHS's motion should be denied and Plaintiffs' alternative order should be adopted.

Respectfully submitted,

/s/ Sean Marotta
Sean Marotta (D.C. Bar No. 1006494)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-4881
sean.marotta@hoganlovells.com

*Attorney for Plaintiffs*

Dated: September 23, 2022.

## CERTIFICATE OF SERVICE

I certify that on September 23, 2022, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all counsel, who are registered users.

<u>/s/ Sean Marotta</u>