**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN HOSPITAL ASSOCIATION, *et al.*,<br><br>       Plaintiffs,<br><br>       v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services,<br><br>       Defendant. | No. 1:14-cv-00851-JEB |

**<u>DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR MODIFICATION OF THE MANDAMUS ORDER</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

DISCUSSION ........................................................................................................2

I.      Ordinary Principles of Equity Apply to the Modification Request. ................................... 2

II.     The Objective of the Mandamus Order Has Been Achieved............................................. 4

III.    The Mandamus Order Is Unworkable and Contrary to the Public Interest. ...................... 7

IV.     All of the Equities Weigh in Favor of Modification of the Mandamus Order. .................. 9

V.      The Court Should Reject Plaintiffs' Alternative Proposal................................................ 16

CONCLUSION......................................................................................................18

# TABLE OF AUTHORITIES

**Cases:**                                                                                         **Page**

*Akins v. Islamic Republic of Iran,*
   549 F. Supp. 3d 104 (D.D.C. 2021) ............................................................................. 3

*Am. Council of the Blind v. Mnuchin,*
   878 F.3d 360 (D.C. Cir. 2017) .................................................................................... 3

*Am. Hosp. Ass'n v. Azar,*
   No. 1:14-cv-00851-JEB, 2018 WL 5723141 (D.D.C. Nov. 1, 2018) ........................... 4, 9, 14

*Am. Hosp. Ass'n v. Burwell,*
   812 F.3d 183 (D.C. Cir. 2016) .......................................................................... 8, 9, 11, 14

*Am. Hosp. Ass'n v. Burwell,*
   209 F. Supp. 3d 221 (D.D.C. 2016) ............................................................................. 9

*Am. Hosp. Ass'n v. Price,* 867 F.3d,
   867 F.3d 160 (D.C. Cir. 2017) .................................................................................... 10

*DeFoe v. Town of Rutherfordton,*
   122 F.2d 342 (4th Cir. 1941) ...................................................................................... 3

*Horne v. Flores,*
   557 U.S. 433 (2009) ........................................................................................... 3, 4, 6

*Keepseagle v. Vilsack,*
   118 F. Supp. 3d 98 (D.D.C. 2015) ............................................................................. 3

*Lewis v. Casey,*
   518 U.S. 343 (1996) ................................................................................................. 7

*North Miami v. Meredith,*
   121 F.2d 279 (5th Cir. 1941) ...................................................................................... 3

*Rufo v. Inmates of Suffolk County Jail,*
   502 U.S. 367 (1992) ................................................................................................. 4

*Salazar by Salazar v. D.C.,*
   896 F.3d 489 (D.C. Cir. 2018) ......................................................................... 7, 15, 17

*Twelve John Does v. D.C.,*
   841 F.2d 1133 (D.C. Cir. 1988) ................................................................................. 3

**Statutes:**

42 U.S.C. § 1395u ........................................................................................................ 6

42 U.S.C. § 1395w-22 ............................................................................................. 8

42 U.S.C. § 1395ff ............................................................................................. 5, 11

42 U.S.C. § 1395ddd ......................................................................................... 6, 10

**Rules:**

Fed. R. Civ. P. 60 ........................................................................................... 2, 3, 9

**Regulations:**

42 C.F.R. § 405.371 ............................................................................................... 6

42 C.F.R. § 405.922 ............................................................................................... 6

42 C.F.R. § 405.1006 ........................................................................................... 17

42 C.F.R. § 405.1200 ............................................................................................. 8

42 C.F.R. § 405.1204 ............................................................................................. 8

42 C.F.R. § 422.562 ............................................................................................... 8

42 C.F.R. § 422.566 ............................................................................................... 8

42 C.F.R. § 422.622 ............................................................................................... 8

42 C.F.R. § 422.626 ............................................................................................... 8

42 C.F.R. § 423.566 ............................................................................................... 7

42 C.F.R. § 423.2016 ............................................................................................. 7

87 Fed. Reg. 37,338 (June 22, 2022) .................................................................... 5

## OTHER AUTHORITIES

11 MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2863
   (3d ed. Apr. 2022 update) .................................................................................. 3

Alia Paavola, *7 health systems reported profits over $1B in 2021*,
   Becker's Hospital Review (Mar. 4, 2022) .......................................................... 6

Office of the Ass't Sec'y for Fin'l Resources, HHS, *Interest Rates on Overdue
   and Delinquent Debts,*
   hhs.gov/about/agencies/asfr/finance/financial-policy-library/interest-rates/index.html ............ 6

## INTRODUCTION

In addressing Defendant's motion for modification—which concerns the overwhelmingly successful efforts of the Department of Health and Human Services (HHS) to reduce a backlog of hundreds of thousands of Medicare appeals—it perhaps would be easy to become lost in a blizzard of numbers and statistics.  As of 2018, the number of appeals pending at the ALJ level of review was projected to reach 426,594 appeals.  The agency reduced that number of appeals by 31% in the first year of this Court's mandamus order, by 61% in the second year, and by more than 85% in the third year.  More recently, there were (at most) 19,802 appeals that remained pending in the backlog at the end of the third quarter of fiscal year 2022, a reduction of more than 95% over the past four years, and the agency expects that the backlog will be reduced by a total of 98% six months from now.  And so on.

There is one piece of data in particular, however, that should bring this case into perspective.  Of the appeals remaining in the backlog, only about **320** appeals are inpatient hospital appeals.  Given that there are approximately six thousand hospitals that participate in the Medicare program, this means that the vast majority of hospitals do not have a single backlogged inpatient appeal that remains pending before the agency's ALJs.  To put it another way, on average, one out of every nineteen hospitals has one backlogged inpatient appeal pending at the ALJ level, and the other eighteen have none.

This should decisively belie any claim that Plaintiffs might make that they suffer any significant harm from what remains of the backlog.  And, in fact, they make no such claim. Instead, they recite generally that their finances are in a poor condition, and it might help if they prevailed more frequently in their Medicare appeals.  But they do not claim that the small remnant of the OMHA backlog is the source of any financial difficulties that any hospital is suffering.  To

the contrary, Plaintiffs' claimed injuries arose from systemic deficiencies in the Medicare appeal system, and those systemic deficiencies have been resolved.  In short, the purpose of the mandamus order has been achieved, and further enforcement of it is not needed.

And indeed, continued enforcement of that order would by harmful to the public interest. Plaintiffs propose that the mandamus order should continue to be enforced until such time as the backlog is completely eliminated.  In response to the agency's explanation that it could not ever guarantee that this goal would be reached, Plaintiffs blithely suggest that the agency could comply with the mandamus order simply by moving Medicare beneficiary appeals to the back of the line. Such an approach would endanger the health, safety, and financial security of Medicare beneficiaries.  OMHA currently gives priority to beneficiary appeals that raise issues such as the denial of coverage of a prescribed drug under Part D, discharge of a Part C enrollee from an inpatient hospital, or the termination of skilled nursing and therapy services for a Part C enrollee in a skilled nursing facility.  In these instances, a beneficiary's health, or even his or her life, could be at stake if he or she does not receive a timely decision on the appeal.  Plaintiffs' suggestion that this Court should ignore the needs of Medicare beneficiaries—so as to accomplish nothing more than an improvement to the odds that the average hospital would receive an earlier decision on its one remaining backlogged appeal, if it has one—is both callous and unwarranted by the law.

The equities, then, weigh heavily against the continued enforcement of the mandamus order under its current terms, and HHS respectfully requests the modification of that order.

## DISCUSSION

## I.     Ordinary Principles of Equity Apply to the Modification Request.

Contrary to Plaintiffs' assertion, this Court may relieve HHS from the mandamus order if "applying [that order] prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  The federal

courts take a "flexible" approach to requests for modification under Rule 60(b)(5) in cases, such as this one, involving institutional reform decrees that "reach beyond the parties involved directly in the suit." *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 368 (D.C. Cir. 2017). This flexible approach requires the Court to determine whether the objective of the original order "has been achieved." *Horne v. Flores*, 557 U.S. 433, 450 (2009). "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id*.

Plaintiffs suggest that Rule 60(b)(5), and the flexible approach to that rule dictated by *Horne v. Flores*, could apply only to an order of injunctive relief, not to an order of mandamus. Pls.' Opp'n to Def.'s Mot. to Modify This Court's Mandamus Order at 12, ECF No. 111 ("Opp'n"). This is incorrect.[1] Rule 60(b)(5) "is not confined to [injunctive] relief, nor even to relief that historically would have been granted in courts of equity. … Instead it applies to any judgment that has prospective effect." 11 MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2863 (3d ed. Apr. 2022 update). For this purpose, an order has "prospective effect" if "it is executory or involves the supervision of changing conduct or conditions." *Twelve John Does v. D.C.*, 841 F.2d 1133, 1139 (D.C. Cir. 1988); *see also Akins v. Islamic Republic of Iran*, 549 F. Supp. 3d 104, 112 (D.D.C. 2021); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 123–24 (D.D.C. 2015). Under the mandamus order, HHS has been subject to this Court's continuing supervision of the agency's efforts to reduce the backlog. That order thus plainly has prospective effect, and Rule 60(b)(5) governs the agency's request for modification of that order.

---

[1] The sole case that Plaintiffs cite for this proposition predated the 1948 adoption of Rule 60(b)(5), and that case applied the then-prevailing standards for modification of an order of mandamus under North Carolina state law, not federal law. *See* Opp'n at 12 (quoting *DeFoe v. Town of Rutherfordton*, 122 F.2d 342, 345 (4th Cir. 1941)). Federal law at that time provided, as it does now, that an order of mandamus may "be enforced, modified or postponed as justice may require." *North Miami v. Meredith*, 121 F.2d 279, 282 (5th Cir. 1941).

Plaintiffs also suggest that, when this Court entered its mandamus order, it "laid out [a] standard for modification" under which the order could be revised only if lawful compliance were to become impossible.  Opp'n at 8.  This Court did not rip the steering wheel out of the moving car in the way that Plaintiffs suggest.  The Court did explain that, "[s]hould a change in circumstances—not limited to an appropriations shortfall—render lawful compliance with the order impossible, … Defendant can return and request modification at that time."  *Am. Hosp. Ass'n v. Azar*, No. 1:14-cv-00851-JEB, 2018 WL 5723141, at *3 (D.D.C. Nov. 1, 2018) (*AHA VI*).  But this Court did not hold in advance that those were the *only* circumstances that could warrant relief under Rule 60 (nor would it be within the authority of a federal court to override the Federal Rules in such a way).  To the contrary, this Court cited *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), which confirms that modification is appropriate when an order "proves to be unworkable because of unforeseen obstacles," or when "enforcement of the decree without modification would be detrimental to the public interest."  *Id.* at 384.  (In any event, for the reasons that we have explained in our opening memorandum, it would be impossible to guarantee the complete elimination of the backlog, and so modification of the mandamus order is warranted even under Plaintiffs' proposed standard.)

To sum up, under the principles of equity, the mandamus order should be modified if its original purpose has been achieved, *Horne*, 557 U.S. at 450; if its enforcement would be contrary to the public interest, *Rufo*, 502 U.S. at 384; or if it has proven to be unworkable, *id*.  If any one of these standards applies, the order should be modified.  All three circumstances are present here.

## II.  The Objective of the Mandamus Order Has Been Achieved.

Instead of meaningfully addressing the numerous ways our opening brief showed that the objective of the mandamus order has been achieved, *see* Def.'s Mot. for Modification of the

Mandamus Order at 14-19, ECF No. 110 ("Def.'s Mot."), Plaintiffs focus primarily on one issue: they claim that hospitals suffer continuing harm from what remains of the backlog.  But the facts belie that claim.  As of the end of the third quarter of fiscal year 2022 (*i.e.*, June 30, 2022), there were, at most, 19,802 Medicare Part A and Part B appeals pending before the Office of Medicare Hearings and Appeals that were subject to, but had not been decided within, the 90-day time frame set forth in 42 U.S.C. § 1395ff(d)(1)(A).  Medicare Appeals Dashboard, Reporting Period Through Quarter 3 of FY 2022, ECF No. 112-1; *see also* Declaration of McArthur Allen ¶ 4, ECF No. 110-1.[2]  As of the end of August of this year, only about 450 of those appeals were coded as inpatient hospital appeals.  *Id.*  That number has been whittled down even further, and as of the end of September 2022, only approximately 321 inpatient hospital appeals remain pending in the backlog.  Supplemental Declaration of McArthur Allen ¶ 6.

To put these statistics into context, about 6,000 hospitals participate in Medicare.  *See* 87 Fed. Reg. 37,338, 37,339 (June 22, 2022).  This means that, out of any given group of nineteen hospitals, on average, eighteen out of those nineteen hospitals have *no inpatient appeals* pending in the backlog, and the nineteenth hospital has *one*.  Plaintiffs brought this action to address "[l]engthy, systemic delays in the Medicare appeals process" that they contended were "causing severe harm" to hospitals.  Compl. at 1-2, ECF No. 1.  Those systemic deficiencies no longer exist; the vast majority of hospitals are no longer subject to the backlog at all with respect to their inpatient claims.  Indeed, some providers are beginning to object to OMHA that its ALJs are moving *too quickly* in scheduling hearings, and these providers are increasingly requesting to

---

[2]  Although OMHA does not yet have final data for the last quarter of fiscal year 2022, its review of the available data indicates that it has further succeeded in reducing the backlog after June 30, and it projects that there are now 12,289 appeals pending in the backlog, a reduction of more than 97% in the backlog as measured against the number of appeals projected to be pending in 2018.  Supp'l Allen Decl. ¶ 5.

reschedule hearings outside of the 90-day window.  Supp'l Allen Decl. ¶ 4.  In short, the objective of the mandamus order "has been achieved," *Horne*, 557 U.S. at 450, and thus there is no need for its continued enforcement in its current form.

Plaintiffs protest that hospitals "need every dollar they can get," given their precarious financial positions.  Opp'n at 18.  Whatever else might be said about the state of hospital finances—*but cf.* Alia Paavola, *7 health systems reported profits over $1B in 2021*, Becker's Hospital Review (Mar. 4, 2022)—it is apparent that the OMHA backlog is not the cause of any financial difficulties that hospitals might now be facing.  In fact, providers are ordinarily paid in advance on their Medicare claims, *see* 42 U.S.C. § 1395u(c)(2), 42 C.F.R. § 405.922, subject to recoupment if a contractor later determines that the provider is not entitled to payment, *see* 42 U.S.C. § 1395ddd; 42 C.F.R. § 405.371(a)(3).  If funds are recouped early in the process and the provider later prevails on appeal before OMHA, then the provider will recover interest on the amount of the claim that is allowed.  *See* 42 U.S.C. § 1395ddd(f)(2)(B).[3]

Given that hospitals will be made whole if they prevail in their appeals, Plaintiffs' claim has never been that they would be harmed by a delay in any one individual appeal.  Instead, their claim has been that systemic deficiencies in the appeal process had delayed so many of their appeals, and had tied up so much of their funds, that their overall financial standing had been impaired to the point that they were unable to provide certain forms of care.  *See* Def.'s Mot. at 18 ("Def.'s Mot.") (describing Plaintiffs' claims).  These systemic deficiencies no longer exist. Plaintiffs cannot plausibly argue that the mandamus order must continue on its current terms merely because a small fraction of hospitals experience a delay in the adjudication of, on average,

---

[3] The current rate of interest is 8.75%.  Office of the Ass't Sec'y for Fin'l Resources, HHS, *Interest Rates on Overdue and Delinquent Debts,* www.hhs.gov/about/agencies/asfr/finance/financial-policy-library/interest-rates/index.html.

one of their inpatient appeals.  An ongoing order of "structural relief" cannot lie, after all, "simply because a problem has not been 100% eradicated."  *Salazar by Salazar v. D.C.*, 896 F.3d 489, 500 (D.C. Cir. 2018); *see also Lewis v. Casey*, 518 U.S. 343, 349 (1996).

## III.  The Mandamus Order Is Unworkable and Contrary to the Public Interest.

Our opening memorandum explained the reasons that the agency will be unable to eliminate the backlog completely by the end of fiscal year 2022, as well as the reasons that the backlog could not ever be completely eliminated.  *See* Def.'s Mot. at 9-13.  Plaintiffs discount this explanation, asserting that "there is at least one step we know HHS *can* take:  It can redeploy the resources it has committed to determining beneficiary-initiated Medicare Part C and D appeals in 90 days."  Opp'n at 10 (emphasis in original).  In other words, Plaintiffs propose that beneficiary appeals be put to the back of the line until the backlog has been completely eliminated for the one-out-of-every-nineteen hospitals that still experiences a delay in a single inpatient appeal, as described above.  This proposal would not meaningfully benefit hospitals in any way, but would be devastating for the health, safety, and financial positions of Medicare beneficiaries.  Consider the following three examples:

First, OMHA decides appeals brought by Medicare beneficiaries of decisions by Part D plan sponsors not to provide or pay for a covered drug.  *See* Allen Decl. ¶ 3; *see also* 42 C.F.R. §§ 423.566(b), 423.2016(b)(5)(i).  No statute requires that these appeals be decided in a particular time frame, but the agency has chosen to provide for expedition of these appeals where the "standard timeframe for making a decision may seriously jeopardize the enrollee's life, health or ability to regain maximum function."  42 C.F.R. § 423.2016(b)(1).  Under Plaintiffs' proposed approach, this jeopardy to a Part D beneficiary's life and health from the denial of coverage for a needed drug would not be resolved until such time as every last backlogged hospital appeal is

decided.  The "real impact on human health and welfare," *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 193 (D.C. Cir. 2016) (*AHA II*), that would result from this approach counsels heavily in favor of modification of the mandamus order.

Second, OMHA decides appeals brought by Medicare Part C enrollees, but there are no statutory or regulatory decision-making timeframes for Part C appeals at this level of appeal.  *See* 42 C.F.R. § 422.562(d).  Appeals by Part C enrollees may challenge certain denials of services or reductions, or premature discontinuations, of previously authorized ongoing courses of treatment, which can include a decision to discharge the patient from a hospital.  42 C.F.R. §§ 422.566, 422.622(g).  OMHA expedites appeals of hospital discharge determinations, *see* Allen Decl. ¶ 3, but under Plaintiffs' proposal, it could no longer do so until the backlog of hospital appeals is completely cleared.  This would leave Medicare beneficiaries who believe that they are incorrectly being discharged from a hospital without meaningful recourse.

Third, Medicare beneficiaries, including Medicare Part C enrollees, may appeal certain decisions to terminate skilled nursing and therapy services provided by a home health agency, skilled nursing facility, or certain rehabilitation facilities to OMHA's ALJs.  *See* 42 U.S.C. § 1395w-22(g)(5), 42 C.F.R. §§ 405.1200-1204, 422.626.  Given the obvious time sensitivity of such decisions, OMHA also provides expedition for this category of beneficiary appeals.  *See* Allen Decl. ¶ 3.  Plaintiffs would send these appeals as well to the end of the queue, leaving Medicare beneficiaries without timely recourse if they believe they are being denied coverage for needed care.

Plaintiffs begrudgingly acknowledge that it might be an "admirable goal" for the agency to give priority to these beneficiary appeals, but they contend that this non-statutory goal must always give way until the statutory deadline for provider appeals is fully met.  Opp'n at 10.  This

is not the law.  The potential of the mandamus order to infringe "on the authority and discretion of the executive branch," *AHA II*, 812 F.3d at 192, is the first consideration that the D.C. Circuit identified in weighing the equities in this case.  HHS has appropriately exercised its discretion to give priority to appeals by Medicare beneficiaries.  Given the obvious potential for jeopardy to the health and safety of Medicare beneficiaries under Plaintiffs' suggested approach, this Court should conclude that applying the mandamus order prospectively "is no longer equitable," Fed. R. Civ. P. 60(b)(5), and should grant the request for modification.

## IV.    All of the Equities Weigh in Favor of Modification of the Mandamus Order.

Given the foregoing, the balance of the equities weighs strongly in favor of granting the requested modification to the mandamus order.  Plaintiffs no longer suffer any identifiable harm from the backlog.  Despite their inability to articulate any need for further relief, Plaintiffs propose a course of action that would effectively endanger the health and safety of Medicare beneficiaries who need prompt determinations of their entitlement to coverage for prescription drugs, inpatient hospital stays, or rehabilitation services.  That is reason enough to modify the order.  But a review of the equitable factors previously identified by this Court and the D.C. Circuit serves to confirm this point.  *See* Def.'s Mot. at 14-19; *see also AHA II*, 812 F.3d at 192-93; *Am. Hosp. Ass'n v. Burwell*, 209 F. Supp. 3d 221, 226-27 (D.D.C. 2016) (*AHA III*); *AHA VI*, 2018 WL 5723141, at *4.

1.   The infringement on the authority and discretion of the executive branch.  As noted above, HHS has exercised its discretion to give priority to Medicare beneficiary appeals, even in the absence of a statutory requirement that it do so.  The continued enforcement of the mandamus order under its current terms would interfere with the agency's discretion on this score.

The continued enforcement of the mandamus order would interfere with the agency's authority and discretion in a second way. The agency could not completely eliminate the backlog unless it settled, or stipulated to pay, every appeal still pending on its 90th day. *See* Def.'s Mot. at 15-16. Plaintiffs express doubt why this would be so. *See* Opp'n at 10 (dismissing as a "bugaboo" HHS's legal obligation under 42 U.S.C. § 1395ddd to protect the Medicare Trust Funds from waste, fraud and abuse). But the point logically follows from HHS's demonstration that certain appeals will inevitably still be pending before OMHA beyond 90 days, *see* Def.'s Mot. at 10-13; Allen Decl. ¶ 7. There is no way to guarantee the removal of a claim that is still pending before an ALJ after 90 days, other than to pay that claim. Such a "sweeten[ing of] the pot," as Plaintiffs propose, Opp'n at 11, would both violate the agency's fiduciary responsibilities, *see Am. Hosp. Ass'n v. Price*, 867 F.3d 867 F.3d 160, 167 (D.C. Cir. 2017) (*AHA V*), and lead to a renewed backlog created by a rush of providers seeking their share of that pot.

Plaintiffs suggest that HHS could "redouble" its efforts under the Settlement Conference Facilitation ("SCF") program. Opp'n at 11. That program has, indeed, played a key role in HHS's efforts to reduce the backlog to a small fraction of what it once was; the program succeeded in removing over 98,000 appeals from the backlog over the last several years. Supp'l Allen Decl. ¶ 3. The SCF program no longer has a meaningful impact on the backlog, however. Given the reduction in the backlog and resulting reduction in appeals processing time, providers are no longer requesting to participate in SCF like they were several years ago. *Id.* Indeed, there are <u>no</u> pending requests from providers to participate in the program; only 48 providers filed requests in 2021; and the most recent SCF request that resulted in a settlement was filed in February 2022. *Id.* The agency attempted to reach out to providers at the end of 2021 to encourage greater participation in the SCF program, but only two providers expressed interest and submitted SCF requests. *Id.* In

short, the agency already "has turned over every potential stone" related to the role that settlements can play in the backlog, Opp'n at 11, and the SCF program is no longer a meaningful factor for the relatively small number of appeals that remain in the backlog.

2.  <u>Congress's awareness of and attention to the situation</u>.  Congress has paid close attention to the backlog, and it has appropriated sufficient funds for fiscal year 2018 and for each year thereafter to permit OMHA to reduce the backlog to a fraction of its former size.  *See* Def.'s Mot. at 16-17.  The excess adjudication capacity supported by this appropriation has enabled the agency to reduce the backlog by 98% by the end of the second quarter of 2022, and to further reduce the backlog beyond that date.  Supp'l Allen Decl. ¶ 7.  In short, Congress's "significant progress toward a solution," *AHA II*, 812 F.3d at 193, weighs strongly in favor of modification of the mandamus order.  The order on its current terms is no longer necessary, given what Plaintiffs acknowledge to be Congress's "steadfast commitment to reducing the backlog."  Opp'n at 17.

3.  <u>The availability of escalation as a remedy</u>.  As the Court is no doubt aware, an appellant whose appeal remains pending before an ALJ for longer than 90 days may escalate its appeal to the fourth level of administrative review.  42 U.S.C. § 1395ff(d)(3)(A).  Although the D.C. Circuit discounted the adequacy of escalation as an alternative remedy under the "systemic failure" that existed in 2016, *see AHA II*, 812 F.3d at 192, those conditions no longer exist.  Now that the normal functioning of the appeals system has been restored, delays may continue to occur in individual cases, in the same manner that delays occasionally arose from some appeals before the backlog began to develop in 2012.  *See* Allen Decl. ¶ 10.  But these occasional delays do not defeat the adequacy of the escalation remedy, which Congress specified to be the "[c]onsequence" of a failure to meet the adjudication deadline.  42 U.S.C. § 1395ff(d)(3)(A).  Plaintiffs protest that some providers may not wish to exercise the option of escalation for big-box appeals or appeals

11

presenting novel or complex evidentiary issues.  Opp'n at 17.  But the choice always remains with the provider; no provider is required to escalate their appeal if it prefers to continue before an ALJ, and in the meantime, as stated above, it is protected by a statutory entitlement to interest if its funds have been recouped and it later prevails before an ALJ.  *See supra*, p. 6.

    4.  <u>The agency's good faith efforts</u>.  The agency has made good faith efforts to reduce the backlog, and indeed those efforts have been so successful that it reduced the backlog even more quickly than it had projected over the first three years that this Court's mandamus order has been in effect.  Allen Decl. ¶ 3.  The agency projects that its efforts will lead to further reductions in the backlog, leading to a 98% reduction in the backlog (as measured against the number of pending appeals projected in 2018) by the end of the second quarter of fiscal year 2023.  *Id.* ¶ 9.  The agency will not "throw[] in the towel" at that point, Opp'n at 1; to the contrary, it remains committed to reducing the backlog.  *See* Supp'l Allen Decl. ¶ 7.

    Although the agency experienced a recent slowdown in the rate of appeal dispositions over the course of fiscal year 2022, this recent trend is not due to any bad faith on the agency's part.  Instead, the rate at which appellants withdraw appeals, or at which ALJs dismiss appeals, dropped to a greater extent than was anticipated over the course of the past year.  Allen Decl. ¶ 7.  The agency had previously expected that the withdrawal rate would increase as OMHA worked through the backlog and started assigning appeals, and it did increase to 50.5% in FY 2020 and 60.4% in FY 2021.  But the decline in the withdrawal and dismissal rate in FY 2022 was more rapid than projected, and this decline is reflected in the disposition rate, which has been lower than expected during this fiscal year.  The change in the rate of withdrawals and dismissals of appeals also affected the overall workload of ALJs because a greater-than-expected percentage of the cases that

remained pending required a greater portion of an ALJ's time prior to disposition.  Allen Decl. ¶ 7.

Nonetheless, even with this unexpected development, the backlog has continued to decrease.

Plaintiffs suggest that OMHA could further increase its adjudication capacity by adopting

new measures, such as ordering ALJs to work overtime.  Opp'n at 9.  But budgetary constraints

prevent OMHA from paying a higher rate for overtime (which would result in fewer appeals being

decided, not more) and the Anti-Deficiency Act precludes the agency from extending an ALJ's

working hours without additional pay.  Supp'l Allen Decl. ¶ 10.  OMHA has already committed

its available appropriations to staff its existing adjudication teams; including staff with expertise

to address especially complex cases.  *Id.*  OMHA has allocated its resources in a way that allows

it to achieve the maximum efficiencies it believes can be achieved, and its efforts have allowed it

to reduce the size of the backlog to only a tiny fraction of what it was four years ago.  *Id.*  There is

no reason to doubt that OMHA is internally allocating its funds and its resources in the way that it

best sees fit to allow for appeals to be decided efficiently.

Plaintiffs also propose that the agency could explore some methods to reduce the rate of

appeals that come in to OMHA.  Opp'n at 9.  But, as Plaintiffs themselves concede, the rate of

incoming appeals is in keeping with, or even running below, historical trends.  *See* Opp'n at 13-

14 (citing Medicare Appeals Dashboard, Reporting Period Through Quarter 2 of FY 2022, ECF

No. 107-1).  The rate of incoming appeals is not causing a surge in the backlog anymore, and there

is no reason to search for new measures to divert appeals way from OMHA.  Plaintiffs also propose

that new categories of claims could be directed to Quality Improvement Organizations (QIOs).

Opp'n at 9.  Plaintiffs have raised this suggestion before, and the agency has already explained

that it is not operationally feasible to shift new categories of claims to QIO review.  *See* Declaration

of Jeneen Iwugo, ¶¶ 6-8, ECF No. 86-6.

In sum, the agency has operated in good faith, using the tools at its disposal, to reduce the backlog of appeals pending before OMHA.  Its efforts have been extraordinarily successful, as it anticipates a 98% reduction in the size of the backlog by the end of the second quarter of the coming fiscal year.  The agency's overwhelming success weighs strongly in favor of modification of the mandamus order.

5.  <u>The effect on human health and welfare</u>.  As we have explained above, Plaintiffs no longer suffer any meaningful injury from the backlog.  The vast majority of hospitals that participate in the Medicare program do not have any inpatient appeals pending in the backlog, and on average only one out of nineteen hospitals has one such appeal pending.  *See supra*, p. 5.  There is no longer any basis to conclude, as the D.C. Circuit and this Court previously reasoned, that delays in ALJ adjudications pose a threat to "hospitals' willingness and ability to provide care." *AHA II*, 812 F.3d at 193; *see also AHA VI*, 2018 WL 5723141, at *3.  Tellingly, Plaintiffs do not even attempt to dispute this point.

To the contrary, as discussed above, Plaintiffs' proposal to continue the enforcement of the mandamus order would pose a threat to health and welfare.  Plaintiffs rather cavalierly suggest that their own appeals should take priority over those of Medicare Part C and D beneficiaries, but for the reasons already explained, the health and safety of Medicare beneficiaries may directly be at stake if they do not receive timely decisions on appeals involving matters such as coverage for prescribed drugs or discharges from inpatient hospital stays.  *See supra*, pp. 7-8.  The risk to human health and welfare that would arise from Plaintiffs' proposed approach weighs strongly in favor of modification.

6.  <u>The agency's discretion with respect to the RAC program</u>.  Our opening memorandum explained that RAC-related appeals no longer play a meaningful role in the backlog; these appeals

now account for a small fraction of OMHA's incoming appeals. *See* Medicare Appeals Dashboard. Plaintiffs recognize this point, but they speculate that "the mandamus order is what keeps HHS focused on limiting new appeals from the RAC program," and the agency "could let the RACs loose on providers once more." Opp'n at 19. To the contrary, the agency has numerous "safeguards in place to limit the number of Medicare appeals resulting from RAC activity." Declaration of Connie Leonard, ¶ 3. These measures include a requirement that all RAC reviews be conditionally reviewed by the Centers for Medicare & Medicaid Services; a limit on the number of reviews a RAC can perform; incentives in the Statement of Work designed to discourage RACs from pursuing claims that would be overturned on appeal; requirements that RACs review different types of claims susceptible to high error rates; and monitoring of RAC appeals to ensure that there is not a new surge of appeals arising from RAC reviews. *Id*. In any event, Plaintiffs may not demand continuation of the mandamus order simply by speculating that they have "no assurance that already-solved problems would not arise again." *Salazar*, 896 F.3d at 501 (internal quotation and alterations omitted). "That gets Rule 60(b) exactly backwards." *Id*.

In sum, the mandamus order has achieved its purpose, and there is no longer any reason to believe that Plaintiffs suffer harm to any meaningful extent from the backlog. The continued enforcement of the mandamus order would be contrary to the public interest, in no small part because Plaintiffs' proposal to push Medicare beneficiaries to the back of the line would create a genuine danger to the health and safety of those beneficiaries. And a broader review of the equitable factors that initially led to the issuance of the mandamus order reveals that all of those factors now counsel in favor of modification. The agency's request for modification should be granted.

**V.      The Court Should Reject Plaintiffs' Alternative Proposal.**

HHS has proposed modification of the order to provide that the agency achieve a 96% reduction in the backlog of Medicare appeals by the end of fiscal year 2022, and a 98% reduction in that backlog by the end of the second quarter of fiscal year 2023.  Plaintiffs concede that these adjustments are warranted.  Opp'n at 22.

The parties differ as to next steps.  For the reasons that the agency has explained, once it reaches these two benchmarks, and the backlog is even smaller than it is now, it would be appropriate for the Court to conclude that HHS has substantially complied with the order and to relieve the agency from further judicial supervision.  Plaintiffs no longer suffer any meaningful harm from the backlog; the public interest would be harmed from the order's continued enforcement; and the equities weigh in favor of the conclusion of this case.  All of those points are true now (and would justify a request for immediate relief from the order, although—in an effort to demonstrate its continued good faith—HHS has not requested that relief at this time).  All of those points will counsel even more definitively in favor of vacatur of the order in six months' time.

Plaintiffs, in contrast, insist on a complete elimination of the backlog by the third quarter of fiscal year 2023.  Opp'n at 22-23.  But nowhere do they explain how such an order could be appropriate, given (1) the impossibility that the agency could guarantee that the backlog could ever be reduced to zero; (2) Plaintiffs' inability to explain how they might be harmed by the few remaining appeals in the backlog, and (3) the real danger to Medicare beneficiaries that would be posed by a standard requiring total elimination of the backlog of provider appeals.  In the absence of any showing of a continued need for the mandamus order after the second quarter of the coming fiscal year, Plaintiffs' suggestion should be rejected.

Plaintiffs also propose their own modification to the mandamus order to "impose enhanced reporting measures on HHS." *Id.* at 23. But if Plaintiffs themselves intend to ask the Court to modify its order to impose new obligations on HHS, they must file their own motion under Rule 60 and demonstrate their entitlement to relief under the rule's terms. *See Salazar*, 896 F.3d at 498. If they were to file such a motion, they would not be able to fulfill their burden "to prove the existence of a continuing and widespread problem" that warrants new relief in their favor. *Id.* at 500. For that reason alone, their alternative proposal should be rejected.

In any event, the new reporting requirements that Plaintiffs propose are not tenable. The agency has already explained that it does not have reliable data regarding how many appeals are subject to tolling events. Allen Decl. ¶ 4; *see also* Supp'l Allen Decl. ¶ 4. Accordingly, it has reported the number of appeals in the backlog including tolled appeals, and thus the true number of backlogged appeals is smaller than the data discussed in these pleadings. *See* Allen Decl. ¶ 4. Likewise, OMHA does not have reliable data on the amount in controversy for pending appeals, because the amount in controversy is a case-by-case determination made by the ALJ or attorney adjudicator, and the amount payable to the provider is calculated only after a provider receives a favorable or partially favorable decision. *See* 42 C.F.R. § 405.1006(d). The data that OMHA receives from contractors at the outset of an appeal reports only the amount that the provider billed, rather than the Medicare allowable amount; billed amounts are typically significantly higher than the Medicare allowed amount and do not account for applicable deductibles, coinsurance, or copayments. Supp'l Allen Decl. ¶ 9. Nor would it be feasible for OMHA to submit monthly status reports, given lags in data collection and the time that the agency needs to review and verify the data that is reported. *Id.* ¶ 8.

## CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that the Court modify its November 1, 2018 mandamus order.

Dated: September 30, 2022          Respectfully submitted,

                                      BRIAN M. BOYNTON
                                      Principal Deputy Assistant Attorney General

                                      JEAN LIN

Of Counsel:                        Special Litigation Counsel
                                      Federal Programs Branch

SAMUEL R. BAGENSTOS
General Counsel
JANICE L. HOFFMAN                 */s/ Joel McElvain*
Associate General Counsel            JOEL McELVAIN
SUSAN MAXSON LYONS          Senior Trial Counsel
Deputy Assistant General Counsel     United States Department of Justice
   for Litigation                   Civil Division, Federal Programs Branch
KIRSTEN FRIEDEL RODDY        1100 L Street, NW
Attorney                          Washington, DC 20005
U.S. Department of Health        Phone: (202) 616-8298
   and Human Services            Fax: (202) 616-8470
                                      E-mail: joel.l.mcelvain@usdoj.gov

                                      *Counsel for Defendant*